UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: ________
DATE FILED: 03/06/2026

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UPSOLVE, INC., and REV. JOHN UDO-OKON,

Plaintiffs,

-against-

22-cv-627 (LAK)

LETITIA JAMES, in her official capacity as
Attorney General of the State of New York,

Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM OPINION GRANTING
MOTION TO DISMISS AND ORDER**

(Title corrected)

Appearances:

Robert J. McNamara
Elizabeth (Betsy) Sanz
INSTITUTE FOR JUSTICE
*Attorneys for Plaintiffs*

Matthew J. Lawson
Assistant Attorney General
LETITIA JAMES
ATTORNEY GENERAL, STATE OF NEW YORK
*Attorney for Defendant*

LEWIS A. KAPLAN, *District Judge.*

The nonprofit Upsolve, Inc., wishes to train non-lawyers like the Rev. John Udo-Okon to provide free legal advice to consumers facing debt-collection lawsuits. But that conduct would violate New York's prohibition on the practice of law by anyone other than a licensed

attorney. The question in this case is whether Upsolve and the Rev. Udo-Okon have a First Amendment right to engage in their proposed course of conduct notwithstanding the state's licensing law. For the reasons that follow, they do not.

## ***Background***

### *I. Factual and Legal History*

#### *A. Debt Collection Lawsuits*

By some accounts, a shockingly high number of debt-collection lawsuits against consumers result in default judgments. In 2009, the Federal Trade Commission hosted a series of roundtables with attorneys, judges, consumer advocates, and other repeat players in the world of debt collection.[1] Participants in those sessions estimated that consumers sued on past-due debts fail to appear or otherwise defend themselves – and thereby lose by default – in 60 to 95 percent of cases.[2] The complaint alleges similar figures for New York, contending that debt collectors obtain default judgment roughly 70 to 90 percent of the time.[3]

Sometimes consumers default because they are not aware a lawsuit has been filed against them. Indeed, plaintiffs submitted declarations from three New Yorkers who say that is

---

1 Fed. Trade Comm'n, *Repairing a Broken System* 1 (2010), https://www.ftc.gov/sites/default/files/documents/reports/federal-trade-commission-bureau-consumer-protection-staff-report-repairing-broken-system-protecting/debtcollectionreport.pdf, *cited in* Compl. (Dkt 1) ¶ 29.

2 *Id.* at 7, *quoted in* Compl. (Dkt 1) ¶ 29.

3 Compl. (Dkt 1) ¶ 19.

exactly what happened to them.[4] But other times a consumer may default (or simply lose the case on the merits) because they lack the knowledge or resources to hire a lawyer or properly defend themselves.[5] In that regard, the complaint alleges that "[a] restricted supply of free or low-cost civil legal assistance" is "prevent[ing] low-income New Yorkers from understanding and accessing their legal rights when they are faced with debt collection actions."[6] All of this is particularly problematic, plaintiffs say, because many debt-collection lawsuits are meritless for simple reasons, such as the debt already having been paid or discharged in bankruptcy, the statute of limitations having run, or the defendant-consumer never having borrowed the money in the first place.[7]

New York has developed resources designed to assist *pro se* defendants in debt-collection actions. Specifically, the state has published a one-page, fill-in-the-blank form (the "Answer Form") that *pro se* defendants can use to submit an answer to a debt-collection complaint.[8] The form lists many common defenses. Some are self-explanatory, such as "It is not my debt" and

---

4 Decl. of William Evertsen (Dkt 7-7) ¶¶ 12-13; Decl. of Liz Jurado (Dkt 7-8) ¶ 6; Decl. of Christopher Lepre (Dkt 7-9) ¶ 9. These declarations are incorporated into the complaint at paragraph 25.

5 Compl. (Dkt 1) ¶ 47 (alleging that by many estimates more than 90 percent, and by some estimates as many as 99 percent, of debt-collection defendants are unrepresented by counsel).

6 Compl. (Dkt 1) ¶ 17.

7 *See id.* ¶¶ 21, 32.

8 *Id.* ¶ 34; Compl. Ex. A (Dkt 1-1).

