# 26-847

## In The United States Court of Appeals For The Second Circuit

UPSOLVE, INC. AND REV. JOHN UDO OKON,

*Plaintiffs-Appellants,*

v.

LETITIA JAMES, IN HER OFFICIAL CAPACITY AS ATTORNEY GENERAL OF THE STATE OF NEW YORK,

*Defendant-Appellee.*

———————

ON APPEAL FROM THE UNITED STATES DISTRICT FOR THE SOUTHERN DISTRICT OF NEW YORK

———————

**BRIEF OF PLAINTIFFS-APPELLANTS**

———————

Robert J. McNamara
Elizabeth L. Sanz
INSTITUTE FOR JUSTICE
901 North Glebe Road, Suite 901
Arlington, Virginia 22203
(703) 682-9320
rmcnamara@ij.org; bsanz@ij.org

*Counsel for Plaintiffs-Appellants*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1, Appellants Upsolve, Inc. and Rev. John Udo-Okon certify that Upsolve, Inc. is a non-governmental, not-for-profit corporate party, does not have a parent corporation and no publicly held corporation owns 10% or more of its stock.

*/s/ Robert J. McNamara*
Robert J. McNamara
*Counsel for Plaintiffs-Appellants*

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT .............................................. i

TABLE OF AUTHORITIES ................................................................. iv

JURISDICTION ................................................................................ 1

STATEMENT OF ISSUES .................................................................. 2

STATEMENT OF THE CASE .............................................................. 3

    I.   New York Debt Collection Actions. ............................................... 3

    II.  The American Justice Movement. ................................................ 5

    III. New York's Regulation of the Unauthorized Practice of Law. ..... 8

    IV. Procedural History. ................................................................. 13

STANDARD OF REVIEW ................................................................. 16

SUMMARY OF ARGUMENT ............................................................. 16

ARGUMENT .................................................................................. 19

    I.   The Supreme Court's recent decision in *Chiles v. Salazar* undermines the prior panel opinion. ......................................... 19

        A.  *Chiles* reaffirms the prior panel opinion's holding that New York's prohibition on unlicensed legal advice is a restriction on speech. ......................................................................... 21

        B.  *Chiles* abrogates the prior panel opinion's holding that New York's prohibition on unlicensed legal advice is content-neutral. ................................................................................. 22

II.  The district court erred in holding that New York's prohibition
     on unlicensed legal advice survives intermediate scrutiny
     on a motion to dismiss. ..................................................................30

     A.  There is a circuit split about the level of intermediate scrutiny
         applicable here. ..................................................................31

     B.  Affirming the district court would put this Court on the wrong
         side of the existing split. ..................................................37

         1.  Affirming the district court's ruling requires splitting
             with other circuits. ..................................................37

         2.  Nothing in this Court's precedent supports a fact-free ver-
             sion of intermediate scrutiny. ..................................43

III. If nothing else, plaintiffs must have a free-association right to talk
     to their own members about the law. ..........................................49

CONCLUSION ..................................................................................51

CERTIFICATE OF COMPLIANCE..................................................52

# TABLE OF AUTHORITIES

PAGE(S)

**CASES**

*360 Degree Virtual Drone Servs., LLC v. Ritter,*
102 F.4th 263 (4th Cir. 2023) .................................................... 32, 33, 36

*Billups v. City of Charleston,*
961 F.3d 673 (4th Cir. 2020) ............................................. 35, 36, 40, 42

*Brokamp v. James,*
66 F.4th 374 (2d Cir. 2023) .....................15, 17, 22, 23, 26, 29, 45, 46, 47

*Capital Associated Indust., Inc. v. Stein,*
922 F.3d 198 (4th Cir. 2019) .................................................................50

*Chiles v. Salazar,*
146 S. Ct. 1328 (2026) ........................................ 16, 20, 21, 24, 27, 28, 29

*Citizens United v. Schneiderman,*
882 F.3d 374 (2d Cir. 2018) ...................................................................44

*Cornelio v. Connecticut,*
32 F.4th 160 (2d Cir. 2022) ........................................................... 16, 44

*Dale v. Barr,*
967 F.3d 133 (2d Cir. 2020) ........................................................... 19, 20

*Deegan v. City of Ithaca,*
444 F.3d 135 (2d Cir. 2006) ...................................................................44

*Del Castillo v. Sec'y, Fla. Dep't of Health,*
26 F.4th 1214 (11th Cir. 2022) ..............................................................33

*Hines v. Pardue,*
117 F.4th 769 (5th Cir. 2024) ................................... 34, 35, 39, 40, 41, 42

*Holder v. Humanitarian Law Project,*
  561 U.S. 1 (2010) ............................................................. 17, 21, 22, 24

*In re Zarnel,*
  619 F.3d 156 (2d Cir. 2010) ...................................................... 20, 30

*Jacoby & Meyers, LLP v. Presiding Justs.,*
  852 F.3d 178 (2d Cir. 2017) .............................................................. 50

*Jeffery v. City of New York,*
  113 F.4th 176, 179 (2d Cir. 2024) .................................................... 44

*McCullen v. Coakley,*
  573 U.S. 464 (2014) .......................................................... 31, 32, 39, 40

*NAACP v. Button,*
  371 U.S. 415 (1963) ..................................................................... 49, 50

*Richwine v. Matusak,*
  148 F.4th 942 (7th Cir. 2025) ........................................... 33, 34, 40, 42

*Roberts v. U.S. Jaycees,*
  468 U.S. 609 (1984) ......................................................................... 49

*United States v. Wilkerson,*
  361 F.3d 717 (2d Cir. 2004) ............................................................. 19

*Upsolve, Inc. v. James,*
  2026 WL 858427 (U.S. Mar. 30, 2026) ............................................. 15

*Upsolve, Inc. v. James,*
  155 F.4th 133 (2d Cir. 2025) ................... 14, 21, 22, 23, 24, 25, 28, 30, 43

*Upsolve, Inc. v. James,*
  604 F.Supp.3d 97 (S.D.N.Y. 2022) ............................................ 7, 9, 14

*Ward v. Rock Against Racism,*
  491 U.S. 781 (1981) ......................................................................... 40

v

*Wojchowski v. Daines,*
498 F.3d 99 (2d Cir. 2007)................................................................20, 30

*Wooden v. United States,*
595 U.S. 360 (2022) .................................................................................36

**RULES AND STATUTES**

28 U.S.C. § 1291............................................................................................1

28 U.S.C. § 1331............................................................................................1

28 U.S.C. § 1343............................................................................................1

42 U.S.C. § 1983............................................................................................1

Fed. R. Civ. P. 12(b)(6)................................................................................16

**OTHER AUTHORITIES**

ABA Resolution 605,
https://www.americanbar.org/content/dam/aba/administrative/house_of_
delegates/2025-annual-supplemental-materials/605-rev.pdf.................13

Barlow F. Christensen, *The Unauthorized Practice of Law: Do Good Fences
Really Make Good Neighbors—or Even Good Sense?*,
2 Am. Bar Found. 159 (1980) .................................................................10

Deborah L. Rhode, *Policing the Professional Monopoly: A Constitutional
and Empirical Analysis of Unauthorized Practice Prohibitions*,
34 Stan. L. Rev. 1 (1981) ........................................................................11

Jonah E. Bromwich, *Crypto Fraudster Sam Bankman-Fried Has New
Pursuit: Jailhouse Lawyer*, N.Y. Times (Dec. 20, 2025),
https://www.nytimes.com/2025/12/20/nyregion/sam-bankman-fried-
jailhouse-lawyer.html..............................................................................39

Laurel A. Rigertas, *Lobbying and Litigating Against "Legal Bootleggers"—the Role of the Organized Bar in the Expansion of the Courts' Inherent Powers in the Early Twentieth Century*,
46 Cal. W. L. Rev. 65 (2009) ............................................................ 10, 11

Laurel A. Rigertas, *The Birth of the Movement to Prohibit the Unauthorized Practice of Law*,
37 Quinnipiac L. Rev. 97 (2018) ........................................................ 9, 10

Robert Kry, *The "Watchman for Truth": Professional Licensing and the First Amendment*,
23 Seattle U. L. Rev. 885 (2000) ...................................................... 11, 12

