# 26-847

In The United States Court Of Appeals
For The Second Circuit

UPSOLVE, INC., AND REV. JOHN UDO OKON,

Plaintiffs-Appellants,

v.

LETITIA JAMES, IN HER OFFICIAL CAPACITY AS ATTORNEY GENERAL OF THE STATE OF NEW YORK,

Defendant-Appellee.

On Appeal from the United States District Court
for the Southern District of New York

**BRIEF AMICUS CURIAE OF PACIFIC LEGAL FOUNDATION AND QUEST FOR JUSTICE, LLC, IN SUPPORT OF PLAINTIFFS-APPELLANTS**

PATRICK N. FORREST
Quest for Justice, LLC
304 S. Jones Blvd. # 4421
Las Vegas, NV 89107

ETHAN W. BLEVINS
Pacific Legal Foundation
839 W 3600 S
Bountiful, Utah 84010

CALEB R. TROTTER
Pacific Legal Foundation
555 Capitol Mall, Suite 1290
Sacramento, CA 95814
Telephone: (916) 419-7111
Facsimile: (916) 419-7747
ctrotter@pacificlegal.org

*Counsel for Amici Curiae Pacific Legal Foundation and Quest for Justice, LLC*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Pacific Legal Foundation, by and through its undersigned attorney, hereby certifies that it has no parent corporation and that no publicly held corporation owns 10% or more of its stock.

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Quest for Justice, LLC, by and through its undersigned attorney, hereby certifies that it has no parent corporation and that no publicly held corporation owns 10% or more of its stock.

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................... i
TABLE OF AUTHORITIES ........................................................... iii
IDENTITY AND INTEREST OF AMICI ............................................... 1
INTRODUCTION AND SUMMARY OF ARGUMENT ........................... 4
ARGUMENT ...................................................................................... 5
I. Listeners' Rights ............................................................................ 5
II. Listeners' Rights and Alternative Means of Communication ......... 9
III. A Less-Restrictive Alternative That Preserves Listener Rights .. 13
CONCLUSION .................................................................................. 16
CERTIFICATE OF COMPLIANCE ....................................................... 17
CERTIFICATE OF SERVICE .............................................................. 18

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*44 Liquormart, Inc. v. Rhode Island*,
517 U.S. 484 (1996) .......... 5

*Barilla v. City of Houston*,
No. 4:20-CV-00145 (S.D. Tex. Jan. 15, 2020) .......... 1

*Chiles v. Salazar*,
607 U.S. _, 146 S.Ct. 1010 (2026) .......... 10

*Citizens United v. Fed. Election Comm'n*,
558 U.S. 310 (2010) .......... 5

*City of Ladue v. Gilleo*,
512 U.S. 43 (1994) .......... 11

*Conant v. Walters*,
309 F.3d 629 (9th Cir. 2002) .......... 5, 7–8

*Kleindienst v. Mandel*,
408 U.S. 753 (1972) .......... 7, 10–12

*Lamont v. Postmaster General*,
381 U.S. 301 (1965) .......... 6

*McCullen v. Coakley*,
573 U.S. 464 (2014) .......... 10, 13

*Spargo v. New York State Comm'n on Judicial Conduct*,
351 F.3d 65 (2d Cir. 2003) .......... 5

*Tilt Vision Studios, LLC v. City of Waller*,
No. 4:23-cv-03864 (S.D. Tex. July 26, 2024) .......... 1

*United States v. Alvarez*,
567 U.S. 709 (2012) .......... 14

*Upsolve v. James*,
155 F.4th 133 (2d Cir. 2025) .......... 8

*Upsolve, Inc. v. James*,
2026 WL 621821 (S.D.N.Y. 2026) .......... 4–5, 9, 12

*Upsolve, Inc. v. James*,
604 F. Supp. 3d 97 (S.D.N.Y. 2022) .......... 8

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council*,
425 U.S. 748 (1976) .......... 14

## Constitutional Provisions

U.S. Const. amend. I .......... *passim*

## Other Authorities

Blevins, Ethan, *Listening to the Listeners: A Patient's Right To Receive Information via Telehealth*,
32 Geo. Mason L. Rev. 557 (2025) .......... 8, 10

Engstrong, David Freeman et al., *Legal Innovation After Reform: Evidence from Regulatory Change* (Sep. 2022),
https://law.stanford.edu/wp-content/uploads/2022/09/SLS-CLP-Regulatory-Reform-REPORTExecSum-9.26.pdf .......... 15

Opinion, *MacDonald v. Sabando*,
No. 23-cv-23044, 2025 WL 1367443, Dkt. No. 34 (D.N.J. May 12, 2025) .......... 1

