# 26-847

IN THE

# United States Court of Appeals

**FOR THE SECOND CIRCUIT**

UPSOLVE, INC., AND REV. JOHN UDO-OKON,

*Plaintiffs-Appellants*,

— against —

LETITIA JAMES, IN HER OFFICIAL CAPACITY AS ATTORNEY GENERAL OF THE STATE OF NEW YORK,

*Defendant-Appellee*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**BRIEF FOR *AMICUS CURIAE* CATO INSTITUTE**
**IN SUPPORT OF PLAINTIFFS-APPELLANTS AND REVERSAL**

Thomas A. Berry
*Counsel of Record*
Dan Greenberg
CATO INSTITUTE
1000 Massachusetts. Ave., NW
Washington, DC 20001
(443) 254-6330
tberry@cato.org

*Counsel for Amicus Curiae*

# CORPORATE DISCLOSURE STATEMENT

The Cato Institute is a nonprofit entity operating under § 501(c)(3) of the Internal Revenue Code. *Amicus* is not a subsidiary or affiliate of any publicly owned corporation and does not issue shares of stock. No publicly held corporation has a direct financial interest in the outcome of this litigation due to the *amicus*'s participation.

Dated: June 2, 2026 /s/ Thomas A. Berry

# TABLE OF CONTENTS

**Page(s)**


CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF AUTHORITIES ........................................................................ iii

INTEREST OF *AMICUS CURIAE* ........................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................1

ARGUMENT ........................................................................................................6

I. New York's Speech Restriction on the Unlicensed Practice of Law Harms Consumers. ........................................................................6

A. UPL Restrictions Are a Twentieth-Century Invention, Not a Longstanding Tradition. ........................................................6

B. UPL Laws Serve Licensed Attorneys' Economic Interests. .............7

II. New York's Speech Restriction on the Unlicensed Practice of Law Exacerbates an Access-to-Justice Crisis. ..............................................11

A. The Access-to-Justice Crisis Is Vast and Well-Documented. ........13

B. Debt Collection in New York Is a Catalyst of the Access-to-Justice Crisis. ........................................................................14

III. New York Has Alternatives. ..................................................................15

IV. The Lower Court's Reasoning Threatens First Amendment Protection Across Licensed Professions. ..............................................18

CONCLUSION ....................................................................................................20

CERTIFICATE OF COMPLIANCE ..................................................................22

CERTIFICATE OF SERVICE ............................................................................23

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Chiles v. Salazar*, 146 S. Ct. 1010 (2026)........................................................ 5, 19

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755 (2018) ................. 5, 19

*People v. Title Guarantee & Trust Co.*, 125 N.E. 666 (N.Y. 1919).......................10

*Reed v. Town of Gilbert,* 576 U.S. 155 (2015) .........................................................3

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989) ................................................3

## Statutes & Legislative Materials

N.Y. JUD. LAW § 476-a ..............................................................................................1

N.Y. JUD. LAW § 478 .................................................................................................1

N.Y. JUD. LAW § 484 .................................................................................................1

N.Y. JUD. LAW § 485 .................................................................................................1

## Other Authorities

*Achieving Civil Justice*, AM. ACAD. OF ARTS & SCIS. (2024)................................13

Anna E. Carpenter et al., *Studying the "New" Civil Judges*, 2018 WIS. L. REV. 249 (2018).............................................................................................14

Chris Edwards, *Occupational Licensing*, *in* EMPOWERING THE NEW AMERICAN WORKER: MARKET-BASED SOLUTIONS FOR TODAY'S WORKFORCE (Scott Lincicome ed., 2022).................................................20

David Freeman Engstrom, Natalie Knowlton, & Lucy Ricca, *Legal Innovation After Reform: Five Years of Data on Regulatory Change*, STAN. L. SCH. (June 2025)........................................................ 13, 14, 16, 17, 18

Deborah L. Rhode, *Policing the Professional Monopoly: A Constitutional and Empirical Analysis of Unauthorized Practice Prohibitions*, 34 STAN. L. REV. 1 (1981) .........................................................................................9

George C. Leef, *The Case for a Free Market in Legal Services*, CATO INST. POL'Y ANALYSIS NO. 322 (Oct. 9, 1998) ...................................... 6, 7, 8, 9, 10, 18