"I have paid all or part of the alleged debt."[9] Others are more technical, such as "I received the Summons and Complaint, but service was not correct as required by law" and "Statute of limitations (the time has passed to sue on this debt)."[10] The form asks also whether the consumer wishes to assert any counterclaims.[11]

*B. Upsolve and the American Justice Movement*

Plaintiff Upsolve, Inc., is a New York-chartered nonprofit "with the mission of helping Americans access their civil legal rights for free."[12] The organization provides free online education on topics including debt collection defense, student loans, wage garnishment, and evictions, reaching over 150,000 people per month.[13] It provides also free resources to self-represented Chapter 7 bankruptcy filers and "invests heavily in public advocacy to raise awareness around civil rights injustices."[14]

This lawsuit involves an Upsolve initiative called the American Justice Movement ("AJM"). "AJM is a program to train and supervise 'Justice Advocates,' public-interest

---

9 Compl. Ex. A (Dkt 1-1).

10 *Id.*

11 *Id.*

12 Compl. (Dkt 1) ¶ 10.

13 *Id.*

14 *Id.*

professionals who are not lawyers, to provide free legal advice on responding to a debt collection lawsuit."[15] Through the AJM program, which would be staffed by non-lawyers,[16] Justice Advocates would provide legal advice to defendants in New York consumer debt-collection actions regarding whether they should file an answer to the complaint, what defenses they should assert in the Answer Form, and how to file and serve the completed form.[17]

Anyone wishing to become a Justice Advocate would be required to attend a virtual training session and make various promises in a "Justice Advocate's Affidavit."[18] Advocates would promise to obtain the informed consent of the client to the limited scope of the representation, advise clients only within the confines of a 12-page Justice Advocate Training Guide (the "Training Guide") provided by the AJM, and seek no compensation for their advice.[19] They would agree also to abide by the New York State Rules of Professional Conduct concerning conflicts of interest and confidentiality (Rules 1.6, 1.7, 1.8, and 1.9).[20] And they would acknowledge that they could be

---

15 *Id.* ¶ 57.

16 *Id.* ¶ 4.

17 *Id.* ¶ 62.

18 *Id.* ¶ 69; Compl. Ex. B [hereinafter "Training Guide"] (Dkt 1-2) at Ex. A.

19 Training Guide (Dkt 1-2) at Ex. A.

20 *Id.*

removed as a Justice Advocate if they were to fail to adhere to any of those promises and "may face other penalties, including under laws governing the unauthorized practice of law."[21]

Pursuant to the Training Guide, a Justice Advocate would advise a client only if the client had been sued in Civil Court in New York and only if the client either had not answered the lawsuit or wished to file an amended answer.[22] For clients sued in Supreme Court in New York, for lawsuits involving a failure to pay child support, and in cases in which a default judgment had already been entered, Justice Advocates would do nothing more than provide the client with a list of resources, including contact information for various pro bono legal services firms.[23]

Before moving forward with a Justice Advocate, each client would be required sign a "User Agreement" acknowledging, among other things, that the advocates are not lawyers and that neither the advocate nor AJM "assume[s] any liability" regarding the outcome of the case.[24] The advocate then would enter the client's information into an internal database so that AJM could "follow up with clients to confirm that the advice they received is fully consistent with the terms of this guide."[25]

---

21 *Id.*

22 *Id.* at 4.

23 *Id.* at 4, Ex. D.

24 *Id.* at Ex. B.

25 *Id.* at 5.

The Training Guide includes roughly six pages of explanation regarding the substance of the Answer Form.[26] For each of the form's defenses, the guide includes one or more questions that the advocates should ask clients. It then explains whether a client should check each box depending on the client's answers to those questions. The guide describes some common counterclaims and explains how they can be asserted on the form.[27] But it further instructs advocates to tell clients that they might have additional counterclaims and should consider seeking out a lawyer if they wish to assert counterclaims.[28] The Training Guide allegedly has been reviewed and approved by "third-party experts in consumer law and debt collection defense."[29]

*C. Unauthorized Practice of Law in New York*

With limited exceptions, only an attorney licensed by the state may "practice . . . as an attorney-at-law" in New York.[30] The practice of law includes "the rendering of legal advice and opinions directed to particular clients."[31] It does not include publications that "[seek] only to present

---

26 *Id.* at 6-12.

27 *Id.* at 10-11.