Conference of Chief Justices & Conference of State Court Administrators, Resolution 1-2025,
https://ccj.ncsc.org/resources-courts/support-exploring-access-justice-through-authorized-justice-practitioner-programs ............................... 13

Sara Randazzo, *No lawyer? No money? More American are suing with AI help*, Reuters (May 15, 2026),
https://www.reuters.com/legal/government/no-lawyer-no-money-more-americans-are-suing-with-ai-help-2026-05-15/ ...................................... 39

Sarah Merken, *South Carolina court says NAACP program doesn't violate legal practice curbs*, Reuters (Feb. 14, 2024),
https://www.reuters.com/legal/legalindustry/south-carolina-court-says-naacp-program-doesnt-violate-legal-practice-curbs-2024-02-13/ ..... 12, 13

The Legal Aid Society et al., *Debt Deception: How Debt Buyers Abuse the Legal System to Prey on Lower-Income New Yorkers* (May 2010),
https://tinyurl.com/Debt-Deception ................................................ 3, 5, 6

## JURISDICTION

This case was filed under 42 U.S.C. § 1983, and the district court had jurisdiction under both 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3). The district court entered final judgment on March 5, 2026 and then entered a corrected order on March 6. Appellants filed a timely notice of appeal on April 2, 2026. This Court has jurisdiction over this appeal under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

The issues on appeal are whether the district court correctly concluded that New York's prohibition on the "unauthorized practice of law," which as applied here forbids the plaintiffs (a nonprofit and one of its volunteers) from giving even limited legal advice in one-on-one conversations, is (1) subject to only intermediate scrutiny and (2) survives that scrutiny even in the context of a motion to dismiss, without the need for any examination of evidence.

## STATEMENT OF THE CASE

### I.  New York Debt Collection Actions.

This case is a First Amendment challenge to New York's prohibition on giving legal advice without first becoming a fully licensed attorney. JA-18. It involves *only* advice; none of the plaintiffs seeks the right to appear in court, draft legal documents, or otherwise act on behalf of others. They seek only the right to talk to people who want to hear what they have to say.

And this case also involves an area of the law where New Yorkers desperately need legal advice: debt collection actions. *Id.* New York faces a mounting problem of debt-collection actions, many of them meritless and filed in the hopes that an overwhelmed pro se defendant will default and allow the plaintiff to collect a judgment on an unproveable debt. JA-23. The driving force behind these lawsuits is not creditors but instead "debt buyers—a relatively new and fast-growing segment of the debt collection industry[.]" The Legal Aid Society et al., *Debt Deception: How Debt Buyers Abuse the Legal System to Prey on Lower-Income New Yorkers*, at 1 (May 2010), https://tinyurl.com/Debt-Deception (cited at JA-23 n.21); *id.* at 26 n.91 (explaining the different types of "meritless" claims). Debt buyers purchase defaulted debts "for pennies on the dollar" and then try

3

to aggressively collect whatever they can from whomever they can. *Id.* at 3.

As baseless and unprovable as many of these collection suits may be, New Yorkers are notoriously bad at defending against them. Most defendants—70 to 90 percent—lose through default judgments. JA-23. A default judgment typically occurs just because the defendant, who is usually a low-income individual who cannot afford a lawyer, lacks the knowledge or support to respond to the lawsuit. JA-26. And when New Yorkers fail to show up in court, debt buyers win big no matter the merits of their claims. For example, in a two-year span, "debt buyers extracted more than $1 billion in judgments against New York City residents." *Debt Deception*, *supra*, at 1.

Default judgments (and windfalls to debt buyers) should not be happening at such an alarming rate. "Responding to a debt collection lawsuit in New York is typically straightforward and does not require significant specialized legal training." JA-27. Indeed, New York (recognizing the mounting problems with baseless debt lawsuits) provides a one-page, check-the-box answer form meant to make it simpler for pro se defendants to file answers and put plaintiffs to their proofs. JA-28. This form

4

includes 24 boxes that defendants can check to challenge service, raise defenses, and even include counterclaims. JA-49. Navigating this form, however, requires "some measure of familiarity with the legal system and specialized terminology." JA-28. For instance, to accurately complete the standardized form, a defendant must understand basic legal concepts like service, unconscionability, statutes of limitations, unjust enrichment, and laches. JA-28–29. Without guidance, some New Yorkers will be at sea as to what these terms mean—but, with a little help, nearly anyone should be able to easily complete and file the answer form themselves, which would have an immediate effect on their success rate. After all, the biggest part of success in these cases is just showing up. *See Debt Deception*, *supra*, at 17 (explaining that debt buyers "often walk away from cases rather than fight" once a defendant responds).

## II.   The American Justice Movement.

The American Justice Movement wants to offer that help. It provides New Yorkers with the meaningful advice they need to respond to debt collection actions. The American Justice Movement is part of a larger nonprofit based in New York: Appellee Upsolve, Inc., a nonprofit organization dedicated to "helping Americans access their civil legal

rights for free." JA-21. Upsolve started by providing free bankruptcy-related resources—and has now grown into the largest such resource in the United States. *Id.* Upsolve guides pro se debtors through Chapter 7 bankruptcies and has achieved over $400 million in debt relief. *Id.*

With its successes, Upsolve wanted to expand its free legal resources. And helping New Yorkers respond to debt collection actions was a natural fit. Upsolve thus created its new program designed to "provide free legal advice on responding to a debt collection lawsuit." JA-33. To provide this advice, the American Justice Movement trains and supervises "Justice Advocates"—volunteers who will receive basic training in the specific details involved in filling out New York's pro se answer checklist. JA-33–35. The program uses "a robust step-by-step Training Guide" to train Justice Advocates, who in turn provide limited legal advice to clients. JA-35.

Justice Advocates also provide other advice—the most important of which may be the straightforward advice that people should answer these lawsuits to force the plaintiffs to show up with proof, which may not exist. *See Debt Deception*, *supra*, at 6 (discussing debt buyers' lack of proof) and 8-10 (discussing advantages held by debt buyers, including

6

how "less than 10% of people sued answered the summons and complaint"). Justice Advocates are also trained about the limits of their advice. They are told to adhere to the limited scope of the training guide; they are forbidden from accepting any compensation for their advice; and they are required to comply with rules governing confidentiality, conflicts of interest, and (of course) informed consent about their nonlawyer status and limited training. JA-36–37. They are also authorized to make referrals: When a client has needs that go beyond the limited scope of the training guide, Justice Advocates are instructed to refer them to legal-service providers to help them. JA-36. They are meant to be *help*, not a cure-all. As Judge Crotty put it at an earlier stage of this case, Justice Advocates are a "link in the informational chain" helping underserved New Yorkers fully vindicate their legal rights. *Upsolve, Inc. v. James*, 604 F. Supp. 3d 97, 119 (S.D.N.Y. 2022) ("*Upsolve I*").

And Justice Advocates are meant to advise only people who know exactly what they're getting. Clients are told that the Justice Advocate is neither a lawyer nor an employee of the court but merely a volunteer providing limited, free legal advice about a consumer-debt lawsuit. They are also explicitly told that their Justice Advocate is not a lawyer and will

*not* represent them—so the client must still represent themselves in court. JA-35–36. In other words, the program was designed to help pro se defendants puzzle out what some words might mean, not to provide those defendants with full representation.

One such Justice Advocate is the Reverend John Udo-Okon, also a plaintiff here. JA-40. Rev. Udo-Okon, like any good pastor, wants to help his parishioners with their life problems. For some of them—problems with their families or their jobs or even medical concerns—he is free to give them the best advice he can. The American Justice Movement attracted him because it might help him give better advice when his parishioners face this sort of legal trouble, as they often do. JA-40–41. But Rev. Udo-Okon can't give any of the advice outlined in the training guide—or any legal advice at all. Neither can anyone else who isn't an attorney. The whole thing, it turns out, is a crime.