*Innovation Office Manual*, The Office of Legal Services Innovation (Feb. 2024),
https://utahinnovationoffice.org/wp-content/uploads/2024/02/Innovation-Office-Manual.pdf .......... 15

Utah Supreme Court Standing Order No. 15 (Sep. 2022),
https://legacy.utcourts.gov/rules/urapdocs/15.pdf .......... 15

## IDENTITY AND INTEREST OF AMICI[1]

Pacific Legal Foundation (PLF), a nonprofit law firm, has defended individual liberty since 1973—including many appearances before the Supreme Court and the federal courts of appeal. PLF has a special interest in protecting the right to speak in professional and volunteer settings, whether that be mural painters seeking to promote their artwork,[2] musicians trying to earn extra income doing what they love,[3] or doctors sharing life-saving information with patients via telehealth services. Indeed, several PLF clients—both patients and telehealth providers—face similar legal issues as those presented in this case. *See* Opinion, *MacDonald v. Sabando*, No. 23-cv-23044, 2025 WL 1367443, Dkt. No. 34 (D.N.J. May 12, 2025) (relying on similar reasoning as the district court below to uphold New Jersey's ban on out-of-state

---

[1] No party's counsel authored this brief in whole or in part. No party contributed financial support intended to fund the preparation or submission of this brief. No individual or organization other than PLF and its counsel contributed funding for the preparation or submission of this brief.

[2] *Tilt Vision Studios, LLC v. City of Waller*, No. 4:23-cv-03864 (S.D. Tex. July 26, 2024).

[3] *Barilla v. City of Houston*, No. 4:20-CV-00145 (S.D. Tex. Jan. 15, 2020).

practitioners meeting with in-state patients via telehealth) (appeal pending).

Quest for Justice, LLC, is a legal technology company that develops software tools to help pro se litigants navigate civil proceedings. The company builds tools to help users evaluate whether they may have a viable claim or defense, understand how to enforce their rights, generate demand letters and court documents, and complete related tasks such as filing, service, and evidence organization. These tools are designed for individuals handling common civil matters, including small claims disputes and consumer-related issues, who cannot afford traditional legal services but nevertheless need reliable guidance to assert and protect their rights.

Quest for Justice has a substantial interest in this case. Millions of Americans appear in civil courts each year without counsel, especially in lower-value disputes. Yet unauthorized-practice-of-law rules often restrict the ability of technology providers to offer tools that help users understand how legal rules and court procedures apply to their circumstances, even when the tools are intended only to assist individuals in navigating standard processes and completing routine

forms. Consequently, Quest for Justice has had to limit the scope of assistance its software can provide to pro se litigants, even in routine matters where guided tools could help them understand and participate in the legal system.

Quest for Justice's experience illustrates the practical consequences of rules that restrict the provision of legal guidance to pro se individuals. Those involved in legal disputes often do not seek abstract descriptions of legal doctrine; they seek assistance in understanding how legal rules apply to their own circumstances and what steps they may take to protect their rights. Quest for Justice's technology facilitates that individualized communication by translating legal rules and procedures into accessible questions and explanations tailored to a user's situation. When unauthorized-practice-of-law rules prohibit even limited forms of individualized legal guidance, they restrict the flow of information that pro se litigants seek. Quest for Justice can offer valuable insight on the impact of such laws that will assist the Court's review of this appeal.

Amici file this brief pursuant to Rule 29(a) of the Federal Rules of Appellate Procedure. All parties to the appeal have consented to the filing of this brief.

## INTRODUCTION AND SUMMARY OF ARGUMENT

This case is about more than the right of Upsolve to share basic legal advice. It is also about the rights of pro se defendants to seek and receive that advice. For decades, the federal courts have recognized that the First Amendment protects the right to receive information. Yet this essential companion to the right to speak often gets forgotten, resulting in a lopsided jurisprudence that discounts the rights and interests of listeners. This case is but one example.

Here, the legal system drops debt defendants into a twisting legal landscape alone, but New York criminalizes those who would offer them a map. The district court held that the unauthorized-practice-of-law (UPL) statute satisfied intermediate scrutiny as applied to plaintiffs in part because it only restricted "individualized legal advice, leaving much law-related speech unregulated." *Upsolve, Inc. v. James*, 2026 WL 621821, at *8 (S.D.N.Y. 2026). But non-individualized legal advice, such as training guides, is fundamentally different in content and value than one-on-one live advice. From the perspective of the listener, in particular, access to a training guide cannot replace the value of individualized

advice. This distinction is fatal to the lower court's holding that the UPL statute is "narrowly tailored as a matter of law." *Id.* at *7.