George J. Stigler, *The Theory of Economic Regulation*, 2 BELL J. ECON. & MGMT. SCI. 3 (1971) .......... 8

Joseph J. Avery, Patricia Sánchez Abril, & Alissa del Riego, *ChatGPT, Esq.: Recasting Unauthorized Practice of Law in the Era of Generative AI*, 26 YALE J.L. & TECH. 64 (2023) .......... 10

Morris M. Kleiner, *Reforming Occupational Licensing Policies*, THE HAMILTON PROJECT (Mar. 2015) .......... 20

N.Y. Opening Br., Upsolve, Inc. v. James, No. 22-1345 (2d Cir. Oct. 5, 2022) .......... 12

N.Y. Reply Br., Upsolve, Inc. v. James, No. 22-1345 (2d Cir. Feb. 8, 2023) .......... 12, 16

Paul Sherman, *Occupational Speech and the First Amendment*, 128 HARV. L. REV. F. 183 (2015) .......... 20

Rebecca L. Sandefur & Thomas M. Clarke, *Roles Beyond Lawyers: Summary, Recommendations, and Research Report of an Evaluation of the New York City Court Navigators Program and its Three Pilot Projects*, AM. BAR FOUND. (Dec. 2016) .......... 17

*Report to the Chief Judge of the State of New York*, N.Y. PERMANENT COMM'N ON ACCESS TO JUST. (Nov. 2019) .......... 14

Robert Kry, *The "Watchman for Truth": Professional Licensing and the First Amendment*, 23 SEATTLE U. L. REV. 885 (2000) .......... 7

*The Justice Gap: The Unmet Civil Legal Needs of Low-income Americans*, LEGAL SERVS. CORP. (April 2022) .......... 13, 14

THOMAS SOWELL, KNOWLEDGE AND DECISIONS (1980) .......... 8

## INTEREST OF *AMICUS CURIAE*[1]

The Cato Institute is a nonpartisan public policy research foundation founded in 1977 and dedicated to advancing the principles of individual liberty, free markets, and limited government. Toward that end, Cato's Robert A. Levy Center for Constitutional Studies publishes books and studies about legal issues, conducts conferences, produces the annual *Cato Supreme Court Review*, and files *amicus* briefs in constitutional law cases. This case interests the Cato Institute because one of Cato's missions is to protect free speech from government overreach.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Upsolve, a nonprofit in New York, seeks to train volunteers to advise debtors about debt problems—but state law criminalizes such assistance, throttles free speech, and exacerbates the State's access-to-justice crisis. New York wants to enforce its prohibition of the unauthorized practice of law[2] ("UPL") against Upsolve and its unpaid volunteers. For the reasons explained below, such enforcement violates the First Amendment.

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(2), all parties have consented to the filing of this brief. Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), amicus certifies that (i) no party's counsel authored this brief in whole or in part; (ii) no party or party's counsel contributed money that was intended to fund preparing or submitting this brief; and (iii) no person—other than amicus curiae, its members, or its counsel—contributed money that was intended to fund preparing or submitting this brief.

[2] *See* N.Y. JUD. LAW §§ 476-a, 478, 484–85.

In consumer debt actions, New York allows defendants to use a one-page, state-created answer form that streamlines responses through a series of checkboxes. Upsolve's goal is to provide nonlawyer volunteers who can help low-income individuals complete these forms at no cost. These volunteers would walk defendants through the forms and explain the relevant terms and defenses. They would not draft or file any legal documents, nor would they appear in court. Yet New York's UPL regime criminalizes this speech because it constitutes individualized legal advice, thus transforming a conversation into a crime.

Upsolve and one of its unpaid volunteers filed this suit to challenge the enforcement of New York's UPL statutes in this specific circumstance. In 2022, the district court preliminarily enjoined enforcement, holding that the UPL statutes were content-based regulations of speech, that they were thus subject to strict scrutiny, and that their application to Upsolve's volunteers was unlikely to survive strict scrutiny. JA-87. On the State's interlocutory appeal, this Court agreed that the UPL statutes regulate speech but held them content-neutral, vacated the preliminary injunction, and remanded for application of intermediate scrutiny. *Id.* On remand, the lower court dismissed the case, concluding that the UPL statutes sufficiently serve consumer-protection interests and thereby withstand intermediate scrutiny. JA-104. Plaintiffs appealed, and the matter is once again before this Court.