28 *Id.*

29 Compl. (Dkt 1) ¶ 64 (citing Decl. of Tashi Lhewa (Dkt 7-5); Decl. of Pamela Foohey (Dkt 7-6)).

30 N.Y. Jud. Law § 478; *see also id.* §§ 476-a, 484, 485, 485-a, 750(B), 753(A)(4).

31 *Matter of Rowe*, 80 N.Y.2d 336, 341-42 (1992).

the state of the law to any reader interested in the subject"[32] because only advice or services "rendered to particular clients" can constitute the practice of law.[33] The state's various prohibitions on the unauthorized practice of law (the "UPL Rules") are enforceable through civil, criminal, and contempt actions.[34]

One way to become a licenced attorney is to complete a course on New York law and pass three standardized tests designed to measure one's competency to practice law: the Uniform Bar Examination, the Multistate Professional Responsibility Exam, and the New York Law Examination.[35] To be eligible for admission by examination, an applicant either must have obtained a law degree or spent a combined four years studying at a law school and in a law office.[36] The other way to become a licensed attorney is to obtain a law degree and then practice or teach law for at least five years while licensed in another jurisdiction.[37] In either case, the applicant must

---

32 *Id.* at 342; *see N.Y. Cnty. Laws.' Ass'n v. Dacey*, 21 N.Y.2d 694 (1967) (mem.) (publication of a self-help book on estate law that included sample forms and advice on how to fill out those forms did not constitute the practice of law).

33 *El Gemayel v. Seaman*, 72 N.Y.2d 701, 706 (1988).

34 N.Y. Jud. Law §§ 476-a, 485, 485-a, 750(B), 753(A)(4).

35 N.Y. Comp. Codes R. & Regs. tit. 22, §§ 520.2, 520.8, 520.9.

36 *Id.* §§ 520.3, 520.4, 520.6, 520.17; *see also id.* § 520.5 (requiring those who obtained a law degree from a school not approved by the American Bar Association to have also practiced law for five years while admitted to practice in another jurisdiction).

37 *Id.* § 520.10. Those with law degrees from a school not approved by the American Bar Association are not eligible for admission without examination. *Id.* § 520.10(a)(3).

demonstrate that he or she has the character and fitness to practice law.[38] Then, once admitted, each licensed attorney must adhere to the New York Rules of Professional Conduct.[39]

Some legal practice is exempt from the licensure requirement. As particularly relevant here, New York permits law students who have completed at least two semesters of study to practice law under the supervision of a legal aid organization in connection with a program approved by the state.[40]

## *II. Procedural History*

### *A. Initial District Court Proceedings*

In January 2022, plaintiffs filed a complaint under 42 U.S.C. § 1983 against New York Attorney General Letitia James and immediately moved for a preliminary injunction.[41] Plaintiffs alleged that, as applied to the AJM program to give free legal advice to debt-collection defendants about how to fill out the Answer Form, the UPL Rules violate their freedom of speech and association under the First and Fourteenth Amendments of the United States Constitution.[42]

---

38 *Id.* § 520.12; *see* N.Y. Jud. Law § 90.

39 *See* N.Y. Comp. Codes R. & Regs. tit. 22, § 1200.0.

40 N.Y. Jud. Law § 478.

41 Compl. (Dkt 1); Mot. for Prelim. Inj. (Dkt 5).

42 Compl. (Dkt 1) ¶¶ 103-12.

In earlier proceedings, Judge Paul A. Crotty granted plaintiffs' motion for a preliminary injunction.[43] In finding that plaintiffs were likely to prevail on their free-speech claim,[44] Judge Crotty held that the UPL Rules were a content-based regulation of speech that likely could not survive strict scrutiny.[45] The state took an interlocutory appeal.

*B. Second Circuit Decision*

In September 2025, the Second Circuit vacated the preliminary injunction. The court agreed with Judge Crotty that, as applied to "convey[ing] . . . legal advice to a client," the UPL Rules regulate speech.[46] But it held that the UPL Rules are content neutral and therefore subject to only intermediate scrutiny.[47] The court remanded for reconsideration of plaintiffs' entitlement to preliminary injunctive relief under that lower standard.[48]

---

43 Opinion & Order (Dkt 68).

44 Judge Crotty declined to hold that plaintiffs were likely to succeed on the merits of their freedom of association claim. *Id.* at 14-16.

45 *Id.* at 16-31.

46 *Upsolve, Inc. v. James*, 155 F.4th 133, 142 (2d Cir. 2025). The Second Circuit held also that plaintiffs had standing to seek a preliminary injunction. *Id.* at 139-40.

47 *Id.* at 143.

48 *Id.* at 144.

*C. Current Proceedings*

The state has moved to dismiss the complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).[49] The Court heard argument on that motion on February 3, 2026. Plaintiffs have moved to reinstate the preliminary injunction.[50]

## ***Discussion***

To survive a motion to dismiss under Rule 12(b)(6), a complaint must "state a claim to relief that is plausible on its face."[51] A court is to make that determination by considering only the facts alleged in the complaint and any documents incorporated into the complaint by attachment or reference.[52] Here, considering only that record and construing the facts in the light most favorable to the complaint, plaintiffs' as-applied free speech and free association claims fail as a matter of law.