### III. New York's Regulation of the Unauthorized Practice of Law.

The one-on-one advice that the American Justice Movement wants to provide is forbidden as the unauthorized practice of law (UPL) in New York. Even though it involves drafting no documents, filing no papers, and never appearing in court, New York's UPL rules would punish

8

Appellees (or any other New Yorker) with crimes and civil penalties merely for communicating their opinion about a particular person's legal problems. As the State has conceded throughout these proceedings, the sort of one-on-one spoken legal advice contemplated by the American Justice Movement would constitute "the practice of law" in New York and would therefore be a crime. *Upsolve I*, 604 F. Supp. 3d at 107 n.4. So under the UPL rules, just talking about how to respond to a consumer-debt lawsuit—even with friends or family—requires a license.

But this sort of regulation of out-of-court legal advice is a relatively recent invention. Even before the Founding, "[t]here is no evidence that colonists concerned themselves with the activities of lay persons outside the courthouse." Laurel A. Rigertas, *The Birth of the Movement to Prohibit the Unauthorized Practice of Law*, 37 Quinnipiac L. Rev. 97, 104 (2018). And following the American Revolution, the country actually experienced "a decline in respect for the bar and a decline in restrictions on law practice and bar admissions." *Id.* at 105 (calling this period of "Jacksonian democracy" as supporting "de-professionalization"). That decline tracked the "frontier conditions" and "egalitarian spirit" of the Founding, "which held any man capable of doing anything"—including giving legal

advice. *Id.* That spirit carried on past the Civil War, when, "[a]s a practical matter, . . . there were no significant restrictions on admission to law practice." *Id.* (quoting Barlow F. Christensen, *The Unauthorized Practice of Law: Do Good Fences Really Make Good Neighbors—or Even Good Sense?*, 2 Am. Bar Found. 159, 173 (1980)). And to the extent that any restriction did prevent a layman from practicing law, it dealt not with speech or advice but only with conduct like "appearances in court and the signing of pleadings." *Id.* at 105 n.46. As a result, the original meaning of the First Amendment, from the Founding through the Reconstruction Era, understood legal advice as just ordinary speech.

That changed as, "during the end of the nineteenth century and especially up through the 1920s," the legal profession rapidly expanded. Laurel A. Rigertas, *Lobbying and Litigating Against "Legal Bootleggers"—the Role of the Organized Bar in the Expansion of the Courts' Inherent Powers in the Early Twentieth Century*, 46 Cal. W. L. Rev. 65, 82 (2009). This growth triggered more "organization in state and regional bar associations," *id.* at 82–83, which started as social clubs that eventually turned into "vehicle[s] to advocate for the profession." Rigertas, *The Birth of the Movement, supra*, at 111–12. The New York City Bar

Association was the first to take its "advocacy" to the next level, by "identifying and stopping unlicensed practitioners," which it saw as a way to curb the rise of legal competitors, such as title companies, that threatened to take work away from traditional attorneys. *Id.* at 113–14, 147–50. Other bar associations soon joined the wave of economic protectionism. And by the 1930s, organized bar associations, including the American Bar Association and the New York Bar, started a push for broad UPL restrictions like the advice prohibition at issue here.[1] Rigertas, *Lobbying*, *supra*, at 92–117.

---

[1] This push eventually shifted to the courts (and away from legislatures) because attorneys were concerned the legislatures would be less inclined to protect attorneys' economic interests. *Id.* at 92. This move came after "legislatures had not proved to be friendly forums for the organized bar's agenda, and the bar feared the influence of other interest groups in the legislative process." *Id.* at 135; *see also* Deborah L. Rhode, *Policing the Professional Monopoly: A Constitutional and Empirical Analysis of Unauthorized Practice Prohibitions*, 34 Stan. L. Rev. 1, 3, 53 (1981) (contrasting the bar's own characterization of UPL laws as "a selfless enterprise actuated solely by considerations of 'public interest and welfare,'" with the bar's "strong economic [and] psychological interests in declining to acknowledge that legal work could be done as competently by laymen as by lawyers"); Kry, *supra*, at 888 (explaining why "there is a large body of historical, economic, and sociological literature that suggests that the primary motivation for professional licensing laws is economic self-interest").

In other words, the use of UPL rules to stomp out legal competition, particularly in the form of out-of-court legal advice, is a comparatively recent innovation. There was no historical or "common practice of imposing licensing requirements on those who did no more than render advice." Robert Kry, *The "Watchman for Truth": Professional Licensing and the First Amendment*, 23 Seattle U. L. Rev. 885, 954–55 (2000). Only in the mid-20th century did restrictions on this sort of speech begin to run rampant.

More recently, though, many states have substantially rolled back that monopolization of legal advice. As the complaint alleges, states like Arizona and Utah have, for years, authorized innovative nonlawyer programs like the American Justice Movement. JA-38–39. But even the complaint tells only part of the story, as jurisdictions across the country continue to back away from monopolizing out-of-court speech about the law. South Carolina, for example, recently approved a limited legal-advice program much like the one offered by the American Justice Movement. *See* Sarah Merken, *South Carolina court says NAACP program doesn't violate legal practice curbs*, Reuters (Feb. 14, 2024), https://www.reuters.com/legal/legalindustry/south-carolina-court-says-

naacp-program-doesnt-violate-legal-practice-curbs-2024-02-13/.[2]   These reforms have garnered widespread praise, including from the American Bar Association[3] and the Conference of Chief Justices and the Conference of State Court Administrators.[4]

New York, however, has declined to follow suit. In New York, the protectionism of the mid-20th century remains in full force and there is no avenue for nonlawyers to provide any legal advice, at all, without attending law school.

## IV.   Procedural History.

And so the plaintiffs brought this lawsuit, seeking a court order that would allow them to run their proposed volunteer program without risking criminal punishment. Initially, the district court granted them a preliminary injunction. As the district court (Judge Crotty) saw it, a restriction on giving legal advice (as distinct from a restriction on drafting binding legal documents or appearing in court) was a restriction on

---

[2] A fuller discussion of less-speech-restrictive approaches to legal advice—and their widespread success—is contained in the forthcoming amicus brief of Professor Rebecca Sandefur and other empirical scholars.
[3] *See* ABA Resolution 605, https://www.americanbar.org/content/dam/aba/administrative/house_of_delegates/2025-annual-supplemental-materials/605-rev.pdf.
[4] *See* Resolution 1-2025, https://ccj.ncsc.org/resources-courts/support-exploring-access-justice-through-authorized-justice-practitioner-programs

speech, not on conduct. *Upsolve I*, 604 F. Supp. 3d at 112–13. And, because it applied to some topics (legal advice) but not others (financial advice), it was a content-based restriction on speech. *Id.* at 114. After all, if the plaintiffs wanted to "provide non-legal advice about a client's debt problem (by, for example, advising that person to cut down on spending to pay off debts), the UPL rules do not apply." *Id.* But if they wanted to help the same person by telling them "how they should fill out the State-Provided Answer Form" to contest their debts, "the UPL rules forbid their speech." *Id.* That distinction, "by definition," was "content-based" because it turned on what Appellees talk about. *Id.* And applying strict scrutiny, the ban on legal advice readily failed. The scope of the ban itself could "hardly be broader" while many less-restrictive alternatives, including those actually adopted by other states, were apparent.[5] *Id.* at 119.

The State appealed, and a panel of this Court vacated the injunction. *Upsolve, Inc. v. James*, 155 F.4th 133, (2d Cir. 2025) ("*Upsolve II*"). The panel agreed with the district court that New York's prohibition on

---

[5] This case comes to this Court on a motion to dismiss, so it is limited to the allegations of the complaint, but the record below reflects that the preliminary injunction allowed plaintiffs to actually run the American Justice Movement volunteer program for years. *See* District Court Docket ECF 111 (Declaration of Jonathan Petts).

14

unlicensed legal advice is a restriction on speech, but it held that the content-neutrality question was controlled by an intervening decision, *Brokamp v. James*, 66 F.4th 374 (2023). Under *Brokamp*, the panel held, it was required to hold that the restriction on legal advice is content-neutral. It therefore vacated the injunction and remanded to allow the district court to apply intermediate scrutiny in the first instance.