This Court should address how listeners' rights play a role in First Amendment analysis of laws restricting the right to receive one-on-one advice.[4]

## ARGUMENT

### I. Listeners' Rights

"[T]he right to hear and the right to speak are flip sides of the same coin." *Conant v. Walters*, 309 F.3d 629, 643 (9th Cir. 2002) (Kozinski, J., concurring). It is "well established" that the First Amendment protects both "the right to engage in protected speech" and "the right to receive such speech." *Spargo*, 351 F.3d at 83.

---

[4] This Court can and should consider the right to receive information even if no plaintiff in this action is a pro se defendant seeking Upsolve's assistance. In a related context, this Court has held that the rights of listeners and speakers are "inextricably intertwined," *Spargo v. New York State Comm'n on Judicial Conduct*, 351 F.3d 65, 82 (2d Cir. 2003), and courts regularly weigh the rights of listeners in cases where only speakers have raised First Amendment claims. *See, e.g.*, *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 339 (2010) (in a case brought by speaker, the Court weighed "[t]he right of citizens to inquire, to hear, to speak, and to use information"); *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 503 (1996) (in a case brought by regulated liquor retailers, the Court struck down restrictions on liquor price information because they "deprive consumers of accurate information").

This right to receive information is independent of the speaker's right to speak. For example, in *Lamont v. Postmaster General*, 381 U.S. 301 (1965), the Supreme Court addressed a statute requiring the postal service to seize incoming foreign mail deemed "communist political propaganda," to be released only upon the addressee's request. *Id.* at 302. The postal service had seized a pamphlet called the "Peking Review #12," addressed to Mr. Lamont, who sued claiming a First Amendment injury. *Id.* at 304. Even though the foreign correspondent lacked a constitutionally protected free speech right, the Court held that Lamont had an independent First Amendment right as a listener. *See id.* at 305 ("We conclude that the Act as construed and applied is unconstitutional because it requires an official act . . . as a limitation on the unfettered exercise of the addressee's First Amendment rights.").

The concurrence elaborated: "The dissemination of ideas can accomplish nothing if otherwise willing addressees are not free to receive and consider them. It would be a barren marketplace of ideas that had only sellers and no buyers." *Id.* at 308 (Brennan, J., concurring). Lamont and similar cases indicate that a listener's right to receive information is not a conditional right that exists only when there is a corollary and

actionable right to speak. *See, e.g.*, *Kleindienst v. Mandel*, 408 U.S. 753, 765 (1972) (recognizing that plaintiffs' First Amendment right to listen was implicated when the government denied a noncitizen journalist's visa application to visit for a speaking tour). Thus, a holding that a speaker's rights may be subject to regulation does not resolve the separate question whether the regulation impairs the listener's right to receive that speech.

Indeed, in certain contexts, the rights and interests of listeners may exceed those of the speaker. In *Conant*, for instance, the Ninth Circuit addressed a case involving a federal prohibition on doctor recommendations that patients use medical marijuana. While the majority only mentioned in passing the patients' right to receive such recommendations, Judge Kozinski's concurrence argued that patients suffered the greater First Amendment injury:

> [I]t is perfectly clear that the harm to patients from being denied the right to receive candid medical advice is far greater than the harm to doctors from being unable to deliver such advice. While denial of the right to speak is never trivial, the simple fact is that if the injunction were denied, the doctors would be able to continue practicing medicine and go on with their lives more or less as before. It is far different for patients . . . .

309 F.3d at 643–44 (Kozinski, J., concurring). From the perspective of the right to listen, someone receiving personalized advice—medical, legal, or otherwise—has a far more poignant interest in regulated speech compared to someone who hears a knock from a door-to-door solicitor or passersby who see a picket line on their route home. *See* Ethan Blevins, *Listening to the Listeners: A Patient's Right To Receive Information via Telehealth*, 32 Geo. Mason L. Rev. 557, 571 (2025).

Like the patients in *Conant*, the pro se defendants that Upsolve seeks to serve here have a heightened First Amendment interest. For example, Plaintiff Reverend Udo-Okon receives requests for legal assistance from his community, including for debt-collection actions. *Upsolve, Inc. v. James*, 604 F. Supp. 3d 97, 105 (S.D.N.Y. 2022). He entered into the record a petition of over 100 signatures of community members who would like to receive free legal advice from him on such topics. *Upsolve v. James*, 155 F.4th 133, 138 (2d Cir. 2025). While Upsolve volunteers' speech rights are implicated by New York's UPL statute, the pro se defendants' rights to receive that information suffer perhaps more, especially given the nonfinancial motives of the speakers.