As Plaintiffs explain in their brief, the restriction here requires strict scrutiny,[3] but New York's UPL regime cannot pass intermediate scrutiny either. Under that standard, the validity of a regulation "depends on the relation it bears to the overall problem the government seeks to correct . . . ." *Ward v. Rock Against Racism*, 491 U.S. 781, 801 (1989). Cato writes separately to explain how New York's UPL regime serves lawyers at the expense of consumers, exacerbates the access-to-justice crisis, and threatens First Amendment protections across licensed professions—despite the existence of sensible alternatives. In short, the UPL law's application to Upsolve is not "narrowly tailored to advancing governmental interests that 'would be achieved less effectively absent the regulation.'" *See* JA-91 (quoting *Ward*, 491 U.S. at 798–99). In fact, the regulation undermines the very governmental interest that the State claims the regulation serves: protecting consumers.

This case underscores the dark side of occupational licensing—in particular, how it advances special interests while harming consumer interests. And the history of UPL prohibitions demonstrates the importance of applying appropriate First

[3] A regulation is content-based and subject to strict scrutiny if it "applies to particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert,* 576 U.S. 155, 163–65 (2015). This restriction is content-based because liability turns on whether the speaker communicates "legal advice" rather than other advice. If Plaintiffs advise someone about financial strategies for managing debt, that's lawful; if Plaintiffs advise someone about the legal implications of debts or alleged debts, that's a crime. This content-based speech restriction intrudes on fundamental First Amendment rights and therefore requires strict scrutiny.

Amendment scrutiny in cases where licensing restrictions limit who can speak. When the government claims that a speech restriction benefits the public while insulating licensed professionals from competition, courts should not just accept the government's claim at face value. State bar associations—composed of licensed attorneys with direct interests in restricting competition—lobbied for these prohibitions. Thus, when the government restricts "professional speech," deference to bare assertions of consumer protection creates grave consequences: Such deference hobbles competition and harms consumers.

New York's ban harms the very people it purports to protect. Low-income defendants in debt-collection cases must often navigate the legal system alone. When trained volunteers are prevented from helping defendants understand a state-created checkbox form, that does not protect consumers; rather, it deprives them of practical assistance that could help them avoid default.

Even though the government bore the burden of proof,[4] the decision below rubber-stamped an arrangement that was reached at the expense of the public interest and shielded from proper constitutional scrutiny. As a practical matter, it appears that the lower court converted intermediate scrutiny to rational basis review, and this reduction in scrutiny exacerbated a large social problem: The New York debt collection cases are at the heart of the ongoing access-to-justice crisis.

[4] JA-90 (as explained in the lower court's decision).

New York has many ways to protect consumers. There is no reason to force most debtors to go it alone, which is what the decision below would effectively do. Several states already permit nonlawyers to provide limited legal services, and there is little evidence that those reforms have harmed consumers. New York could also require disclaimers (which Upsolve already provides) and rely on common-law remedies for fraud, negligence, and breach of duty. In short, protecting the consumer does not require criminalizing speech.

And the stakes are larger than legal advice. Occupational licensing obligations are borne by a large share of the American workforce, and the work of many licensed occupations consists primarily of speech. If ordinary licensing requirements are enough to defeat a First Amendment challenge, states across the country will have a roadmap for suppressing occupation-related speech. The Supreme Court has firmly rejected this kind of licensing-based diminution of First Amendment protection. *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755 (2018) ("*NIFLA*"). Just this year, it reiterated that rejection. *Chiles v. Salazar*, 146 S. Ct. 1010 (2026).

New York may regulate the legal profession. But it may not use licensing as a First Amendment loophole. Speech does not lose constitutional protection because it is individualized or offered by someone outside a state-protected professional monopoly. This Court should reverse the decision below, making it clear that—

whether examined with strict or intermediate scrutiny—the First Amendment requires more than blank-check deference toward restrictions on speech.