*I. Free Speech Claim*

*A. Legal Background*

Under the First Amendment, a state may pass no law abridging "the freedom of

---

49 Dkt 121.

50 Dkt 109.

51 *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 359 (2d Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

52 *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).

speech."[53] This provision generally gives everyone a right to express themselves through words or conduct. In deciding a First Amendment challenge, the first step is to determine whether the law at issue restricts expression – that is, whether "the conduct triggering coverage under the statute consists of communicating a message."[54] In this case, the Second Circuit already has held that "New York's UPL statutes, as applied to Plaintiffs, constitute a regulation of speech."[55]

The next step in a First Amendment analysis is to determine whether the law's applicability to particular speech turns on "the topic discussed or the idea or message expressed."[56] If so, the law is generally considered "content based" and subject to strict scrutiny.[57] If, instead, the law is justified "without reference to the content of the regulated speech," the law is considered "content neutral" and subject to intermediate scrutiny.[58] The Second Circuit has determined that New York's UPL Rules "are content neutral and thus subject only to intermediate scrutiny."[59]

---

53 U.S. Const. amend. I; *see Slattery v. Hochul*, 61 F.4th 278, 287 n.1 (2d Cir. 2023) (noting applicability of the First Amendment to the states under the terms of the Fourteenth Amendment).

54 *Holder v. Humanitarian L. Project*, 561 U.S. 1, 28 (2010).

55 *Upsolve*, 155 F.4th at 141.

56 *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).

57 *Id.* at 163-64.

58 *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (quoting *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984)).

59 *Upsolve*, 155 F.4th at 143.

The final step (and the only one at issue here) is the application of intermediate scrutiny on which the government bears the burden of proof.[60] Content-neutral regulations of speech are lawful only if they (1) "advance[] important governmental interests unrelated to the suppression of free speech" and (2) "[do] not burden substantially more speech than necessary to further those interests."[61]

Under the first prong of this standard, the government must show that the challenged law seeks to address governmental interests that are "important" and "real" (as opposed to "merely conjectural") and that the regulation will address the problem "in a direct and material way."[62] Under the second prong, the government must show that the regulation does not "burden substantially more speech than is necessary" to further the government's interests.[63] The regulation need not be "the least speech-restrictive means" of addressing the problem.[64] Rather, a court must afford the government a certain "latitude" and may not invalidate a law "simply because [it] concludes that the government's interest could be adequately served by some less-speech-restrictive

---

60 *See, e.g.*, *Brokamp v. James*, 66 F.4th 374, 397 (2d Cir. 2023).

61 *Upsolve*, 155 F.4th at 144 (alterations in original) (quoting *Turner Broad. Sys., Inc. v. FEC* (*Turner II*), 520 U.S. 180, 189 (1997)).

62 *Brokamp*, 66 F.4th at 397 (quoting *Cornelio v. Connecticut*, 32 F.4th 160, 171 (2d Cir. 2022)).

63 *Ward*, 491 U.S. at 799.

64 *Turner Broad. Sys., Inc. v. FCC* (*Turner I*), 512 U.S. 622, 662 (1994).

alternative."[65] So long as a regulation is narrowly tailored to advancing governmental interests that "would be achieved less effectively absent the regulation," a court must defer to a government's reasonable determination about "how much protection of [those interests] is wise and how that level of [protection] is to be attained."[66] It follows that the validity of a content-neutral regulation "depends on the relation it bears to the overall problem the government seeks to correct, not on the extent to which it furthers the government's interests in an individual case."[67]

The government often will need to adduce evidence to demonstrate that a regulation withstands intermediate scrutiny – such as proof that obvious, substantially less-speech-restrictive alternatives would not advance the government's interests just as effectively.[68] But a court may conclude that a law is narrowly tailored to important government interests at the pleading stage, without resort to extrinsic evidence.[69]

---

65 *TikTok Inc. v. Garland*, 604 U.S. 56, 77 (2025) (first quoting *Turner II*, 520 U.S. at 213; and then quoting *Ward*, 491 U.S. at 800).

66 *Ward*, 491 U.S. at 798-99 (quoting *Clark*, 468 U.S. at 299).

67 *Ward*, 491 U.S. at 801; *see also Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 464-68 (1978) (holding state could ban in-person solicitation by lawyers "under circumstances likely to result in the adverse consequences the State seeks to avert" without requiring a showing of harm or injury in any particular case).

68 *See Cornelio*, 32 F.4th at 175; *McCullen v. Coakley*, 573 U.S. 464, 490-94 (2014).