On remand, the district court (now Judge Kaplan) did not consider whether to reinstate the injunction but instead granted the government's motion to dismiss the case entirely.[6] JA-78. While intermediate scrutiny usually requires the government to present evidence, the district court held that, here, the prohibition on advice survived on the face of the pleadings—not because the complaint pled facts that show the government would have evidence to meet its burden but because no evidence could be required. The advice ban, on its face, obviously met every element of intermediate scrutiny, notwithstanding less-restrictive approaches actually adopted by other states. JA-90–100.

---

[6] The plaintiffs had sought Supreme Court review of the previous panel opinion in this case, but their petition for certiorari on the interlocutory appeal was mooted by the intervening entry of final judgment in the trial court. *See Upsolve, Inc. v. James*, 2026 WL 858427 (U.S. Mar. 30, 2026).

This appeal timely followed.

## STANDARD OF REVIEW

This Court "review[s] a district court's grant of a motion to dismiss de novo, accepting as true all factual claims in the complaint and drawing all reasonable inferences in the plaintiff's favor." *Cornelio v. Connecticut*, 32 F.4th 160, 168 (2d Cir. 2022) (quotation marks omitted). In deciding a Rule 12(b)(6) motion, courts do not "weigh the evidence that might be presented at trial but merely [ ] determine whether the complaint itself is legally sufficient." *Id.* (quotation marks omitted). And because Rule 12 requires courts to look only to the allegations on the complaint, judgment in a free-speech case, where the defendant carries an affirmative burden, "will rarely, if ever, be appropriate at the pleading stage." *Id.* at 172.

## SUMMARY OF ARGUMENT

The district court's dismissal of the complaint should be reversed.

To begin, the prior panel opinion held that a restriction on legal advice (but not financial advice) can escape strict scrutiny if character-ized as a restriction on speech whose *purpose* is conveying legal advice. That holding does not survive the Supreme Court's intervening decision in *Chiles v. Salazar*, 146 S. Ct. 1328 (2026), which undermines both the

16

prior panel opinion and the opinion it held was controlling: *Brokamp v. James*, 66 F.4th 374 (2d Cir. 2023). *Chiles* confirms the prior panel opinion's holding that a restriction on giving legal advice is a restriction on speech, of course. But it knocks away every pillar undergirding the previous finding of content neutrality. *Chiles* squarely holds that the content-neutrality question here is governed by *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010), which has already held that restrictions on legal advice are content-based restrictions on speech. It rejects the idea (adopted by *Brokamp* and repeated by the prior panel opinion) that a law can be declared content-neutral on the grounds that it does not discriminate based on viewpoint. It rejects the idea (similarly relied on by the previous panel opinion) that a law forbidding one-on-one discussions of certain topics is saved from strict scrutiny by the fact that a plaintiff retains other ways to speak about the banned topic. It reaffirms that content-based laws are subject to strict scrutiny unless they fall into a longstanding exception to ordinary First Amendment rules, which licensing laws do not, and it rejects the idea that the government can restrict speech on certain topics so long as it does so based on the ends that speech

17

hopes to achieve. In the wake of *Chiles*, this Court must look at the content-neutrality question with fresh eyes.

Even if it doesn't, though, the district court's intermediate-scrutiny analysis was error. There is, in candor, a split of authority over how intermediate-scrutiny works in contexts like this. The Fourth Circuit has held that (at least sometimes) professional-licensing laws like the one challenged here are subject to a new, loosened intermediate scrutiny—one that, unlike traditional intermediate scrutiny, does not require the government to present evidence justifying its suppression of speech. Other courts—most notably the Fifth and Ninth—disagree. If the Fourth Circuit has the right of it, the decision below may be correct. But nothing in this Court's precedents recognizes a new, lowered intermediate-scrutiny test for speech bans like this one, and there is no reason to adopt one now. Applying the ordinary intermediate-scrutiny test to the allegations of the complaint—which alleges that New York has adopted a staggeringly broad prohibition on speech for no good reason—leads to the conclusion that the complaint states a claim for relief.

Finally, the district court erred in dismissing the complaint's freedom-of-association claim. Even assuming that the district court is correct

18

about the free-speech analysis here—and that New York can, without meaningful judicial review, cabin entire topics of relevant advice off to designated guilds of licensed professionals—surely New Yorkers who cannot afford access to those guilds must retain some residual right to gather together in groups and nonprofits to discuss the information that New York otherwise forbids. For all of these reasons, the judgment of the district court should be reversed.

## ARGUMENT

### I. The Supreme Court's recent decision in *Chiles v. Salazar* undermines the prior panel opinion.

The opinion below, understandably, operates from the premise that its decision was controlled by the previous panel opinion in this case. This Court, however, must begin by deciding the extent to which it remains bound by that opinion. The general rule in this Court, of course, is that panels "are bound by the decisions of prior panels until such time as they are overruled either by an en banc panel of our Court or by the Supreme Court." *United States v. Wilkerson*, 361 F.3d 717, 732 (2d Cir. 2004). But "there are situations in which this general rule does not apply." *Dale v. Barr*, 967 F.3d 133, 142 (2d Cir. 2020). Specifically, this Court is "not bound to follow [a] prior ruling" when an intervening Supreme Court

19

decision "casts doubt" on that ruling or its reasoning. *Id.* The intervening ruling need not "address the precise issue decided by the panel for this exception to apply." *In re Zarnel*, 619 F.3d 156, 168 (2d Cir. 2010). Instead, it is enough for an intervening decision to "have broken the link on which [the Court] premised [its] prior decision or undermined an assumption of that decision[,]" even if the effect of the intervening precedent is "subtle." *Wojchowski v. Daines*, 498 F.3d 99, 108, 109 (2d Cir. 2007) (cleaned up).

That test matters here because after this case's last appearance before this Court, the Supreme Court decided *Chiles v. Salazar*, a free-speech case about a law restricting certain kinds of one-on-one talk therapy. As discussed below, *Chiles* directly addresses two holdings adopted by the previous panel opinion in this case. First, *Chiles* reaffirms the panel's holding that New York's rules prohibiting unlicensed legal advice were a restriction on speech, not conduct. Second, *Chiles* abrogates the prior panel's holding that a prohibition on giving legal advice (but not other kinds of advice) was a content-neutral restriction on speech that turned only on the "purpose, focus, and circumstance" of the plaintiffs' speech.

20

### A. *Chiles* reaffirms the prior panel opinion's holding that New York's prohibition on unlicensed legal advice is a restriction on speech.

The prior panel opinion first concluded that a prohibition on providing legal advice is a restriction on speech because, "for an as-applied [free-speech] challenge, courts should look to whether 'the conduct triggering coverage under the statute consists of conveying a message.'" *Upsolve II*, 155 F.4th at 142 (quoting *Holder v. Humanitarian Law Proj.*, 561 U.S. 1 (2010)). Under that test, plaintiffs—who just want to talk to people, not to "draft pleadings, appear in court, or file any legal documents"—are regulated solely because of the message they want to communicate. *Id.*

*Chiles* confirms that this is the right test and that *Holder* is the controlling case. As the Supreme Court explained in *Chiles*, in *Holder* "the government threatened to prosecute lawyers, doctors, and others for providing spoken training and expert advice (such as 'how to use humanitarian and international law to peacefully resolve disputes') to certain groups." *Chiles*, 146 S. Ct. at 1022. That made the law in *Holder* (as applied) a restriction on speech, and the same was true of the law in *Chiles*, which prevented talk therapists from trying to help a minor patient change his or her sexual orientation or gender identity. *Id.*

21

The same is true here. Plaintiffs want to provide spoken training and advice on particular topics (answering consumer-debt lawsuits) to particular people (New Yorkers facing those suits). As the prior panel held, and as *Chiles* confirms, that means this case is controlled by *Holder* and New York's restriction on the unauthorized practice of law, as applied, is a restriction on speech.

### B. *Chiles* abrogates the prior panel opinion's holding that New York's prohibition on unlicensed legal advice is content-neutral.