Yet those rights received no mention from the district court. Instead, the court reasoned that the state of New York has a more heightened interest in regulating one-on-one legal advice than generalized legal advice in the form of guides or books. But the right to listen is more burdened by laws that bar access to one-on-one counsel personalized to the listeners' needs than speech addressed to a general audience. On appeal, this Court should consider how the interests of listeners affect the First Amendment analysis in one-on-one personalized communication solicited by the listener.

## II. Listeners' Rights and Alternative Means of Communication

The district court erred in its narrow tailoring analysis by failing to account for the rights and interests of listeners. Specifically, the court held that the UPL rules are narrowly tailored because they "restrict only the giving of legal advice to a specific person about the person's individual legal problems," leaving plaintiffs free to "speak[] publicly about legal issues, including through the publication of self-help materials." *Upsolve*, 2026 WL 621821, at *7. This holding neglects the interests and rights of the pro se defendants who would receive plaintiffs' advice. A listener has a stronger interest in direct, personalized communication, for which the

specific speaker was sought out, than in generalized speech directed at a general audience. *See* Blevins, *supra*, at 570–72.

A content-neutral law "must not burden substantially more speech than is necessary to further the government's legitimate interests." *McCullen v. Coakley*, 573 U.S. 464, 486 (2014) (citation omitted).[5] When judging how much speech a law burdens, written or recorded works are not an adequate substitute for live verbal communication. An emphasis on the listener demonstrates this. For example, in *Kleindienst*, a hallmark case on listeners' rights, a group of professors sued the State Department for rejecting the visa application of a foreign journalist whom they had invited to the United States to speak at academic conferences. Although the plaintiffs' challenge failed thanks to the unique foreign-policy context, the Supreme Court rejected the government's argument that listeners' rights were not affected because the plaintiffs could still access Mandel's ideas through his books, audio recordings, or telephone. 408 U.S. at 765. The Court explained that "[t]his

---

[5] As appellant ably explains, strict scrutiny should apply here under *Chiles v. Salazar*, 607 U.S. _, 146 S. Ct. 1010 (2026), but this brief examines the UPL statute under the intermediate scrutiny applied below, since the statute cannot survive either standard of scrutiny.

argument overlooks what may be particular qualities inherent in sustained, face-to-face debate, discussion and questioning." *Id.* Generalized communication and personalized communication were not interchangeable.

While the *Kleindeinst* Court did not specify the level of scrutiny at work (the test for content neutrality was created that same term), the Supreme Court has since incorporated similar reasoning into its content-neutrality caselaw. For instance, in *City of Ladue v. Gilleo*, 512 U.S. 43 (1994), the Court addressed a content-neutral ordinance prohibiting certain residential signs. The Court rejected the city's contention that the ordinance was properly tailored because it allowed for similar signs elsewhere: "Displaying a sign from one's own residence often carries a message quite distinct from placing the same sign someplace else, or conveying the same text or picture by other means." *Id.* at 56. Thus, when assessing whether a law leaves open alternative channels of speech, the Court defines the speech at issue with particularity based on context and medium.

Ironically, it is this very distinction between written works and verbal communication that the district court relied on to reduce First

Amendment protections here. According to the lower court, the UPL statute's focus on one-on-one communication still left speakers free to speak on any legal topic they wished, such as by writing a book or giving a presentation, so long as it was not personalized advice to a specific client. *See Upsolve*, 2026 WL 621821, at *7.

For the listener, however, the difference between direct personalized advice and a book is profound. Few patients would consider a medical textbook to be an adequate substitute for an in-person doctor visit. Likewise here, when pro se defendants seek advice in their individual debt collection actions, a legal treatise is not an adequate substitute for experienced advice for their particular case. Yet the federal district court held that the state has a stronger interest in regulating this one-on-one setting. That reasoning inverts the rights and interests of listeners, protecting them least where their interests are greatest.

A focus on the pro se defendants demonstrates why the UPL statute is not narrowly tailored. General legal advice in the form of a book or guide, which the law allows, is not an adequate alternative channel of communication because specific legal advice in a one-on-one context is a fundamentally different type of speech. *See Kleindienst*, 408 U.S. at 765.

The district court found the UPL statute narrowly tailored by expanding the denominator—the relevant category of speech—that is left unregulated. But the relevant category is not all speech on legal matters—it is personalized one-on-one legal advice.