## ARGUMENT

### I. NEW YORK'S SPEECH RESTRICTION ON THE UNLICENSED PRACTICE OF LAW HARMS CONSUMERS.

UPL restrictions did not emerge from a groundswell of demand for consumer protection. Rather, they emerged from a well-documented campaign by incumbent lawyers to insulate themselves from competition. That campaign recast incumbent protection as consumer protection. This history matters, and the decision below illustrates why. If this Court affirms the judgment below, it will allow rent-seeking operations to carve out an unjustified exception in the First Amendment.

#### A. UPL Restrictions Are a Twentieth-Century Invention, Not a Longstanding Tradition.

For most of American history, legal advice was freely given and freely received without government restriction. Indeed, the years following the Revolution "saw a concerted attack upon the privileges of the legal profession," and by the time of the Civil War, "no significant restrictions remained." George C. Leef, *The Case for a Free Market in Legal Services*, CATO INST. POL'Y ANALYSIS NO. 322, at 18 (Oct. 9, 1998).[5] Several states even affirmatively declared in statutes or constitutional provisions that every citizen was entitled to practice law. *Id.*

[5] Available at https://tinyurl.com/8m65wjw4.

Those who wished to provide legal assistance had many options. *Id.* Some read law independently, as Abraham Lincoln did; some served an apprenticeship, as Clarence Darrow did; some attended one of the small number of law schools then in existence. *Id*. Aspiring practitioners weighed the costs and benefits of various approaches to legal education and then chose based on their particular circumstances and ambitions. *Id*. The market sorted out competence from incompetence without requiring state licensure as a precondition to speech.

The district court's 2022 opinion recognized this history's significance: "Simply put, the historical practices at the time of the ratification of the First and Fourteenth Amendments show that the rendering of personalized advice to specific clients was not one of the 'well-defined and narrowly limited classes of speech, the prevention and punishment of which has never been thought to raise any constitutional problem.'" App. 60a (quoting Robert Kry, *The "Watchman for Truth": Professional Licensing and the First Amendment*, 23 SEATTLE U. L. REV. 885, 957 (2000)).

### B. UPL Laws Serve Licensed Attorneys' Economic Interests.

Occupational licensing restrictions follow a predictable pattern. Incumbent professionals, organized through trade associations, lobby legislatures to create barriers to entry that restrict competition. Advocacy for such restrictions invariably invokes the protection of consumers from incompetent or fraudulent practitioners.

But the primary beneficiaries of such restrictions are licensed professionals themselves, who face reduced competition and can therefore charge higher prices. The resultant costs—higher prices and fewer choices—are diffused across millions of consumers, each of whom has little incentive to organize opposition to regulations they may not even know exist. Leef, *supra*, at 1, 21–22. Economists have documented this social dynamic across multiple licensed occupations. *Id*. at 22.

This explains why practitioners in regulated industries—not consumers—typically demand and benefit from licensing regimes. George J. Stigler, *The Theory of Economic Regulation*, 2 BELL J. ECON. & MGMT. SCI. 3 (1971). As Thomas Sowell explains, licensing restrictions

> almost invariably exempt existing practitioners, who thereby reap increased earnings from the contrived scarcity, without having to pay the costs they impose on new entrants in the form of longer schooling, tougher qualifying examinations, or more extended apprenticeship. . . . Although "the public interest" is a prominent rhetorical feature of occupational licensing laws and pronouncements, historically the impetus for such licensing comes almost invariably from practitioners rather than the public, and it almost invariably reduces the quantity of new practitioners through various restrictive devices, and the result is higher prices.

Leef, *supra*, at 21 (quoting Thomas Sowell, KNOWLEDGE AND DECISIONS 200 (1980)).

The legal profession exemplifies this pattern. The modern UPL regime emerged from the organized bar's desire to restrict competition, not from consumer demand. *Id*. at 19. Roughly a century and a half ago, the legal profession pressed for

legislation that established minimum educational qualifications for bar membership. *Id*. at 18. The public-interest rationale may have been "sincerely believed by some," but raising admission standards provided extraordinary benefits to incumbent lawyers who faced a rising lawyer-to-population ratio and increasing complaints about "overcrowding at the bar." *Id*.