69 *See, e.g.*, *Citizens United v. Schneiderman*, 882 F.3d 374, 380-85 (2d Cir. 2018) (holding law challenged on First Amendment grounds survived intermediate scrutiny at the pleading stage); *see also Jeffery v. City of New York*, 113 F.4th 176, 195 (2d Cir. 2024) ("[W]e conclude that the requisite narrow tailoring is demonstrated as a matter of law by the totality of the pleadings and judicially noticeable facts.").

*Brokamp v. James*[70] provides a useful illustration. There, a therapist challenged on First Amendment grounds a New York law that generally prohibits anyone from engaging in mental health counseling without a license.[71] To secure one of those licenses, a person must "satisfy particular educational, experiential, examination, age, and character requirements."[72] The plaintiff qualified for a streamlined licensing process because she held a Virginia license for mental health counseling.[73] The Second Circuit rejected her facial and as-applied challenges to that streamlined procedure, holding that the law survived intermediate scrutiny at the motion to dismiss stage.[74]

As to whether the regulation at issue in *Brokamp* directly furthered important governmental interests, the court explained that the law was designed to safeguard public health and that "licensure based on specified standards of education, experience, and testing" was a type of regulation "long recognized by the Supreme Court directly and materially to alleviate concerns about ignorant, incompetent, and/or deceptive health care providers."[75] The court then concluded that "the statutory definition of 'mental health counseling' together with the statutory exemptions" demonstrated that "the law is sufficiently tailored to ensure that its licensing requirement does not

---

70 66 F.4th 374 (2d Cir. 2023).

71 *Id.* at 382-83.

72 *Id.* at 384.

73 *Id.* at 385, 402; *see also id.* at 385 n.10 (noting the requirements for endorsing out-of-state licenses).

74 *Id.* at 403.

75 *Id.* at 399.

burden more speech than necessary."[76] That definition (limiting the statute's reach to counseling offered in an organized setting with the purpose of treating a disorder of the psyche) tailored the law to "circumstances where persons are most likely to present as professional mental health counselors in order to gain client trust and, thus, where there is a state interest in minimizing the risks incompetence or deception pose to public health."[77]

The court then held that no "different conclusion" was warranted "in [plaintiff's] particular case."[78] The plaintiff had argued that the statute was not narrowly tailored as applied to her because her extensive education and experience as a licensed therapist (including experience serving clients in New York under a pandemic-era exemption to the licensing requirement) demonstrated that "she pose[d] no threat to public health."[79] But the court held that the state's interest in protecting the public from incompetent and deceptive counselors justified the minimally burdensome requirement that plaintiff prove that she "really [is] licensed and in good standing in another state" and that her out-of-state-license "was obtained by satisfying educational, experiential, and testing requirements comparable to New York's."[80] The record showed that the plaintiff easily

---

76 *Id.* at 402; *see also id.* at 390 n.16.

77 *Id.* at 401.

78 *Id.* at 402.

79 *Id.* at 401.

80 *Id.* at 402.

could submit that proof, so the regulation was not unreasonably burdensome as applied to her.[81] And a similar but more targeted interest in protecting children justified requiring the plaintiff to take a course on the identification of child abuse.[82]

*B. Analysis*

*i. The UPL Rules directly advance important government interests*

New York has a "well-established interest in regulating attorney conduct and in maintaining ethical behavior and independence among the members of the legal profession."[83] It cannot reasonably be disputed that this interest qualifies as "important" – indeed, the Supreme Court has described it as "compelling"[84] and "substantial."[85] The goal of such regulations is to protect the integrity of "the primary governmental function of administering justice"[86] as well as to "protect the public from ignorance, inexperience and unscrupulousness."[87]

---

81 *Id.*

82 *Id.*

83 *Jacoby & Meyers, LLP v. Presiding Justs. of the First, Second, Third & Fourth Dep'ts*, 852 F.3d 178, 191 (2d Cir. 2017).

84 *Goldfarb v. Va. State Bar*, 421 U.S. 773, 792 (1975).

85 *Sperry v. Florida ex rel. Florida Bar*, 373 U.S. 379, 383 (1963).

86 *Goldfarb*, 421 U.S. at 792.

87 *People v. Alfani*, 227 N.Y. 334, 339 (1919).