In the second half of the prior panel's merits analysis, though, *Holder* disappears entirely. Instead, the prior panel held that the content-neutrality of New York's ban on unlicensed advice was controlled by *Brokamp v. James*, 66 F.4th 374 (2d Cir. 2023). *Upsolve II*, 155 F.4th at 143. In *Brokamp*, a panel of this Court rejected a challenge to a licensing law that restricted the speech of unlicensed mental-health counselors. *Id.* The panel there reasoned that this restriction (which it assumed, as applied to pure talk therapy, was a restriction on speech) was content-neutral because it applied based not on the content of a person's speech but upon the speech's "purpose, focus, and circumstance." *Brokamp*, 66 F.4th at 393. As the *Upsolve* panel emphasized, the law in *Brokamp* was

22

content-neutral because it "did not permit the State to 'license views it finds acceptable, while refusing to license less favored or more controversial views." *Upsolve II*, 155 F.4th at 143 (quoting *Brokamp*, 66 F.4th at 393). Neither did it "'condemn certain ideas or viewpoints' or 'prohibit[ ] public discussion of an entire topic." *Id.* (quoting same).

That logic required the prior panel opinion to hold that the law here is similarly content-neutral. To be sure, it applies only to legal advice (not financial advice), but it applies regardless of the *sort* of legal advice someone might give. The ban on unlicensed advice applies equally to those who want to give legal advice only to debtors as to those who would advise creditors, which makes clear that it does "not license only certain views that the State finds acceptable[.]" *Id.* And it left the plaintiffs free to say other things: They could "discuss legal topics and provide generalized advice, including by publishing books and guides, without" obtaining a license. *Id.* Ultimately, *Brokamp* compelled the prior panel here to conclude that New York's law discriminates based only against "speech having a particular purpose, focus, and circumstances . . . namely, the rendering of legal advice and opinions to particular clients[.]" *Id.* (quotation marks omitted).

23

None of this logic survives *Chiles*. To start, *Chiles* confirms that *Holder* controls not just the speech-conduct question but also the content-neutrality question. Recall that *Holder* confronted a situation in which "the government threatened to prosecute lawyers, doctors, and others for providing spoken training and expert advice (such as 'how to use humanitarian and international law to peacefully resolve disputes')[.]" *Chiles*, 146 S. Ct. at 1022. That was a restriction on speech, yes—but it was *also* an attempt to "'regulate speech on the basis of its content' and thus demanded strict-scrutiny review." *Id.* So too here: The government threatens to prosecute plaintiffs and others for providing spoken training and expert advice (such as how to fill out the pro-se answer form provided by New York). The prior panel opinion's failure to follow *Holder*'s content-neutrality analysis does not survive *Chiles*'s confirmation that both parts of that opinion are controlling—even in cases about "licensed professionals." *Id.*

But there's more. *Chiles*, almost point-by-point, rejects each premise of the prior panel opinion. Take the fact that New York's ban on legal advice "does not license only views the state finds acceptable[.]" *Upsolve II*, 155 F.4th at 143. *Chiles* makes clear that this conflates two categories

24

of First Amendment violations: On the one hand, "content-based restrictions"—defined as "laws regulating speech based on its subject matter or 'communicative content'"—"trigger strict scrutiny." 146 S. Ct. at 1021. By contrast, "regulations that discriminate based on the speaker's point of view" are different; they pose "greater dangers[,]" to be sure, but *Chiles* makes clear that the absence of viewpoint discrimination does not save a content-based law from strict scrutiny. *Id.* As the Court repeatedly emphasized, the law in *Chiles* both "regulate[d] the content of Ms. Chiles's speech" and also went "a step further, prescribing what views she may and may not express." *Id.* at 1024. Contrary to the prior panel opinion's assumption, *Chiles* makes clear that *viewpoint* neutrality is independent of whether a law is also *content*-based.

Or take the prior panel opinion's emphasis on plaintiffs' continued ability to "discuss legal topics and provide generalized advice, including by publishing books and guides" about the law. *Upsolve II*, 155 F.4th at 143. *Chiles* rejects that, too. "Of course," the Court acknowledged, "Ms. Chiles remains free to say other things." *Id.* Just as did the prior panel opinion, the dissent in *Chiles* pointed out that Ms. Chiles could still speak: She could "'shar[e] information' about sexual orientation or gender

25

identity" outside the context of a talk-therapy session. 146 S. Ct. at 1042. She could "criticiz[e] Colorado's law" or even (just as the prior panel opinion here emphasized) "'writ[e] papers espousing her views[.]" *Id.* But none of those things mattered in *Chiles* because the law in question remained content-based and viewpoint-based. That means none of those things should matter here, either—but, in the last panel opinion, they did.

And *Chiles* undermines the prior panel opinion still further. That opinion derived two controlling principles from *Brokamp*: First, that "not all speech-licensing regimes are content based" if they do not evince a viewpoint preference. 155 F.4th at 143 & n.2. And, second, that states may freely distinguish between different speech based on its "purpose, focus, and circumstance" without running afoul of the prohibition on content-based restrictions. 155 F.4th at 143. The first principle is the one espoused by the two-Justice concurrence in *Chiles*. The second is the rule advocated by the one-Justice dissent in *Chiles*. And neither of them can be squared with the majority opinion in *Chiles*.

Start with the first—the idea that viewpoint-neutral licensing schemes that forbid laypeople from saying certain things can escape the

26

normal strict-scrutiny treatment. That same position was advocated by the two-Justice concurrence in *Chiles*, which sought to limit the decision to *viewpoint-based* laws only and which would have considered applying less searching review to "content-based but viewpoint-neutral laws regulating speech in doctors' and counselors' offices." 146 S. Ct. at 1031 (Kagan, J., concurring).

But the majority opinion rejects this approach, insisting that the law in *Chiles* could escape strict scrutiny only by falling into a "recognized exception to [the] usual First Amendment rules." *Id.* at 1025. And it did not. It was not "fraud, defamation, [or] 'fighting words[.]'" Neither did it "fall within a long tradition of permissible content regulation." *Id.* at 1026.

That last one bears particular emphasis here. *Chiles* made clear that Colorado had failed to shoe-horn its restriction into a tradition of permissible content regulation for two independent reasons. One was that counselor licensing itself was a "relatively recent innovation" dating back only decades. *Id.* at 1027. Another, of course, was that the law Colorado sought to justify engaged in viewpoint discrimination, but the Court explicitly invoked viewpoint discrimination as a "[s]econd"

27

independent basis for rejecting the argument. *Id.* In short, the Court squarely held that there is no "long tradition of permissible content regulation" of counselor's speech. *Id.* at 1026–28. The *Chiles* concurrence's suggestion that there might be (at least for viewpoint-neutral regulations) therefore cannot be squared with the plain text of the majority opinion—and neither can *Brokamp*'s holding that a restriction on a counselor's ability to talk to her patients about their feelings is nonetheless content-neutral.[7] Even more clearly, a restriction that hinges entirely on what a person says—like the restriction here, which bans legal advice but not personal-finance advice—cannot be squeezed into any "long tradition of permissible content regulation." *Chiles*, 146 S. Ct. at 1026.

The same holds true of the idea that a restriction on counselor's speech can escape strict scrutiny by couching it in terms of the speech's "purpose, focus, and circumstance." *Upsolve II*, 155 F.4th at 143. After all, *Chiles* reminds us, "[t]he First Amendment is no word game[, a]nd the rights it protects cannot be renamed away or their protections nullified by mere word games." 146 S. Ct. at 1023 (quotation marks omitted).

---

[7] The history of state regulation of out-of-court legal advice, of course, is almost as newfangled as the history of counselor licensing and deserves the same treatment. *See supra* 9–13.

It would have been perfectly possible to characterize the law challenged in *Chiles* as one directed only at speech with the *purpose* of changing a patient's sexual orientation, with the *focus* and *circumstance* of a professional-patient relationship. Indeed, both Colorado and the dissent tried. *See, e.g., id.* at 1041 (Jackson, J., dissenting) (defining "professional medical speech" as speech "in the context of the professional-patient relationship . . . for the purpose of providing medical care"). The majority rejects this approach, squarely holding that "the State's law trains directly on the content of [Chiles's] speech" rather than anything else. *Id.* at 1026.