Indeed, the entire purpose of Upsolve's strategy is to fill a gap in the information ecosystem that a book or guide cannot fill. No book will tell pro se defendants how they specifically should complete the relevant form that accompanies debt-collection actions. People are not asking Reverend Udo-Okon to write a guide about debt-collection actions for their reading pleasure—they are asking him for advice about their unique circumstances. The UPL statute gives no quarter for that speech. Pro se defendants seek content that the UPL statute forbids, content that they have a First Amendment right to receive.

## III. A Less-Restrictive Alternative That Preserves Listener Rights

To satisfy content neutrality, the government must "look to less intrusive means of addressing its concerns." *McCullen*, 573 U.S. at 492. New York can preserve the rights of pro se defendants to seek out basic legal advice while also satisfying its own interests in protecting them against unsound advice. While the state has many options available, one

less-restrictive alternative bears particular mention in the context of listeners' rights: mandatory disclosure.

Rather than restrict listeners' access to information they have a right to receive, the government can often pursue its interests through more speech, not less. The Supreme Court has held that this is the preferred way to address risks posed by speech:

> There is, of course, an alternative to this highly paternalistic approach. That alternative is to assume that this information is not in itself harmful, that people will perceive their own best interests if only they are well enough informed, and that the best means to that end is to open the channels of communication rather than to close them.

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council*, 425 U.S. 748, 770 (1976). The burden rests with the government to show "why counterspeech would not suffice to achieve its interest." *United States v. Alvarez*, 567 U.S. 709, 726 (2012).

Here, that counterspeech could come in the form of mandatory disclosures that a legal service is being provided by a nonlawyer. Utah offers one example of how a state can use such disclosures to serve their interests in protecting the public while also carving out exemptions from the UPL standards in order to serve lower-income communities. In Utah, approved entities can operate in a regulatory sandbox that exempts them

from certain licensing and regulatory standards, including nonlawyers approved to provide certain legal services.[6] Such nonlawyers must, however, include a clear disclosure that they are not attorneys and point clients to further information provided by the state.[7] A Stanford study found that the complaint rate for nonlawyer services provided under the sandbox program was about the same, if not lower, than the complaint rate for licensed attorneys.[8] Thus, this less-restrictive alternative appears to satisfy Utah's interest in protecting the public while spoiling listeners with more information, rather than depriving them of vital assistance.

Listeners are better off in general with more information, not less. Rather than babyproofing the information marketplace, the state should empower pro se defendants to use information wisely, not lock the cupboards.

---

[6] *See* Utah Supreme Court Standing Order No. 15 (Sep. 2022), https://legacy.utcourts.gov/rules/urapdocs/15.pdf.

[7] *See Innovation Office Manual*, The Office of Legal Services Innovation 20–21 (Feb. 2024), https://utahinnovationoffice.org/wp-content/uploads/2024/02/Innovation-Office-Manual.pdf.

[8] David Freeman Engstrong et al., *Legal Innovation After Reform: Evidence from Regulatory Change* 45–46 (Sep. 2022), https://law.stanford.edu/wp-content/uploads/2022/09/SLS-CLP-Regulatory-Reform-REPORTExecSum-9.26.pdf.

## CONCLUSION

Pro se defendants have a right to ask for help in dealing with their legal troubles, and the people able and eager to help them have a right to give the answer. This Court should reverse the lower court's conclusion to the contrary.

DATED: June 2, 2026.

Respectfully submitted,

s/ Caleb R. Trotter

CALEB R. TROTTER
Pacific Legal Foundation
555 Capitol Mall, Suite 1290
Sacramento, CA 95814
Telephone: (916) 419-7111
Facsimile: (916) 419-7747
ctrotter@pacificlegal.org

PATRICK N. FORREST
Quest for Justice, LLC
304 S. Jones Blvd. # 4421
Las Vegas, NV 89107

ETHAN W. BLEVINS
Pacific Legal Foundation
839 W 3600 S
Bountiful, Utah 84010

*Counsel for Amici Curiae Pacific Legal Foundation and Quest for Justice, LLC*

## CERTIFICATE OF COMPLIANCE

Type-Volume Limit, Typeface Requirements,
and Type-Style Requirements

This document complies with the type-volume limitation of Local Rule 32.1(a)(4) and Fed. R. App. P. 29(a)(5), excluding the parts of the document exempted by Fed. R. App. P. 32(f), because this document contains 3,052 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 in font style Century Schoolbook and font size 14.

DATED: June 2, 2026.

s/ Caleb R. Trotter
CALEB R. TROTTER

## CERTIFICATE OF SERVICE

I hereby certify that on June 2, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

s/ Caleb R. Trotter
CALEB R. TROTTER