In 1930, the American Bar Association appointed its first Committee on Unauthorized Practice of Law. State and local bar organizations followed suit, ultimately engineering the passage of statutes that prohibited the "unauthorized" practice of law in every state. *Id.* at 19. As the late Professor Deborah Rhode of Stanford noted, "Although the organized bar has often suggested that the campaign against lay practice arose as a result of a public demand, the consensus among historians is to the contrary." *Id*. (quoting Deborah L. Rhode, *Policing the Professional Monopoly: A Constitutional and Empirical Analysis of Unauthorized Practice Prohibitions*, 34 STAN. L. REV. 1, 1 (1981)).

Only licensed attorneys were thereafter permitted to "practice law"—a vague prohibition that allowed sympathetic courts to determine on a case-by-case basis what professional conduct was in or out of bounds. *Id*. at 19. This imprecision served the bar's interests: it made it easy for bar committees to threaten legal action against any nonlawyer whose activities could plausibly be characterized as "services

traditionally rendered by lawyers." *Id.* (quoting *People v. Title Guarantee & Trust Co.*, 125 N.E. 666, 671 (N.Y. 1919)).

The content and scope of UPL prohibitions have expanded steadily since their emergence.[6] Their expansion parallels the organized bar's growing influence. The organized bar does not stop at limiting entrants into the profession: It aggressively polices information sharing. The prohibition on providing legal advice, even when divorced from court representation and document filing, restricts the flow of information that could reduce demand for licensed attorneys' services. Speech restriction thus becomes a tool of anticompetitive suppression.

Consider the application of New York's UPL laws here. Upsolve wishes to train volunteers to help low-income New Yorkers with a one-page checkbox form—a form New York itself created to simplify responding to debt-collection lawsuits. That form exists because New York recognized that the legal system was failing these defendants. Yet the State now invokes its UPL laws to prohibit anyone other than licensed attorneys from explaining that form's use.

New York's response to this access-to-justice crisis is revealing. Rather than expanding the pool of people permitted to provide basic assistance, the State clings

---

[6] Joseph J. Avery, Patricia Sánchez Abril, & Alissa del Riego, *ChatGPT, Esq.: Recasting Unauthorized Practice of Law in the Era of Generative AI*, 26 YALE J.L. & TECH. 64, 76 (2023) ("Over the ensuing decades, numerous states created their own statutory rules regarding UPL, with each successive round of rules seemingly more expansive than the last.").

to restrictions that block entry into this particular labor market. Only licensed attorneys are permitted to guide individuals through a state-created, one-page checkbox form. This is incumbent protection masquerading as consumer protection.

***

Cato has long warned that occupational licensing often serves private interests rather than public welfare. The costs of such licensing fall disproportionately on those least able to bear them: aspiring workers who lack the resources to complete extensive training requirements and consumers who must pay higher prices for restricted services.

The rent-seeking origins of UPL laws are not merely historical curiosities. They illuminate a structural problem that persists today: special interests that capture regulatory boards and exploit them to restrict speech in a manner that jeopardizes the public interest. When licensing boards controlled by incumbent professionals suppress communication, courts have particular reason to scrutinize the justifications offered for such restrictions rather than to defer to self-interested narratives.

## II. NEW YORK'S SPEECH RESTRICTION ON THE UNLICENSED PRACTICE OF LAW EXACERBATES AN ACCESS-TO-JUSTICE CRISIS.

States have legitimate interests in regulating the practice of law, particularly courtroom advocacy and the establishment of attorney-client relationships with accompanying fiduciary duties. But New York's UPL statute sweeps far beyond

these core concerns: It criminalizes even free, limited-scope assistance with filling out straightforward forms. The access-to-justice and debt-collection crises at the heart of this case demonstrate the damage already done by UPL's encroachment on free speech. Rather than protecting vulnerable populations, New York's approach prevents them from receiving the help they need. In practice, many of them receive no help at all. The State has banned speech that would almost certainly help far more consumers than it could ever harm.