The UPL Rules, in conjunction with the qualifications for licensure, clearly further these interests. The regulations require that those wishing to practice law obtain legal education, pass examinations designed to measure their competency to practice law, and demonstrate that they have the moral character and fitness to serve as an officer of the court. "[L]icensure based on specified standards of education, experience, and testing" is a form of regulation long recognized "directly and materially to alleviate concerns about ignorant, incompetent, and/or deceptive" conduct by professionals.[88] Although *Brokamp* had no occasion to pass on the licensing of "professions involving less apparent state interests than public health,"[89] the licensing of lawyers advances governmental interests that are just as readily apparent and well-established. The complaint itself acknowledges that the UPL Rules "are designed to protect consumers from the risk of unreliable or unscrupulous representation and thereby increase public faith in the justice system," and that the law serves those purposes "in many applications."[90]

The state's interests are particularly strong here. In the context of plaintiffs' lawsuit, the UPL rules are being applied to the giving of individualized legal advice about how to respond to a pending lawsuit, including what legal defenses to raise (or not raise). That advice will be given in an organized setting in which clients will be asked to sign a "User Agreement" in exchange for receiving assistance from non-lawyers who will identify themselves as "Justice Advocates." Many of the risks that the licensure of attorneys guards against are at or near their apices in this context.

---

88 *Brokamp*, 66 F.4th at 399.

89 *Id.* at 399 n.24.

90 Compl. (Dkt 1) ¶ 100.

A person without proper legal training may provide incompetent advice that prejudices a client's legal rights. Or a person with questionable moral character may proceed in a representation despite a clear conflict of interest or advise a client to make statements that mislead the court. Ensuring that anyone providing formal advice on how to complete an Answer Form is "trained, examined and licensed" clearly advances the State's interests in avoiding those risks.[91]

Plaintiffs suggest that the UPL Rules do not advance the state's interests as applied to them because Justice Advocates would give "reliable, truthful, and non-misleading" advice.[92] But those allegations – perhaps more properly "predictions" – are "beside the point."[93] The question is whether the UPL Rules further the state's interests as applied to "the general circumstances of [plaintiffs'] acts," not as applied to plaintiffs' "individual case."[94] Here, those general circumstances are the giving of legal advice, in an organized setting, to New Yorkers actively being sued. The licensing requirement directly advances the state's stated goals when "considering all the varied groups" that may seek to engage in that type of speech.[95]

---

91 *El Gemayel*, 72 N.Y.2d at 705 (quoting *Spivak v. Sachs*, 16 N.Y.2d 163, 168 (1965)).

92 Compl. (Dkt 1) ¶¶ 106, 111; *see id.* ¶¶ 3, 101; Mem. in Opp. to Def.'s Mot. to Dismiss (Dkt 126) at 7-8.

93 *Ward*, 491 U.S. at 801.

94 *United States v. Edge Broad. Co.*, 509 U.S. 418, 431 (1993).

95 *Ward*, 491 U.S. at 801.

*ii. The UPL Rules are narrowly tailored*

The Rule 12(b)(6) record and the statutory text demonstrate that the UPL Rules, as applied, are narrowly tailored as a matter of law. To start, the UPL Rules restrict only the giving of legal advice to a specific person about that person's individual legal problems.[96] New York does *not* prohibit plaintiffs (or anyone else) from speaking publicly about legal issues, including through the publication of self-help materials.[97] Plaintiffs would be free to post their Training Guide online or distribute it as a pamphlet, complete with all the same advice as to when each defense on the Answer Form should be raised. They would be free also to publicly decry the high rate of default judgments in debt-collection cases and to push for whatever policy reforms they deem necessary. The only thing plaintiffs cannot do is advise a specific person about his or her individual case – the circumstances in which incompetent and unscrupulous legal advice is most likely to be relied upon and thereby cause harm.

In that sense, the UPL Rules are materially similar to the mental health counseling law at issue in *Brokamp*.[98] Plaintiffs attempt to distinguish that law on the ground that it applies "*only* to counseling conversations that happen[] in the context of a formal counseling session meant

---

96 *El Gemayel*, 72 N.Y.2d at 706; *Matter of Rowe*, 80 N.Y.2d at 341-42.

97 *El Gemayel*, 72 N.Y.2d at 706; *see also Upsolve*, 155 F.4th at 143 ("As New York courts have repeatedly held, individuals are free to discuss legal topics or provide generalized advice, including by publishing books and guides, without running afoul of the UPL statutes.").

98 *See Brokamp*, 66 F.4th at 401.

to provide medical treatment."[99] But plaintiffs challenge the UPL Rules only as applied to the wholly analogous context of a formal advisory session meant to provide legal advice, so the Court need not address whether the law burdens substantially more speech than necessary in other circumstances. Further attempting to distinguish the mental health counseling law, plaintiffs complain that the UPL Rules apply even if a speaker "makes clear [the speaker is] only a layperson, not an attorney offering representation."[100] But the mental health law does not appear to contain any safe harbor for therapists who disclose that they are not licensed but who otherwise engage in counseling within the meaning of the law.[101] Thus, the statutory definition of the practice of law, like the statutory definition of mental health counseling, tailors the UPL Rules to a significant degree as applied here.