If the Supreme Court rejected Justice Jackson's view that a speech restriction can be saved from strict scrutiny where the speech is "in the context of the professional-patient relationship . . . for the purpose of providing medical care," it is hard to see how *Brokamp*'s conclusion that laws can avoid strict scrutiny by regulating based on whether "speech h[as] a therapeutic purpose . . . in the context of a professional practice or organized setting" can survive. *Brokamp*, 66 F.4th at 394. And it is still harder to see how the prior panel opinion's holding that it is content-neutral to regulate speech whose "purpose, focus, and circumstance" consist of "rendering of legal advice and opinions to particular clients"

29

remains good law. *Upsolve II*, 155 F.4th at 143. Rendering legal advice and opinions is speech with particular content: It is saying "I think you should do this" rather than "I can't tell you what I would do." Re-labeling it as speech with the *purpose* of rendering advice (rather than as speech that *is* advice) is exactly the sort of "word game" *Chiles* commands us to abjure.

In short, *Chiles* has "broken the link" on which this Court premised its earlier holding that a restriction on legal advice but not advice on other topics is content-neutral. *Wojchowski*, 498 F.3d at 108. To be sure, a restriction on particular kinds of talk therapy is not the *same* as a restriction on legal advice, but the Court's analysis squarely and methodically rejects nearly every premise on which the prior opinion rests. *Cf. In re Zarnel*, 619 F.3d at 168 (intervening ruling need not "address the precise issue decided by the panel"). This Court should recognize as much.

## II. The district court erred in holding that New York's prohibition on unlicensed legal advice survives intermediate scrutiny on a motion to dismiss.

Even if intermediate scrutiny were the right test, though, the district court erred by applying a fact-free version of intermediate scrutiny in which the government was required to present no evidence and the

ready availability of less speech-restrictive alternatives was categorically irrelevant. That is not the law of this circuit—though, in candor, there is an active circuit split on this question, and some other courts of appeals have adopted the sort of loosened intermediate scrutiny adopted below. If the district court had applied the correct version of intermediate scrutiny—one in which the government bears an evidentiary burden to show it has not too readily abandoned less-speech-restrictive alternatives—the motion to dismiss would have been denied. The decision below should therefore be reversed.

### A. There is a circuit split about the level of intermediate scrutiny applicable here.

A content-neutral law subject to intermediate scrutiny must still directly advance a significant government interest and be "narrowly tailored to serve" that interest. *McCullen v. Coakley*, 573 U.S. 464, 486 (2014). Narrow tailoring means "it must not burden substantially more speech than is necessary to further the government's legitimate interests" and, while its burdens "need not be the least restrictive or least intrusive means" of achieving the government's ends, "the government may still not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *Id.*

31

(quotation marks omitted). To meet this burden, the government bears the burden of proof: It must show that lesser burdens "would fail to achieve the government's interests, not simply that the chosen route is easier." *Id.* at 495. This test matters because "demanding a close fit between ends and means . . . prevents the government from too readily sacrificing speech for efficiency." *Id.* at 486.

Not every circuit follows *McCullen* in every circumstance, though. The best articulation of the circuit split comes from the Fourth Circuit's decision in *360 Degree Virtual Drone Services v. Ritter*, which holds that there are two distinct intermediate-scrutiny tests: the "traditional" one that requires evidence and a "loosened" one that applies to "professional-conduct-focused regulations." 102 F.4th 263, 276 (4th Cir. 2023). In deciding which test to apply, "a variety of factors may come into play[,]" including whether the forbidden speech "carries legal, health, economic, or public-safety-related consequences," whether the regulation applies to public speech or private speech (with private speech being less protected), or whether the regulation "appears to regulate some kind of unpopular

32

or dissenting speech." *Id.* at 274–75. The list of factors is, of course, non-exclusive.[8]

Other circuits disagree and exclusively apply the traditional intermediate-scrutiny test, even to occupational-licensing laws. Take *Richwine v. Matusak*, in which the Seventh Circuit confronted an as-applied challenge to Indiana's funeral-director license brought by "death doulas"—people who wanted to provide one-on-one advice about planning for death and the funeral process. 148 F.4th 942 (7th Cir. 2025). That case involved a licensing law that generally restricted professional conduct like embalming bodies, but the plaintiffs there (as here) challenged it only to the extent it prevented them from giving one-on-one advice. *Id.* at 953–54. Despite that, the Seventh Circuit applied the traditional intermediate-scrutiny test, under which the government failed to carry its burden to show the law was narrowly tailored. Indeed, by sweeping in a wide range of speech under the umbrella of its licensing requirement, it "further[ed] the state's interests the way an atom bomb would further the

---

[8] The Eleventh Circuit appears to agree with the Fourth in holding that licensing laws that restrict speech as-applied can escape ordinary First Amendment scrutiny. *See Del Castillo v. Sec'y, Fl. Dep't of Health*, 26 F.4th 1214, 1226 (11th Cir. 2022).

eradication of a residential ant infestation." *Id.* at 955. This was because the law forbade simple advice about how and whether to seek a green burial—even if the adviser did not purport to *provide* the green burial. *Id.* Requiring a license for that kind of advice was overkill because "[i]nformation is not in itself harmful" and "to the extent the state wants to prevent its citizens' access to this information about their options, that is the very type of overregulation that the First Amendment requires us to view with heavy skepticism." *Id.*

The Fifth Circuit takes the same view. There, intermediate scrutiny—even of licensing laws—is "no gimme for the government[.]" *Hines v. Pardue*, 117 F.4th 769, 779 (5th Cir. 2024). "[T]he burden of justification [for a content-neutral restriction] is demanding and it rests *entirely* on the state." *Id.* (citation omitted). In *Hines*, the Fifth Circuit confronted a Texas law that forbade Texas veterinarians from offering veterinary advice about an animal without first examining it in person. Assuming without deciding that the law was content-neutral,[9] the Fifth Circuit (again applying ordinary intermediate scrutiny) found that the

---

[9] *But see id.* at 785–86 (Ramirez, J., concurring) (arguing that a restriction on particular advice is content-based and subject to strict scrutiny).

34

government had failed to carry its burden in several independent ways at summary judgment. It had failed to present admissible evidence that its restriction was preventing real, not hypothetical, harms. *Id.* at 782. It failed to present evidence that its law directly alleviated those harms, in no small part because it allowed plenty of advice without direct examination: Veterinarians could provide advice about animals they hadn't seen in years or about animals whose premises they had visited without seeing the animal, and medical doctors could provide telehealth advice about humans anytime. *Id.* at 783. Separately, it was not narrowly tailored because the state had failed to explain, with evidence, why it had not pursued less-restrictive means to achieve its ends. *Id.* at 784–85. In short, the ordinary intermediate-scrutiny test required a real evidentiary showing from the government, and the government lost in *Hines* because it failed to adduce enough evidence.

Indeed, even the Fourth Circuit agrees that "ordinary" intermediate scrutiny—unlike the new version announced in *Drone Services*—requires governments to present real evidence and courts to inquire into the availability of less-restrictive alternatives. In *Billups v. City of Charleston*, for example, that court found that a tour-guide licensing law

35

failed intermediate scrutiny because (among other things) the city had failed to present sufficient evidence at trial to corroborate its prediction that it could not sufficiently protect tourists by using its "deceptive solicitation and business licensing ordinances" or by using "a voluntary tour guide certification program similar to those used by other local governments around the country." 961 F.3d 673, 688 (4th Cir. 2020). Government officials' uncorroborated assertions that these alternatives would not work were insufficient to show narrow tailoring under intermediate scrutiny. *Id.*

In short, there is a split of authority over whether ordinary intermediate-scrutiny applies to licensing laws that restrict speech in their specific application. The Fourth and Eleventh Circuits appear to say no—at least sometimes.[10] And at least the Fifth and Seventh Circuits say yes,

---

[10] As discussed above, the Fourth Circuit employs a nonexclusive multi-factor balancing test to decide which licensing laws get ordinary scrutiny (like in *Billups*) and which don't (like in *Drone Services*). *Drone Servs.*, 102 F.4th at 278. Exactly how that test would shake out applied in any other context—including as applied to out-of-court advice of the sort at issue here—is hard to predict. *Cf. Wooden v. United States*, 595 U.S. 360, 385 (2022) (Gorsuch, J., concurring in the judgment) ("Multi-factor balancing tests of this sort[ ] have supplied notoriously little guidance in many other contexts, and there is little reason to think one might fare any better here.").