The State appears to argue that New York's access-to-justice crisis is irrelevant unless and until Plaintiffs can prove that no other help for those denied access exists. More precisely, the State argues that legal-aid groups "do not turn away clients"[7] and that there is "no evidence"[8] Plaintiffs' prospective clients could not obtain free advice from licensed attorneys. But the Constitution does not require Plaintiffs to prove that they provide the sole cure to some given problem; rather, the Constitution prevents state governments from silencing speech that would make meaningful help more available to those who are, in practice, denied access to justice.

---

[7] N.Y. Opening Br. at 71, Upsolve, Inc. v. James, No. 22-1345 (2d Cir. Oct. 5, 2022).

[8] N.Y. Reply Br. at 35, Upsolve, Inc. v. James, No. 22-1345 (2d Cir. Feb. 8, 2023).

### A. The Access-to-Justice Crisis Is Vast and Well-Documented.

Supply of affordable legal services is now vastly outpaced by demand. "[M]illions of Americans each year cannot get meaningful help with legal issues impacting their lives. Priced out of the market for lawyers and left to navigate a complex and even Byzantine legal system alone, they often face harmful and even devastating consequences for themselves, their families, and their communities."[9] According to the Legal Services Corporation's ("LSC") 2022 Justice Gap Study, "Low-income Americans do not get any or enough legal help for 92% of their substantial civil legal problems." *The Justice Gap: The Unmet Civil Legal Needs of Low-income Americans*, LEGAL SERVS. CORP. 7, 8 (April 2022).[10] Nearly three-quarters of low-income households experienced at least one civil legal problem in the prior year, and 39% experienced five or more. *Id.* at 8, 32.

The supply of legal assistance falls far short of the demand. A 2023 American Bar Association study found only 2.8 paid civil legal aid lawyers nationwide for every 10,000 people in poverty. *Achieving Civil Justice*, AM. ACAD. OF ARTS & SCIS. 9 (2024).[11] In 2021, LSC-funded legal aid organizations turned away an estimated

---

[9] David Freeman Engstrom, Natalie Knowlton, & Lucy Ricca, *Legal Innovation After Reform: Five Years of Data on Regulatory Change*, STAN. L. SCH. 5 (June 2025), https://tinyurl.com/4xdbvrvv.

[10] Available at https://tinyurl.com/mv777dju.

[11] Available at https://tinyurl.com/2x6e6d65.

1.4 million civil legal problems—71% of the problems brought to their doors—because they lacked the capacity to help. Legal Servs. Corp., *supra*, at 9. The result is a civil court system in which self-representation has become the norm. A 2015 study found that only 26% of civil defendants had representation. Anna E. Carpenter et al., *Studying the "New" Civil Judges*, 2018 WIS. L. REV. 249, 258 n.29 (2018).

UPL rules exacerbate this problem. Engstrom, *supra*, at 10. Under most regimes, "any nonlawyer who offers legal advice, even simple legal advice for free, potentially exposes herself to criminal liability." *Id.* As a result, the supply of legal services for the poorest Americans is greatly diminished.

### B. Debt Collection in New York Is a Catalyst of the Access-to-Justice Crisis.

New York's legal aid organizations report that they must turn away eligible clients due to a lack of organizational capacity, and the vast majority of low-income individuals facing civil legal problems receive no professional assistance. *See Report to the Chief Judge of the State of New York*, N.Y. PERMANENT COMM'N ON ACCESS TO JUST. 14, 22, 36, 41 (Nov. 2019).[12] Pro bono representation from licensed attorneys is laudable, but it cannot satisfy New Yorkers' needs. Legal aid organizations face overwhelming demand. They lack the resources to assist most debt-collection defendants.

[12] Available at https://tinyurl.com/4dx667sc.

Ultimately, the vast majority of debt-collection defendants proceed pro se. More accurately, most of them do not proceed at all, and so they are burdened with default judgments. They do not choose between licensed and unlicensed assistance; Upsolve tried to give them a choice between unlicensed assistance and no assistance at all. But New York's prohibition eliminates the former option and saddles defendants with the latter one.