After substantially narrowing their scope by definition, the UPL Rules impose a restriction on speech rather than an outright prohibition. Anyone can give legal advice to individual clients so long as they obtain a license. To obtain such a license, a person must satisfy educational, testing, and character requirements that are tailored to the state's interests in avoiding ignorant, incompetent, and unethical conduct. New York does not need to take plaintiffs' word when they say that Justice Advocates will provide only "truthful and non-misleading advice,"[102] just as New

---

99 Mem. in Opp. to Def.'s Mot. to Dismiss (Dkt 126) at 12.

100 *Id.* at 13.

101 *See* N.Y. Educ. Law § 8402; *Brokamp*, 66 F.4th at 401 (explaining that the licensing requirement would reach "life coaches, mentors, and self-help gurus" who engage in conduct constituting mental health counseling, "however they characterize[] themselves").

102 Compl. (Dkt 1) ¶ 6.

York did not need to accept the *Brokamp* plaintiff's assertion that she "pose[d] no threat to public health" given her extensive education and experience as a therapist.[103] Further demonstrating that New York carefully has considered the need to balance competing interests in this area, Justice Advocates could qualify for an exemption from the licensing requirement by completing only two semesters of law school and finding an approved, lawyer-run program to supervise them.

The only remaining issue is plaintiffs' contention that the licensing requirements are too burdensome as applied to them.[104] As Judge Crotty's thoughtful opinion noted, there is no doubt that New York could "impose targeted trainings or educational standards on Plaintiffs short of a full Bar certification."[105] And the complaint alleges that some states and federal agencies permit non-lawyers to perform certain legal work.[106] Such alternatives might demonstrate that the UPL Rules are not the least restrictive means of addressing the state's interests. But this Court is applying intermediate, not strict, scrutiny. It may not strike down the UPL Rules "simply because [it] concludes that the government's interest could be adequately served by some less-speech-restrictive alternative."[107] Rather, because the UPL Rules are substantially related to advancing the state's

---

103 *Brokamp*, 66 F.4th at 401.

104 *See* Mem. in Opp. to Def.'s Mot. to Dismiss (Dkt 126) at 12 (arguing *Brokamp* is distinguishable because the law there "imposed nearly no practical burdens on the plaintiff's speech").

105 Opinion & Order (Dkt 68) at 30.

106 Compl. (Dkt 1) ¶¶ 74-76.

107 *TikTok*, 604 U.S. at 77 (quoting *Ward*, 491 U.S. at 800).

legitimate interests, the Court must defer to New York's reasonable decision about "how much protection of [those interests] is wise and how that level of [protection] is to be attained."[108] Accordingly, "[t]hose alternatives do not alter [the Court's] tailoring analysis."[109]

The UPL Rules are narrowly tailored for the reasons just explained. They apply only to individualized legal advice, leaving much law-related speech unregulated, and they prohibit a person from speaking only until he or she has obtained sufficient training in the law, permitting anyone willing to satisfy those requirements free to speak as he or she wishes. For those reasons, and as applied to the type of speech in which plaintiffs seek to engage, the UPL Rules advance the state's content-neutral interests without burdening a substantial amount of speech that is unlikely to bring about the evils against which the rules are directed. Beyond that, the Court cannot second-guess the New York Legislature's reasoned, policy-laden decision as to how much training and experience is enough training and experience – a decision that goes merely to "how much protection of [the government's interests] is wise."[110]

Plaintiffs' misplaced reliance on *McCullen v. Coakley*[111] underscores that conclusion. There, Massachusetts had enacted a law that prohibited essentially all speech within a 35-foot radius

---

108 *Ward*, 491 U.S. at 798 (quoting *Clark*, 468 U.S. at 299).

109 *TikTok*, 604 U.S. at 77.

110 *Ward*, 491 U.S. at 798 (quoting *Clark*, 468 U.S. at 299).