36

even when very specifically confronting speech regulated by professional-licensing requirements. Meanwhile, all the circuits seem to agree that "ordinary" intermediate scrutiny (when it applies) requires courts to look seriously at evidence and evaluate whether the government has too readily eschewed a less-restrictive alternative regulation. This split is squarely implicated by this case.

### B. Affirming the district court would put this Court on the wrong side of the existing split.

Affirming the district court would require this Court to take the wrong side of this circuit split—to reject the approach of the Fifth and Seventh Circuit and to apply something like the Fourth Circuit's new, "loosened" and evidence-free version of intermediate scrutiny. But nothing in this Court's precedent requires it to take that approach, and it should decline to do so.

### 1. Affirming the district court's ruling requires splitting with other circuits.

The district court did not expressly grapple with this circuit split, but it nonetheless implicitly chose a side. On the district court's view, New York has outlawed unlicensed legal advice because it is worried about incompetent advice from unlicensed practitioners, and that ban

37

directly advances that interest because every time it is applied to plaintiffs, it will prevent them from giving unlicensed legal advice. JA-97. And it is narrowly tailored, even though less restrictive alternatives may be available, because (the district court held) the courts are not empowered to second-guess the legislature's judgment to impose this restriction. JA-99–100. Finally, it held that this case can be resolved on the pleadings because the court could not entertain any facts that might dislodge these obvious conclusions, let alone require the government to introduce any evidence in support of them. JA-101. Each of these conclusions comports with the Fourth Circuit's new, "loosened" intermediate scrutiny, but none of them match the ordinary intermediate scrutiny applied in other circuits.

Start with the government's asserted interest in protecting the public from incompetent, unlicensed legal advice. Recall that, in *Hines*, the Fifth Circuit held that Texas failed to directly advance the government's asserted interest in preventing veterinarians from giving advice about animals they had not examined because Texas law left open several other avenues by which animal owners could receive exactly that sort of advice (from, say, a veterinarian who had not examined the animal in years or

38

one who had only seen the premises where the animal was kept). *Hines*, 117 F.4th at 783. The same could be said here: After all, New Yorkers get unlicensed legal advice *all the time*. They get it from books and from bartenders alike. But they also get it from disgraced crypto billionaires.[11] And they get it, increasingly, from unregulated artificial-intelligence programs.[12] In the Fifth Circuit, a regulator would be required to explain why trained, human volunteers pose more of a danger than any of those sources. The district court imposed no similar burden on the government here.

Or take the district court's approach to the burdens imposed by New York's prohibition. The district court declined to follow the Supreme Court's decision in *McCullen v. Coakley* because, it said, that decision only requires courts to examine less-restrictive alternatives that would burden less speech, not alternatives that would regulate the same speech

---

[11] Jonah E. Bromwich, *Crypto Fraudster Sam Bankman-Fried Has New Pursuit: Jailhouse Lawyer*, N.Y. Times, (Dec. 20, 2025), https://www.nytimes.com/2025/12/20/nyregion/sam-bankman-fried-jailhouse-lawyer.html.

[12] Sara Randazzo, *No lawyer? No money? More Americans are suing with AI help*, Reuters (May 15, 2026), https://www.reuters.com/legal/government/no-lawyer-no-money-more-americans-are-suing-with-ai-help-2026-05-15/.

with a lighter touch. JA-100–101 (citing *McCullen*). On that view, none of plaintiff's proffered less-restrictive alternatives would count, since all of them allow for nonlawyer volunteers to give legal advice but none simply declare legal advice to be wholly unregulated.

The district court's approach, though, ignores the obvious consequence of adopting less-restrictive regulations on speech: More people would be able to comply with the regulations, which would allow more people to speak and thus leave more speech unregulated. That is why other circuits (and, indeed, the Supreme Court) consistently say it matters whether the government regulates too *heavily*, not just too broadly. That is, the proper inquiry is not just whether the state is regulating *too many words* but whether "a substantial portion of the burden [it is imposing] on speech does not serve to advance its goals." *Richwine*, 148 F.4th at 955 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1981)). That is why, in *Billups*, the Fourth Circuit credited less-restrictive alternatives like business licenses or anti-fraud statutes—not because those would leave tour guides *unregulated* but because they would be *less burdensome* and therefore allow more speakers. 961 F.3d at 688–89. So too in *Hines*, where a proposed less-restrictive alternative would

40

forbid the veterinarian from offering advice without a physical exam only where the examination was reasonably necessary: It would not *deregulate* veterinary advice, but it would reduce the burdens on speech and result in more of it. 117 F.4th at 784–85. And so too here, where the state has a host of options, many currently deployed in other jurisdictions to great effect, that would allow people to give certain narrow legal advice of the kind plaintiffs want to share. *See supra* 12–13. These alternatives, like those accepted by other courts, would mean more speakers would be legally allowed to speak and therefore the state would be restricting less speech.

Or consider the district court's approach to facts more broadly. The district court seemed to believe it was not permitted to entertain factual testimony about less restrictive alternatives. JA-73 (19:10–12) ("So you contemplate a trial, which, were the State of New York inclined to do it, would involve a thorough assessment of what's happened in South Carolina."); *accord* JA-100 ("the Court must defer to New York's reasonable decision about how to advance its interests"). In other circuits, though, exactly that kind of evidentiary inquiry is not just allowed, but mandated. *Hines* evaluated less-restrictive alternatives in light of a

41

summary-judgment record. 117 F.4th at 784 (finding the state's "argument—and the expert testimony on which it relies—unpersuasive"). *Billups* did it post-trial. 961 F.3d at 689 (evaluating witness testimony about alternatives). Even *Richwine*, though only on a preliminary-injunction motion, had a factual record before it. 148 F.4th at 956 (discussing affidavits). The district court's articulation of the intermediate-scrutiny test—one in which it asked whether the challenged law was "substantially related to advancing the state's legitimate interests" and then was required to "defer to New York's reasonable decisions about how to advance those interests"—looks much more like traditional rational-basis review than it does ordinary intermediate scrutiny as applied by any other court in the nation.

And the district court's refusal to consider evidence (or even the possibility of evidence) led it into a false choice: either New York officials could require three years of law school and bar admission before allowing anyone to give any legal advice on any topic *or* they could "take plaintiffs' word when they say that Justice Advocates will provide only 'truthful and non-misleading advice[.]'" JA-98. But of course not. As the allegations of the complaint make clear, there are many steps in between "require three

42

years of law school and a law license" and "take the plaintiffs' word for it," and many of those less-restrictive steps are seeing success, right now, in allowing for more speech and greater access to justice. Given the opportunity, plaintiffs will be able to prove those allegations—and, in jurisdictions across the country, that would matter. The district court held it would not.

In short, the district court's application of intermediate scrutiny looks nothing like ordinary intermediate scrutiny and instead looks a lot like the Fourth Circuit's new, "loosened" and fact-free intermediate scrutiny. But that is error: This Court has never adopted that newfangled test, and it should not do so now.

### 2.   Nothing in this Court's precedent supports a fact-free version of intermediate scrutiny.

Nothing in this Court's precedent has ever endorsed the Fourth Circuit's idea of a second, "loosened" intermediate-scrutiny test. Quite the contrary.[13] This Court's precedents recognize only one intermediate-

---

[13] Indeed, when it went looking for out-of-circuit precedent to support its conclusion that New York's ban on unlicensed legal advice was a restriction on speech, the prior panel opinion favorably cited both *Hines* and *Billups*—an odd choice if those cases conflict with this Court's approach to the First Amendment. *Upsolve II*, 155 F.4th at 141–42.

scrutiny test: "the traditional 'narrowly tailored' test." *Deegan v. City of Ithaca*, 444 F.3d 135, 142 (2d Cir. 2006). That traditional test, as uniformly understood by the cases cited above and by cases in this circuit, requires the government to meet a factual burden. For that reason, "the norm is to wait until the summary judgment stage of the litigation" to evaluate whether the government can carry that burden. *Cornelio v. Connecticut*, 32 F.4th 160, 172 (2d Cir. 2022) (citation omitted). Granting judgment in a free-speech case "will rarely, if ever, be appropriate at the pleading stage." *Id.* (citation omitted). Those rare exceptions are cases where a complaint fails to allege any serious burdens on speech, as in *Citizens United v. Schneiderman*, 882 F.3d 374 (2d Cir. 2018), or where the complaint itself alleges that a restriction was adopted in response to "severe instances of criminal behavior" and "property destruction, vandalism, and looting." *Jeffery v. City of New York*, 113 F.4th 176, 179 (2d Cir. 2024). No decision from this Circuit allows a court to simply reject a complaint that alleges that the government has imposed a substantial burden on speech when that burden is not only unnecessary but "affirmatively counterproductive." JA-20.