Debt-collection lawsuits constitute approximately one-quarter of all civil cases in New York's court system. Pet. Cert. App. 6a, 28a. Default rates range from 70% to 90%. *Id*. Many of these lawsuits are "clearly meritless"—brought by third-party debt collectors against defendants who do not owe the amounts claimed or owe nothing at all. *Id*. A default judgment can have devastating consequences, including wage garnishment, eviction, vehicle repossession, bankruptcy, bank account seizures, and a lowered credit score. App. 6a, 29a. Default judgments in this realm are often unrelated to the absence of a valid defense. Rather, these default judgments are typically caused by a defendant's inability to navigate a convoluted system that serves the interests of attorneys far more than it serves the interests of the parties who are enmeshed in it.

## III. NEW YORK HAS ALTERNATIVES.

New York cautions that enjoining enforcement here would "further damage the public interest" by "ratifying plaintiffs' substandard program" and "encouraging

others to lower the bar even further." N.Y. Reply Br. at 34, Upsolve, Inc. v. James, No. 22-1345 (2d Cir. Feb. 8, 2023). That speculative prediction rests on the premise that individualized, limited-scope legal advice is too dangerous for the wrong speaker to supply. But if New York policymakers believe that competence, disclosure, supervision, or accountability rules are needed, they have the power to pursue narrower measures directed to those concerns. What they may not do is invoke hypothetical systemic harms to justify a categorical ban on an entire type of speech.

The State's line of argument implies a parade of horribles: If New York cannot apply its UPL prohibition to Upsolve's aid program, the consequences will allegedly be devastating. The State argues that allowing this program to survive would leave New York with no way to regulate the legal profession or to protect consumers of legal services. But there is very little evidence for this view, and there is much against it.

Across the country, many jurisdictions and legal scholars have recognized that the traditional model of UPL restrictions leaves too many people without meaningful help. *See* Engstrom, *supra*, at 6 (examining the substantial reforms made by states across the nation to expand who may provide legal assistance). There is little to no evidence that these reforms harm consumers. *Id*. at 32–33. New York has numerous

alternatives available short of a categorical prohibition that would protect consumers without suppressing speech.

For example, New York could permit unlicensed assistance for specific, simple tasks while reserving complex representation and court advocacy to licensed attorneys. Many states across the country have enacted reforms to expand who may provide legal assistance, and many more are considering similar measures. *Id*. at 6. Instead of thwarting groups like Upsolve, several states—including Alaska, Delaware, Hawaii, Arizona, and Utah—are authorizing such groups to deploy nonlawyers to provide limited legal services. *Id*. *See also* Rebecca L. Sandefur & Thomas M. Clarke, *Roles Beyond Lawyers: Summary, Recommendations, and Research Report of an Evaluation of the New York City Court Navigators Program and its Three Pilot Projects*, AM. BAR FOUND. (Dec. 2016) (finding nonlawyer navigators effective in helping self-represented litigants).[13]

New York could also require unlicensed advisors to clarify that they are not attorneys and cannot provide legal representation. Such disclaimers enable informed consent while allowing assistance to proceed. Upsolve already does this.

These potential reforms demonstrate what should be obvious: consumer protection does not require total prohibition of nonlawyer legal advice. Targeted regulations addressing specific risks—such as disclosure requirements, scope-of-

[13] Available at https://ssrn.com/abstract=2949038.

practice limitations, and supervision arrangements—can protect consumers without eliminating their access to assistance entirely.

Furthermore, even if New York eliminated all UPL restrictions, it could still enforce civil and criminal prohibitions on fraud and preserve private remedies for negligence, breach of contract, and other concrete harms. Common law remedies protect consumers against actual harm while avoiding prior restraints on speech.

Experience in analogous fields casts further doubt on New York's consumer protection justification. Tax preparation, for instance, is largely unregulated: The market for tax preparation services works without criminalizing tax advice. *See* Leef, *supra*, at 34 (discussing minimal regulation of tax preparation and its maximization of consumer value). Because of the rigid structure of UPL regimes, "the legal profession has not seen the diversification in service providers that has been so successful in the medical field, where nurse practitioners, physician assistants, phlebotomists, and providers in other roles perform a range of needed services at lower cost and in a more holistic way." Engstrom, *supra*, at 10.