111 573 U.S. 464 (2014).

of any abortion clinic during business hours.[112] After reciting various alternatives that would have "burden[ed] substantially less speech" and that appeared readily capable of furthering the government's interests, such as laws targeted at harassment and obstruction, the Court held the law was not narrowly tailored.[113]

The difference between a blanket prohibition on speech near abortion clinics and a law prohibiting only harassing or obstructive conduct near abortion clinics, is not the same as the difference between imposing some educational, testing, and fitness requirements and imposing less educational, testing, and fitness requirements. A ban on *any* speech within a geographic area unquestionably "suppress[es] a great quantity of speech that does not cause the evils that [the ban] seeks to eliminate."[114] An alternative that bans only harassment would substantially narrow that overbroad scope. In contrast, New York's law requiring a license to give one-on-one legal advice will advance the state's interests in a substantial number of its applications to speech like the AJM. Tweaking the prerequisites for licensure would not substantially alter the amount of speech burdened by the law. No amount of extrinsic evidence could demonstrate that obtaining a law degree, passing standardized tests and a course on New York law, and demonstrating one's character and fitness to practice law are requirements so unreasonably burdensome that the state has exceeded the "latitude" it enjoys to "design regulatory solutions to address content-neutral interests."[115]

---

112 *Id.* at 471-72.

113 *Id.* at 490-95.

114 *Ward*, 491 U.S. at 799 n.7.

115 *TikTok*, 604 U.S. at 77 (quoting *Turner II*, 520 U.S. at 213).

*II. Freedom of Association Claim*

The freedom of speech "could not be vigorously protected from interference by the State unless a correlative freedom to engage in group effort toward those ends were not also guaranteed."[116] For that reason, the Supreme Court long has recognized that "the right to engage in activities protected by the First Amendment" requires the protection of "a corresponding right to associate with others" for expressive purposes.[117] Plaintiffs argue that application of the UPL Rules to their conduct violates this "freedom of association."[118]

Plaintiffs are mistaken. The regulation does not penalize plaintiffs' "mere association" with debt-collection litigants.[119] Nor does it intrude "into the internal structure or affairs" of Upsolve or any other organization.[120] Plaintiffs only complaint is that the UPL Rules restrict their ability to associate for the purpose of giving "free advice about how to fill out a form provided by the State."[121] But New York constitutionally may regulate the giving of such advice,

116 *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984).

117 *Id.*

118 Compl. (Dkt 1) ¶¶ 108-12; Mem. in Opp to Def.'s Mot. to Dismiss (Dkt 126) at 16-20.

119 *Holder*, 561 U.S. at 39.

120 *Jaycees*, 468 U.S. at 623.

121 Mem. in Opp. to Def.'s Mot. to Dismiss (Dkt 126) at 18.

so "[a]ny burden on plaintiffs' freedom of association in this regard is justified for the same reasons that [the Court has] denied plaintiffs' free speech challenge."[122]

Plaintiffs invoke *NAACP v. Button*,[123] in which the Supreme Court struck down a Virginia law that prohibited an organization from retaining an attorney to represent a third party,[124] and *In re Primus*,[125] in which the Supreme Court struck down a South Carolina law that prohibited an attorney from advising a prospective client that she could obtain free legal assistance from a nonprofit with which the attorney was affiliated.[126] The Court's recognition in those cases of a First Amendment right to engage in "collective activity undertaken to obtain meaningful access to the courts" has surface appeal here.[127] But the cases are squarely distinguishable. In each, an attorney was to be the one providing the legal representation. That meant that neither state could justify its law for any of the reasons New York justifies the UPL Rules, leaving the Court to grapple with laws that regulated association *qua* association. Here, plaintiffs fail to offer any theory of associational

122 *Holder*, 561 U.S. at 40.

123 371 U.S. 415 (1963).

124 *Id.* at 423-26, 428-29.

125 436 U.S. 412 (1978).

126 *Id.* at 414, 439.

127 *Id.* at 426 (quoting *United Transp. Union v. Mich. Bar*, 401 U.S. 576, 585 (1971)).

injury that is separable from their underlying, meritless contention that the UPL Rules violate their freedom of speech.[128]

***Conclusion***

For the foregoing reasons, the defendant's motion to dismiss with prejudice (Dkt 121) is granted. Plaintiffs' motion to reinstate the preliminary injunction (Dkt 109) is denied as moot. The Clerk shall close the case.

SO ORDERED.

Dated: March 5, 2026
Corrected: March 6, 2026

Lewis A. Kaplan
United States District Judge

---

128 *See Emilee Carpenter, LLC v. James*, 107 F.4th 92, 108 (2d Cir. 2024) (rejecting plaintiffs' freedom of association claim as "just another way of saying that the [New York law] violates [her] free-speech rights" (alterations in original) (quoting *Telescope Media Grp. v. Lucero*, 936 F.3d 740, 760 (8th Cir. 2019)).