44

In reaching its contrary conclusion, the district court again relied heavily on this Court's decision in *Brokamp v. James*, 66 F.4th 374 (2d Cir. 2023). But the district court read *Brokamp* extraordinarily broadly, turning it from a limited, fact-bound decision into a rule that *any* licensing law that restricts speech will definitionally survive intermediate scrutiny. *Brokamp* cannot support that reading.

Just contrast the district court's approach to the burdens imposed by a challenged law with the approach the *Brokamp* panel took. As discussed above, the district court held that a law's burdens are essentially irrelevant under intermediate scrutiny: The district court's narrow-tailoring analysis does not care whether a law requires a would-be speaker to graduate from law school or merely to take an approved training class from a nonprofit. But *Brokamp* cared very much. There, the panel made clear that the plaintiff (a Virginia-licensed counselor) did not have standing to challenge New York's licensing requirement for counselors. Instead, she only had standing to challenge New York's "streamlined requirement for licensure by endorsement" that applied to counselors licensed out of state. *Id.* at 389. As the panel noted, this restriction was not "seriously burdensome" in light of the fact that the plaintiff herself

45

could "easily make [the necessary] showing" for licensure. *Id.* at 402. For the *Brokamp* panel, that mattered because the minimal burden "itself tailor[ed] the licensing statute to avoid an undue burden on the speech of counselors." *Id.* For the district court, though, the minimal (or maximal) nature of a burden is categorically irrelevant.

Or take the *Brokamp* panel's approach to tailoring. For the district court, tailoring is met here because the state seeks to prevent unlicensed legal advice, and plaintiffs seek to provide unlicensed legal advice to those who need it. JA-97. But *Brokamp* was far more circumspect. For the panel there, the law was narrowly tailored because it applied only to speech that "(1) ha[d] a therapeutic purpose, (2) relat[ed] to a mental disorder or problem, (3) in the context of a professional practice or an organized setting." 66 F.4th at 394. By contrast, there was no barrier whatsoever to offering "instruction, advice, support, encouragement, or information" to people suffering from emotional or mental-health problems so long as the conversation did not purport to *treat* that mental health problem.

The district court resisted this distinction, insisting that the definition of "counseling" in the *Brokamp* statute was just as broad as the

46

definition of "legal advice" here. JA-98. But that's hard to square with the *Brokamp* decision itself, which insisted that requirement of a "therapeutic" purpose made it "implausible" that the statute could ever reach people like "life coaches, self-help gurus, mentors, religious leaders, [or] close friends" who might offer materially identical advice absent an avowed therapeutic intent. 66 F.4th at 404 n.29. Nothing like that is true about the law challenged here. Under the counseling statute, Reverend Udo-Okon (or anyone else) can set up shop in the basement of his church and say "I am not a medical professional, but I have some training and I want to give you advice about your emotional problems." But he can't set up shop and say "I am not a lawyer, but I have some training and I want to give you advice about your legal problems" unless he first goes to law school. That is a substantially broader—and thus, less tailored—prohibition on speech than this Court confronted in *Brokamp*, and it cannot be upheld without any evidence to justify it simply because the different law at issue in *Brokamp* survived intermediate scrutiny.

In short, the district court reads *Brokamp* to mean, in effect, that any licensing law that squelches speech will not just survive intermediate scrutiny but will do so even on a motion to dismiss. Nothing in

47

*Brokamp* itself requires this, and taking that broader reading requires splitting from the holdings of cases in other circuits. This Court should not do so.

Instead, this Court should reverse the judgment below and remand this case so the government can try to justify its speech restriction with evidence. So it can explain (if it can) why speech from human volunteers like the members of the American Justice Movement must be silenced when countless other sources of legal advice (including online AI engines) run rampant. So it can explain (if it can) why states from Alaska to South Carolina can allow nonlawyers to give legal advice in certain contexts while New York cannot. So it can explain (if it can) why New Yorkers cannot be trusted to get information from someone they know is not a trained attorney and to weigh that information accordingly. Or so it can explain (if it can) why ordinary tort remedies would be insufficient to protect New Yorkers from bad advice about the law (as they protect them from so many other sorts of bad advice). On the face of the complaint, none of these questions has an answer. Under the ordinary intermediate-scrutiny test, each of them needs one. The judgment below should therefore be reversed.

### III. If nothing else, plaintiffs must have a free-association right to talk to their own members about the law.

The district court also dismissed the complaint's free-association claim, reasoning that it was simply an outgrowth of the rejected First Amendment claim. JA-102–04. To the extent the district court's ruling hinged on its skepticism of the complaint's free-speech claim, it should be reversed for the same reasons the free-speech claim should be reinstated. *See supra* 18–48. After all, the First Amendment protects the "right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition[.]" *Roberts v. U.S. Jaycees*, 468 U.S. 609, 618, 104 S. Ct. 3244 (1984).

But, more broadly, the district court misunderstands the link between the complaint's free-speech and free-association claims. Assume the district court is right about how the First Amendment cashes out here—that the Free Speech Clause means New York can make it illegal to provide any legal advice, no matter how desperately needed, without meeting whatever qualifications it chooses. Surely, New Yorkers in desperate need must have some countervailing right to band together for the express purpose of sharing information that is essential to vindicating their legal rights. *Cf. NAACP v. Button,* 371 U.S. 415, 437–38 (1963)

49

(rejecting law that "prohibit[ed] every cooperative activity that would make advocacy of litigation meaningful").

The Fourth Circuit's opinion in *Capital Associated Industries, Inc. v. Stein*, 922 F.3d 198 (4th Cir. 2019) is instructive. There, the court rejected a free-association challenge brought by a trade association that wanted to provide legal services to its members. While it called the case "admittedly close," the Fourth Circuit ultimately rejected the associational claim for three reasons: "First, what [the trade association] seeks to accomplish would be for commercial ends[;] . . . [s]econd, it would not facilitate access to the courts[;] [a]nd third, it would pose ethical concerns not present in the *Button* cases." *Id.* at 206. None of those is true here: The American Justice Movement is a non-profit, its entire mission is facilitating access to courts, and it presents no "serious danger . . . of professionally reprehensible conflicts of interest." *Button*, 371 U.S. at 443, 83 S. Ct. at 343; *see also Jacoby & Meyers, LLP v. Presiding Justs.*, 852 F.3d 178, 188 (2d Cir. 2017) (finding no associational right when the plaintiffs were not non-profit organizations, but were "engaged in the practice of law as a business" for the purpose of commercial gain). In short, while some courts have rejected the idea that private businesses

50

have an associational right to practice law, none has rejected the idea that private citizens have a right to band together in a nonprofit setting to help each other figure out how best to access the courts, particularly in the face of prohibitions as broad and draconian as New York's.

## CONCLUSION

The judgment below should be reversed.

May 26, 2026

Respectfully submitted,

*/s/ Robert J. McNamara*
Robert J. McNamara
Elizabeth L. Sanz
INSTITUTE FOR JUSTICE
901 North Glebe Road, Suite 900
Arlington, Virginia 22203
(703) 682-9320
rmnamara@ij.org
bsanz@ij.org

*Counsel for Plaintiffs-Appellants*

51

52

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) and Local Rule 32.1(a)(4)(A) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), it contains 10,186 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Century Schoolbook 14-point font, a proportionally spaced typeface.

Dated: May 26, 2026

*/s/ Robert J. McNamara*
Robert J. McNamara
*Counsel for Plaintiffs- Appellants*