## IV. THE LOWER COURT'S REASONING THREATENS FIRST AMENDMENT PROTECTION ACROSS LICENSED PROFESSIONS.

The stakes in this case are bigger than legal advice. The deferential nature of the holding below invites exploitation by a multitude of licensing boards. Occupational licensing pervades the American economy, and licensing boards are typically controlled by incumbent professionals with strong economic incentives to

suppress competitive speech: That means the district court's reasoning supplies a roadmap for additional First Amendment-free zones wherever licensing exists.

Once the Second Circuit classified New York's prohibition as content-neutral, the district court treated the ordinary apparatus of licensure as almost dispositive proof that the regulation satisfies intermediate scrutiny. This rationale implies a First Amendment loophole: once a state places speech inside a licensed occupation, the licensing requirement itself is treated as the answer to the First Amendment question. But the First Amendment does not permit constitutional protection to turn on professional labels. *See Chiles*, 146 S. Ct. at 1023 ("The First Amendment is no word game. And the rights it protects cannot be renamed away or their protections nullified by 'mere labels.'"); *NIFLA*, 585 U.S. at 773. The Supreme Court has repeatedly rejected the categorization and diminution of professional speech,[14] making clear that "the First Amendment's protections extend to licensed professionals much as they do to everyone else." *Chiles*, 146 S. Ct. at 1022. Accepting such a doctrine would give "the States unfettered power to reduce a group's First Amendment rights by simply imposing a licensing requirement." *NIFLA*, 585 U.S. at 773.

[14] *Chiles*, 146 S. Ct. at 1024 ("our precedents have expressly rejected the . . . notion that 'professional speech' represents some 'separate category of speech' subject to 'diminished constitutional protection'"); *NIFLA*, 585 U.S. at 768 ("This Court's precedents do not recognize such a tradition for a category called 'professional speech.'").

That doctrine's consequences could be extensive. Occupational licensing has spread throughout the United States, covering more than 20% of the workforce,[15] with some estimates closer to 30%.[16] By 2003, it was estimated that approximately 1,100 occupations required a license, certification, or registration somewhere in the United States.[17] Many of these occupations "consist primarily, if not entirely, of speech." Paul Sherman, *Occupational Speech and the First Amendment*, 128 HARV. L. REV. F. 183, 183 (2015). The lower court's reasoning threatens to transform occupational licensing into a general-purpose tool for evading First Amendment scrutiny. If licensing boards are allowed to deter occupation-related speech and evade serious scrutiny, a significant portion of American discourse will be pushed into a First Amendment-free zone.

## CONCLUSION

For the reasons set forth above and in Plaintiffs' brief, the district court erred by granting the government's motion to dismiss. Accordingly, this Court should reverse the decision below.

---

[15] Chris Edwards, *Occupational Licensing*, *in* EMPOWERING THE NEW AMERICAN WORKER: MARKET-BASED SOLUTIONS FOR TODAY'S WORKFORCE 59 (Scott Lincicome ed., 2022), https://tinyurl.com/mtpfuus8.

[16] Morris M. Kleiner, *Reforming Occupational Licensing Policies*, THE HAMILTON PROJECT 14 (Mar. 2015), https://tinyurl.com/2yrha6c2.

[17] *Id*. at 8.

Respectfully submitted,

/s/ Thomas A. Berry
Thomas A. Berry
*Counsel of Record*
Dan Greenberg
CATO INSTITUTE
1000 Massachusetts. Ave., NW
Washington, DC 20001
(443) 254-6330
tberry@cato.org

Dated: June 2, 2026

*Counsel for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), I certify that this brief contains 4,473 words, excluding the parts exempted by Fed. R. App. P. 32(f), and therefore complies with the type-volume limitations set forth in Rules 29(a)(5) and 32(a)(7)(B). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionately spaced typeface, 14-point Times New Roman font, using Microsoft Word.

Respectfully submitted,

/s/ Thomas A. Berry
Thomas A. Berry
*Counsel of Record*
Dan Greenberg
CATO INSTITUTE
1000 Massachusetts. Ave., NW
Washington, DC 20001
(443) 254-6330
tberry@cato.org

Dated: June 2, 2026

*Counsel for Amicus Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing document with the Clerk of the Court, who will enter it into the CM/ECF system, which will send a notification of such filing to the appropriate counsel.

/s/ *Thomas A. Berry*

Dated: June 2, 2026