# 26-847

IN THE

## United States Court of Appeals

FOR THE

## Second Circuit

UPSOLVE, INC., REVEREND JOHN UDO-OKON,

*Plaintiffs-Appellants,*

v.

LETITIA JAMES, in her official capacity as Attorney General of New York,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the Southern District of New York

**_AMICUS_ BRIEF OF PROFESSOR REBECCA L. SANDEFUR AND 23 EMPIRICAL SCHOLARS IN SUPPORT OF APPELLANTS**

Whitney Cloud
DLA PIPER LLP (US)
One Liberty Place
1650 Market Street Suite 5000
Philadelphia, PA 19103-7300
(215) 656-2440
whitney.cloud@us.dlapiper.com

Peter Karanjia
Caitlin Brydges (*not admitted*)
DLA PIPER LLP (US)
500 Eighth Street, N.W.
Washington, DC 20004
(202) 799-4135
peter.karanjia@us.dlapiper.com
caitlin.brydges@us.dlapiper.com

*Counsel for Amici Curiae Professor Rebecca L. Sandefur and Empirical Scholars*

# TABLE OF CONTENTS

**Page**

IDENTITY AND INTEREST OF THE *AMICI CURIAE* ........................................1

SUMMARY OF ARGUMENT ..............................................................................2

I. The Access-to-Justice Crisis Has Intensified Through the Years, Underscoring the Urgent Need for Nonlawyer Solutions. ..........................4

II. The Empirical Evidence Demonstrates that Nonlawyer Programs Work Well. ..........................................................................................13

A. A Representative Sampling of State Programs Shows that Nonlawyers Not Only Meet the Urgent Access-to-Justice Crisis, They Can Help Resolve It. ..................................................14

B. Federal Programs Demonstrate the Longstanding Success, Reliability, and Competence of Nonlawyer Advocates.........................19

C. The Consistent Theme: Training and Specialization Produce Quality Outcomes. ..........................................................................21

III. The Empirical Evidence Shows that New York's UPL Law Is Unconstitutional as Applied to Upsolve's Justice Advocates Program. ...........................................................................................21

A. The Data Confirm that Upsolve's Program Would Be Safe and Successful. ..........................................................................................21

B. Many Other States Have Found Less Restrictive Means That Work. ...................................................................................................22

C. The Program Here Poses Minimal Risk of Consumer Harm. ...............24

CONCLUSION .................................................................................................25

APPENDIX A: *AMICI CURIAE* SCHOLARS .................................................A-1

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*B.B. by Rosenthal v. Hochul*,
166 F.4th 259 (2d Cir. 2026) ....................22

*Billups v. City of Charleston*,
961 F.3d 673 (4th Cir. 2020) ....................23

*McCullen v. Coakley*,
573 U.S. 464 (2014)....................13, 23

*Penson v. Ohio*,
488 U.S. 75 (1988)....................12

*People v. Alfani*,
125 N.E. 671 (N.Y. 1919)....................14

**Rules**

Fed. R. App. P. 29(a)(2)....................1

**Other Authorities**

Joy Anderson et al., *Community Justice Workers: Part of the Solution to Alaska's Legal Deserts*, 41 ALASKA L. REV. 9 (2024) ....................15

Lester Bird & Casey Chiappetta, *Debt Collection Lawsuits Surge to Pre-Pandemic Highs*, PEW (Sep. 2, 2025), https://www.pew.org/en/research-and-analysis/articles/2025/09/02/debt-collection-lawsuits-surge-to-pre-pandemic-highs. ....................6, 12

Matthew Burnett & Rebecca L. Sandefur, *Justice Work as Democracy Work: Reimagining Access to Justice as Democratization*, 76 S.C. L. Rev. 833 (2025). ....................15

Matthew Burnett, Rebecca L. Sandefur & James Teufel, *Research Brief: Analysis of the Social and Economic Impact of the Alaska Community Justice Worker Program (2021-2025)*, AM. BAR FOUND., https://www.americanbarfoundation.org/wp-content/uploads/2025/11/ABF-Alaska-Community-Justice-Brief-FIN.pdf. ....................15, 16

COMM. ON PRO. RESP., N.Y.C. BAR, NARROWING THE "JUSTICE GAP": ROLES FOR NONLAWYER PRACTITIONERS (2013), https://www2.nycbar.org/pdf/report/uploads/20072450-RolesforNonlawyerPractitioners.pdf ....................10

COMM. ON PRO. RESP., N.Y.C. BAR, PROHIBITIONS ON NONLAWYER PRACTICE: AN OVERVIEW AND PRELIMINARY ASSESSMENT (1995), https://www2.nycbar.org/pdf/report/uploads/95033-ProhibitionsonNon-LawyerPractice.pdf ....................10

Comms. on Civ. Ct. & Consumer Affs., *Report on the Consumer Credit Fairness Act*, N.Y.C. BAR (May 2021), https://www.nycbar.org/member-and-career-services/committees/reports-listing/reports/detail/report-on-the-consumer-credit-fairness-act#_ftnref9....................9

CONSORTIUM ON LEGAL SERVS. & THE PUB., AM. BAR ASS'N, LEGAL NEEDS AND CIVIL JUSTICE: A SURVEY OF AMERICANS (1994), https://www.americanbar.org/content/dam/aba/administrative/legal_aid_indigent_defendants/downloads/legalneedstudy.pdf....................5

LOGAN CORNETT ET AL., AN INTERIM EVALUATION OF UTAH'S LEGAL REGULATORY SANDBOX PART 3: OUTCOMES EVALUATION (IAALS 2025) ....................19

CRIME & JUST. INST., WHAT REALLY PREVENTS COURT APPEARANCE? SURVEY FINDINGS FROM PEOPLE WHO FAILED TO APPEAR IN TWO COUNTIES (2025) ....................8

Zachariah DeMeola & Michael Houlberg, *To Close the Justice Gap, We Must Look Beyond Lawyers*, INST. FOR THE ADVANCEMENT OF THE AM. LEGAL SYS. (Nov. 4, 2021), https://iaals.du.edu/blog/close-justice-gap-we-must-look-beyond-lawyers. ....................11

FED. TRADE COMM'N, REPAIRING A BROKEN SYSTEM: PROTECTING CONSUMERS IN DEBT COLLECTION LITIGATION & ARBITRATION (2010), https://www.ftc.gov/sites/default/files/documents/reports/federal-trade-commission-bureau-consumer-protection-staff-report-repairing-broken-system-protecting/debtcollectionreport.pdf............................9

DAVID FREEMAN ENGSTROM ET AL., A BLUEPRINT FOR EXPANDING ACCESS TO JUSTICE IN LOS ANGELES SUPERIOR COURT'S EVICTION DOCKET (2025) ...............................................................................9

Will von Geldern & Karin D. Martin, *No Right to Counsel: Evictions, Administrative Burden, and Access to Civil Justice*, 36 STAN. L. & POL'Y REV. 313 (2025) ....................................................................8

Bruce A. Green, *Civil Justice at the Crossroads: Should Courts Authorize Nonlawyers to Practice Law?*, 75 STAN. L. REV. ONLINE 104 (June 2023)..................................................................................14

Gillian K. Hadfield, *Higher Demand, Lower Supply? A Comparative Assessment of the Legal Resource Landscape for Ordinary Americans*, 37 FORDHAM URB. L.J. 129 (2010)..............................................11

*How Much Should I Charge as a Lawyer?*, CLIO (Mar. 2026), https://www.clio.com/resources/legal-trends/compare-lawyer-rates/ ................10

Tara Hughes & Joyce Reichard, *How States Are Using Limited Licensed Legal Paraprofessionals to Address the Access to Justice Gap*, AM. BAR ASS'N (Feb. 2, 2026), https://www.americanbar.org/groups/paralegals/blog/how-states-are-using-non-lawyers-to-address-the-access-to-justice-gap/. ..........................14

HUM. RTS. WATCH, RUBBER STAMP JUSTICE: US COURTS, DEBT BUYING CORPORATIONS, AND THE POOR (2016), https://www.hrw.org/sites/default/files/report_pdf/us0116_web.pdf..................6

INST. FOR THE ADVANCEMENT OF THE AM. LEGAL SYS. & HAGUE INST. FOR THE INNOVATION OF L., JUSTICE NEEDS & SATISFACTION IN THE UNITED STATES OF AMERICA (2021), https://iaals.du.edu/sites/default/files/documents/publications/justice-needs-and-satisfaction-us.pdf .......................................................................5

Irving R. Kaufman, *Does the Judge Have a Right to Qualified Counsel?*, 61 AM. BAR ASS'N J. 569 (1975). .....12

Rebecca Love Kourlis & Neil M. Gorsuch, *Legal Advice Is Often Unaffordable. Here's How More People Can Get Help: Kourlis and Gorsuch*, USA TODAY (Sep. 17, 2020), https://www.usatoday.com/story/opinion/2020/09/17/lawyers-expensive-competition-innovation-increase-access-gorsuch-column/5817467002/ .....10, 19

THE LEGAL AID SOC'Y ET AL., DEBT DECEPTION: HOW DEBT BUYERS ABUSE THE LEGAL SYSTEM TO PREY ON LOWER-INCOME NEW YORKERS (May 2010), https://www.neweconomynyc.org/wp-content/uploads/2014/08/DEBT_DECEPTION_FINAL_WEB-new-logo.pdf .....8, 12

LEGAL SERVS. CORP., *The Justice Gap: Measuring the Unmet Civil Legal Needs of Low-Income Americans* (2022), https://justicegap.lsc.gov/resource/executive-summary/. .....5

David McClendon, *Consumer Debt Cases Are Surging Again—and One Company Is Leading the Charge*, JAN. ADVISORS (Aug. 29, 2025), https://www.januaryadvisors.com/consumer-debt-cases-are-surging-again-2024/ ..... 6, 7

Andy Newman, *They Need Legal Advice on Debts. Should It Have to Come from Lawyers?*, N.Y. TIMES (Jan. 25, 2022), https://www.nytimes.com/2022/01/25/nyregion/consumer-debt-legal-advice.html .....7, 12

*NYC Civil Court Resources*, N.Y.S. UNIFIED CT. SYS., https://www.nycourts.gov/new-york-city-civil-court/nyc-civil-court-general-information .....12

PERMANENT COMM'N ON ACCESS TO JUST., REPORT TO THE CHIEF JUDGE OF THE STATE OF NEW YORK (Nov. 2018), https://ww2.nycourts.gov/sites/default/files/document/files/2019-10/18_ATJ-Comission_Report.pdf .....7

PERMANENT COMM'N ON ACCESS TO JUST., REPORT TO THE CHIEF JUDGE OF THE STATE OF NEW YORK (Nov. 2020), https://www.nycourts.gov/LegacyPDFS/accesstojusticecommission/20_ATJ-Comission_Report.pdf .....9

PERMANENT COMM'N ON ACCESS TO JUST., REPORT TO THE CHIEF JUDGE OF THE STATE OF NEW YORK (Nov. 2022), https://www.nycourts.gov/LegacyPDFS/accesstojusticecommission/22_ATJ-Comission_Report.pdf....................8, 9

PERMANENT COMM'N ON ACCESS TO JUST., REPORT TO THE CHIEF JUDGE OF THE STATE OF NEW YORK (Nov. 2023), https://www.nycourts.gov/LegacyPDFS/accesstojusticecommission/23_ATJ-Comission_Report.pdf....................9

PERMANENT COMM'N ON ACCESS TO JUST., REPORT TO THE CHIEF JUDGE OF THE STATE OF NEW YORK (Nov. 2024), https://www.nycourts.gov/LegacyPDFS/accesstojusticecommission/2024-Commission-Report-Online.pdf....................10

THE PEW CHARITABLE TRS., HOW DEBT COLLECTORS ARE TRANSFORMING THE BUSINESS OF STATE COURTS (2020), https://www.pew.org/-/media/assets/2020/06/debt-collectors-to-consumers.pdf....................9

*Progress to Date*, FRONTLINE JUST., https://www.frontlinejustice.org/about....................13, 14

*Recognized Organizations and Accredited Representatives Roster by State and City*, U.S. DEP'T OF JUST. (Apr. 20, 2026), https://www.justice.gov/eoir/media/1398081/dl?inline....................20

REGUL. INNOVATION WORKING GRP. OF THE COMM. TO REIMAGINE THE FUTURE OF N.Y.'S CTS., REPORT AND RECOMMENDATIONS OF THE WORKING GROUP ON REGULATORY INNOVATION (2020), https://www.nycourts.gov/LegacyPDFS/publications/RWG-RegulatoryInnovation_Final_12.2.20.pdf....................10

Julia Rock & Sam Mellins, *Have You Been Sued for Credit Card Debt? Your Fake Relative Might Know.*, N.Y. FOCUS (June 10, 2025), https://nysfocus.com/2025/06/10/new-york-sewer-service-debt-collection-fraud....................8

Rebecca L. Sandefur & James Teufel, *Assessing America's Access to Civil Justice Crisis*, 11 U.C. IRVINE L. REV. 753 (2021)....................6

Rebecca L. Sandefur, *Access to What?*, 148 DAEDALUS 49 (2019)....................6

Rebecca L. Sandefur, *Legal Advice from Nonlawyers: Consumer Demand, Provider Quality, and Public Harms*, 16 STAN. J. CIV. RTS. & C.L. 283 (2020)....................20

Rebecca L. Sandefur & Lucy Ricca, *Outside the Box: How States Are Increasing Access to Justice Through Evidence-Based Regulation of the Practice of Law*, 108 JUDICATURE 59 (2024). ....................19

Rebecca L. Sandefur & Matthew Burnett, *Justice Futures: Access to Justice and the Future of Justice Work*, *in* RETHINKING THE LAWYER'S MONOPOLY: ACCESS TO JUSTICE AND THE FUTURE OF LEGAL SERVICES (David Freeman Engstrom & Nora Freeman Engstrom eds., 2025). ....................18, 19

Rebecca Sandefur, *Civil Legal Needs and Public Legal Understanding*, AM. BAR FOUND., https://www.americanbarfoundation.org/wp-content/uploads/2023/04/sandefur_-_civil_legal_needs_and_public_legal_understanding_handout.pdf....................11

James Teufel, Matthew Burnett & Rebecca L. Sandefur, *Research Brief: Analysis of the Social and Economic Impact of Delaware Qualified Tenant Advocates (2022-2025)*, AM. BAR FOUND, https://www.americanbarfoundation.org/wp-content/uploads/2026/02/Delaware-Qualified-Tenant.pdf. ....................16, 17, 18

AMY WIDMAN, NONLAWYER ASSISTANCE AND REPRESENTATION: REPORT TO THE ADMINISTRATIVE CONFERENCE OF THE UNITED STATES (2024), https://www.acus.gov/sites/default/files/documents/Nonlawyer%20Assistance%20and%20Representation%20-%20Final%20Report%202024.12.09_0.pdf....................19, 20, 21

Daniel Wilf-Townsend, *Assembly-Line Plaintiffs*, 135 HARV. L. REV. 1704 (2022)....................6, 7

## IDENTITY AND INTEREST OF THE *AMICI CURIAE*[1]

Dr. Rebecca L. Sandefur is a leading scholar and sociologist with expertise in access to civil justice. She is a Professor in the College of Liberal Arts and Sciences and the Sandra Day O'Connor College of Law at Arizona State University. She is also a Faculty Fellow at the American Bar Foundation, an independent, non-partisan research organization focused on the study of law and legal processes. In 2018, Professor Sandefur was named a MacArthur Fellow for her development of a new evidence-based approach to access to civil justice for low-income people. Her work has received numerous awards, including from the National Center for Access to Justice (2015) and the National Center for State Courts (2020).

In this *amicus* brief, Professor Sandefur is joined by 23 scholars who study the legal profession and access to justice across jurisdictions. The full list and affiliations of *amici* joining this brief are included in the appendix.

*Amici* have an interest in this case because state statutes restricting the "unauthorized practice of law"—such as the New York statute challenged in this case—pose a substantial obstacle to innovative programs that use nonlawyer professionals to help alleviate the severe access-to-justice gap faced by countless

---

[1] All parties consent to this filing. Fed. R. App. P. 29(a)(2). No counsel for a party authored this brief in whole or in part, and no person other than *amici* or their counsel made any monetary contributions intended to fund the preparation or submission of this brief. *Id.*

individuals across the country who cannot access legal services. At the same time, some states have experimented with creative solutions to address the access-to-justice gap—for example, by authorizing nonlawyer professionals to assist individuals who cannot obtain counsel in navigating debt-collection, housing court, and other routine legal proceedings. *Amici* share an interest in advancing the success of these innovative programs and in ensuring that unauthorized-practice-of-law restrictions comport with the First Amendment.

## SUMMARY OF ARGUMENT

Like other states across the country, New York faces a crisis of access to civil justice that annually places hundreds of thousands of unrepresented people in debt-collection proceedings and undermines the legitimacy of the courts, as well as the rule of law itself. Appellants seek to provide nonlawyer specialists at no cost who can help mitigate these concerns by providing more accessible, and often more effective, legal services for underrepresented Americans facing debt-collection actions, but New York's unauthorized-practice-of-law (UPL) statute prevents them from doing so. *Amici* submit this brief to provide empirical support for Appellants' claim that Upsolve's program would help, not hurt, New Yorkers and that the state's unreasonable, unjustifiable, and overbroad restrictions fail to pass muster under any level of First Amendment scrutiny.

Building on the substantial evidence cited in Appellants' complaint (and in a prior amicus brief that Professor Sandefur filed with the district court, *see* Dist. Ct. Dkt. No. 38-1), additional evidence has emerged from programs in Alaska, Delaware, and Utah demonstrating that trained nonlawyer specialists achieve remarkably successful outcomes without causing any consumer harm. Fourteen states and the District of Columbia currently allow or are in the process of allowing nonlawyers to obtain authorization to provide limited legal services, and twenty more are actively developing such programs. And while states have begun to adopt these nonlawyer programs largely within the past five years, the federal government has long allowed nonlawyer representation in certain administrative hearings, showing that the practice is time-tested.

These programs show that the district court's assumption—that New York's blanket licensure requirement is the only way to protect consumers—is empirically unfounded. On the contrary, there is ample, reliable evidence that similar community justice and nonlawyer programs offer protection to consumers that is otherwise unavailable to them. Research concerning these programs and these agencies shows that nonlawyer representation (1) helps individuals involved in these proceedings appreciate the legal nature of their problems; (2) increases the likelihood that these individuals will more actively engage with the legal process, including attending their court hearings; and (3) helps overburdened courts decide more cases on the

merits (rather than granting default judgments at extraordinarily high rates), thereby improving procedural justice and the rule of law.

In each of these ways, Upsolve's program likewise can enhance the fairness and effectiveness of our civil justice system. Given the scarcity of legal resources for the hundreds of thousands of New Yorkers who cannot afford to hire counsel to vindicate their rights in civil debt-collection proceedings (including insufficient *pro bono* resources), Upsolve should be allowed to deploy its well-designed and focused nonlawyer training to substantially improve access to justice for those who desperately need it. Common sense dictates that allowing citizens to avail themselves of the advice and know-how of experienced non-lawyer Justice Advocates is far preferable to leaving them to fend for themselves without any counsel (paid or *pro bono*). That is no less true under any level of First Amendment scrutiny. As applied here, New York's UPL restriction fails to advance any important governmental interest in restricting Upsolve's salutary program, much less do so in an appropriately tailored way that does not burden substantially more speech than necessary.

## I. The Access-to-Justice Crisis Has Intensified Through the Years, Underscoring the Urgent Need for Nonlawyer Solutions.

The access-to-justice crisis in the United States has persisted for decades, despite the existence of legal aid and *pro bono* work. In 1992, the American Bar Association commissioned a landmark study that found approximately half of

American households "faced some situation that raised a legal issue."[2] Of those, roughly 40% of low- and moderate-income households were left to address their legal problems without legal assistance, and an additional 38% of low-income households took no action at all.[3] Only 29% of low-income households turned to the civil justice system to resolve their issues.[4] The predominant reasons were "a sense that it would not help and that it would cost too much."[5]

Thirty years later, the situation is unfortunately no better. "Low-income Americans do not get any or enough legal help for 92% of their substantial civil legal problems."[6] And a 2020 study commissioned by the Institute for the Advancement of the American Legal System (IAALS) surveyed over 10,000 Americans nationally. The IAALS study found that Americans experience over 260 million civil justice problems annually, of which 120 million go unresolved.[7]

---

[2] CONSORTIUM ON LEGAL SERVS. & THE PUB., AM. BAR ASS'N, LEGAL NEEDS AND CIVIL JUSTICE: A SURVEY OF AMERICANS 9 (1994), https://www.americanbar.org/content/dam/aba/administrative/legal_aid_indigent_defendants/downloads/legalneedstudy.pdf.

[3] *Id.* at 17.

[4] *Id.* at 22.

[5] *Id.* at 20.

[6] LEGAL SERVS. CORP., *The Justice Gap: Measuring the Unmet Civil Legal Needs of Low-Income Americans,* Executive Summary (2022), https://justicegap.lsc.gov/resource/executive-summary/.

[7] INST. FOR THE ADVANCEMENT OF THE AM. LEGAL SYS. & HAGUE INST. FOR THE INNOVATION OF L., JUSTICE NEEDS & SATISFACTION IN THE UNITED STATES OF

Cases involving consumer debt are emblematic of this broader trend. The debt-buying industry is booming: debt-buying companies buy debts from lenders for "pennies on the dollar" and file an avalanche of actions to collect the debt themselves and are "among the heaviest individual users of state court systems across the US."[8] In fact, "tens of millions of people across the US either owe money to a debt buyer or have in the past."[9] In 2022, debt-collection lawsuits—brought by creditors and debt-buyers alike—accounted for 4.7 million cases on state civil dockets across the country.[10] And in over 90% of those cases, consumer-defendants were unrepresented.[11]

---

AMERICA 6 (2021), https://iaals.du.edu/sites/default/files/documents/publications/justice-needs-and-satisfaction-us.pdf; *see also* Rebecca L. Sandefur, *Access to What?*, 148 DAEDALUS 49, 49–55 (2019); Rebecca L. Sandefur & James Teufel, *Assessing America's Access to Civil Justice Crisis*, 11 U.C. IRVINE L. REV. 753, 753 (2021).

[8] HUM. RTS. WATCH, RUBBER STAMP JUSTICE: US COURTS, DEBT BUYING CORPORATIONS, AND THE POOR 1, 13 (2016), https://www.hrw.org/sites/default/files/report_pdf/us0116_web.pdf; *see also* Daniel Wilf-Townsend, *Assembly-Line Plaintiffs*, 135 HARV. L. REV. 1704, 1732 (2022).

[9] *Id.* at 10–11.

[10] Lester Bird & Casey Chiappetta, *Debt Collection Lawsuits Surge to Pre-Pandemic Highs*, PEW (Sep. 2, 2025), https://www.pew.org/en/research-and-analysis/articles/2025/09/02/debt-collection-lawsuits-surge-to-pre-pandemic-highs.

[11] *Id.*

Trends suggest that the number of debt-collection lawsuits filed each year will only continue to climb.[12] In several states, debt-collection case filings have surged past 2019 levels, when cases last peaked.[13] And consumer debt and financial insecurity have further exploded following years of inflation and the expiration of pandemic-era financial support and relief programs.[14] Now, debt-buying firms are leveraging artificial intelligence applications to increase their volume of filings at a massive scale each year.[15]

The problem is especially acute in New York State. In 2018 and 2019, a total of 265,000 consumer-debt suits were filed in city and district civil courts.[16] In over 95% of them, the defendants were not represented by a lawyer, and 88% did not even respond to the suit[17]—likely because they did not know how to represent

[12] David McClendon, *Consumer Debt Cases Are Surging Again—and One Company Is Leading the Charge*, JAN. ADVISORS (Aug. 29, 2025), https://www.januaryadvisors.com/consumer-debt-cases-are-surging-again-2024/; *see also* Wilf-Townsend, *supra* note 8, at 1724–36 (cataloguing debt-collection filings across several years).

[13] McClendon, *supra* note 12.

[14] *Id.*

[15] *Id.*

[16] Andy Newman, *They Need Legal Advice on Debts. Should It Have to Come from Lawyers?*, N.Y. TIMES (Jan. 25, 2022), https://www.nytimes.com/2022/01/25/nyregion/consumer-debt-legal-advice.html.

[17] *Id.* In this respect, debt-collection proceedings reflect a broader access to justice gap that persists in New York. *See* PERMANENT COMM'N ON ACCESS TO JUST., REPORT TO THE CHIEF JUDGE OF THE STATE OF NEW YORK 29 (Nov. 2018), https://ww2.nycourts.gov/sites/default/files/document/files/2019-10/18_ATJ-

themselves.[18] As a result, debt-collection suits in New York favored the debt buyer the vast majority of the time.[19] From 2019 to 2024, New York state "courts issued roughly 152,000 default judgments against consumers."[20] Again, this echoes the broader crisis across the country, with over 70% of Americans losing debt-collection

---

Comission_Report.pdf ("Data suggests that the number of unrepresented litigants statewide remains unacceptably high, with percentages in particular case types, such as child support and consumer debt, near or above 90%.").

[18] *See* CRIME & JUST. INST., WHAT REALLY PREVENTS COURT APPEARANCE? SURVEY FINDINGS FROM PEOPLE WHO FAILED TO APPEAR IN TWO COUNTIES 4 (2025); Will von Geldern & Karin D. Martin, *No Right to Counsel: Evictions, Administrative Burden, and Access to Civil Justice*, 36 STAN. L. & POL'Y REV. 313, 334 (2025).

[19] THE LEGAL AID SOC'Y ET AL., DEBT DECEPTION: HOW DEBT BUYERS ABUSE THE LEGAL SYSTEM TO PREY ON LOWER-INCOME NEW YORKERS, 8–9 (May 2010) [hereinafter *Debt Deception*], https://www.neweconomynyc.org/wp-content/uploads/2014/08/DEBT_DECEPTION_FINAL_WEB-new-logo.pdf; PERMANENT COMM'N ON ACCESS TO JUST., REPORT TO THE CHIEF JUDGE OF THE STATE OF NEW YORK 18 (Nov. 2022) [hereinafter *2022 Annual Report*], https://www.nycourts.gov/LegacyPDFS/accesstojusticecommission/22_ATJ-Comission_Report.pdf ("There are over 100,000 default judgments against consumers per year in New York State.").

[20] Julia Rock & Sam Mellins, *Have You Been Sued for Credit Card Debt? Your Fake Relative Might Know.*, N.Y. FOCUS (June 10, 2025), https://nysfocus.com/2025/06/10/new-york-sewer-service-debt-collection-fraud.

suits by default.[21] In sum, there continues to be a "growing need for legal assistance in consumer matters."[22]

In its annual reports to the Chief Judge of New York, the Permanent Commission on Access to Justice (Justice Commission) consistently highlights the problem of inadequate legal assistance in debt-collection actions.[23] And the Justice Commission acknowledged that "simply increasing the number of lawyers who

---

[21] THE PEW CHARITABLE TRS., HOW DEBT COLLECTORS ARE TRANSFORMING THE BUSINESS OF STATE COURTS 2 (2020), https://www.pew.org/-/media/assets/2020/06/debt-collectors-to-consumers.pdf; *see also* DAVID FREEMAN ENGSTROM ET AL., A BLUEPRINT FOR EXPANDING ACCESS TO JUSTICE IN LOS ANGELES SUPERIOR COURT'S EVICTION DOCKET 8 (2025); FED. TRADE COMM'N, REPAIRING A BROKEN SYSTEM: PROTECTING CONSUMERS IN DEBT COLLECTION LITIGATION & ARBITRATION 7 (2010), https://www.ftc.gov/sites/default/files/documents/reports/federal-trade-commission-bureau-consumer-protection-staff-report-repairing-broken-system-protecting/debtcollectionreport.pdf (The Federal Trade Commission estimates that, nationwide, between "sixty percent to ninety-five percent of consumer debt collection lawsuits result in defaults").

[22] *2022 Annual Report*, *supra* note 19, at 54; Comms. on Civ. Ct. & Consumer Affs., *Report on the Consumer Credit Fairness Act*, N.Y.C. BAR (May 2021), https://www.nycbar.org/member-and-career-services/committees/reports-listing/reports/detail/report-on-the-consumer-credit-fairness-act#_ftnref9.

[23] *See, e.g.*, PERMANENT COMM'N ON ACCESS TO JUST., REPORT TO THE CHIEF JUDGE OF THE STATE OF NEW YORK 10 (Nov. 2020), https://www.nycourts.gov/LegacyPDFS/accesstojusticecommission/20_ATJ-Comission_Report.pdf; *2022 Annual Report*, *supra* note 19, at 12; PERMANENT COMM'N ON ACCESS TO JUST., REPORT TO THE CHIEF JUDGE OF THE STATE OF NEW YORK 56 (Nov. 2023), https://www.nycourts.gov/LegacyPDFS/accesstojusticecommission/23_ATJ-Comission_Report.pdf.

represent low-income litigants . . . is insufficient to fully address the justice gap."[24] In fact, the Commission *endorses* the use of nonlawyer legal advocates to address these access-to-justice issues.[25]

This lack of representation is not surprising. With the average hourly billable rate for lawyers at $349 in 2025,[26] finding counsel is out of reach for many. And both in New York and nationwide, legal aid and *pro bono* resources come nowhere close

---

[24] PERMANENT COMM'N ON ACCESS TO JUST., REPORT TO THE CHIEF JUDGE OF THE STATE OF NEW YORK 69–71 (Nov. 2024), https://www.nycourts.gov/LegacyPDFS/accesstojusticecommission/2024-Commission-Report-Online.pdf.

[25] *Id.*; *see also* Rebecca Love Kourlis & Neil M. Gorsuch, *Legal Advice Is Often Unaffordable. Here's How More People Can Get Help: Kourlis and Gorsuch*, USA TODAY (Sep. 17, 2020), https://www.usatoday.com/story/opinion/2020/09/17/lawyers-expensive-competition-innovation-increase-access-gorsuch-column/5817467002/ (similarly encouraging states to pursue innovative nonlawyer solutions). For the history of calls for authorization of increase nonlawyer roles in New York, *see* COMM. ON PRO. RESP., N.Y.C. BAR, NARROWING THE "JUSTICE GAP": ROLES FOR NONLAWYER PRACTITIONERS 9–12 (2013), https://www2.nycbar.org/pdf/report/uploads/20072450-RolesforNonlawyerPractitioners.pdf; COMM. ON PRO. RESP., N.Y.C. BAR, PROHIBITIONS ON NONLAWYER PRACTICE: AN OVERVIEW AND PRELIMINARY ASSESSMENT 34 (1995), https://www2.nycbar.org/pdf/report/uploads/95033-ProhibitionsonNon-LawyerPractice.pdf; REGUL. INNOVATION WORKING GRP. OF THE COMM. TO REIMAGINE THE FUTURE OF N.Y.'S CTS., REPORT AND RECOMMENDATIONS OF THE WORKING GROUP ON REGULATORY INNOVATION 19–31 (2020), https://www.nycourts.gov/LegacyPDFS/publications/RWG-RegulatoryInnovation_Final_12.2.20.pdf.

[26] *How Much Should I Charge as a Lawyer?*, CLIO (Mar. 2026), https://www.clio.com/resources/legal-trends/compare-lawyer-rates/.

to meeting the acute need.[27] Put simply, Americans across the country are struggling with burdensome debt-collection lawsuits, and most of them are doing so without any legal assistance. For Americans who are unable to consult attorneys, "one of the most common responses . . . is to do nothing at all to try to resolve" these lawsuits.[28] When people do not assert their legal rights (including, for example, by raising defenses to meritless collection actions), the result is adverse judgments that can have profound consequences on Americans' lives, including mushrooming debt, bankruptcy, and the loss of their homes.

These impacts are not limited to the individuals named as defendants in debt-collection proceedings. They also extend to the courts and the justice system as a whole. "The paramount importance of vigorous representation follows from the nature of our adversarial system of justice. This system is premised on the well-tested principle that truth—as well as fairness—is 'best discovered by powerful

---

[27] Gillian K. Hadfield, *Higher Demand, Lower Supply? A Comparative Assessment of the Legal Resource Landscape for Ordinary Americans*, 37 FORDHAM URB. L.J. 129, 152 (2010); *see* Zachariah DeMeola & Michael Houlberg, *To Close the Justice Gap, We Must Look Beyond Lawyers*, INST. FOR THE ADVANCEMENT OF THE AM. LEGAL SYS. (Nov. 4, 2021), https://iaals.du.edu/blog/close-justice-gap-we-must-look-beyond-lawyers.

[28] Rebecca Sandefur, *Civil Legal Needs and Public Legal Understanding*, AM. BAR FOUND. at 1, https://www.americanbarfoundation.org/wp-content/uploads/2023/04/sandefur_-_civil_legal_needs_and_public_legal_understanding_handout.pdf.

statements on both sides of the question.'"[29] Yet where, as here, the overwhelming majority of debt-collection cases filed in New York courts result in default judgments—by some counts, more than 85%[30]—the system is not working as it should.

The lack of *any* legal assistance for these individuals—including the help of nonlawyer Justice Advocates that Appellants seek to provide—does a great disservice to courts struggling to adjudicate a tidal wave of these cases.[31] It places a greater burden on courts already managing heavy caseloads[32] to determine, without the benefit of hearing from the alleged debtor-defendant, whether the collection action suffers from jurisdictional or other legal defects, such as a statute-of-limitations bar. Courts would benefit from having defendants appear and assert relevant defenses, aided by trained and experienced Justice Advocates who, as discussed below, can and do provide high-quality assistance—often superior to that which generalist attorneys could provide. Adjudication based on the merits—where

[29] *Penson v. Ohio*, 488 U.S. 75, 84 (1988) (quoting Irving R. Kaufman, *Does the Judge Have a Right to Qualified Counsel?*, 61 AM. BAR ASS'N J. 569, 569 (1975)).

[30] *See* Newman, *supra* note 16; *Debt Deception*, *supra* note 19, at 8–9.

[31] *See* Bird & Chiappetta, *supra* note 10.

[32] The New York City Civil Court "is the largest civil jurisdiction court, by volume, in the United States." *NYC Civil Court Resources*, N.Y.S. UNIFIED CT. SYS., https://www.nycourts.gov/new-york-city-civil-court/nyc-civil-court-general-information.

courts benefit from arguments by both sides—will also best advance the proper application and development of the law. The lack of legal assistance therefore works a disservice to courts, judges, and more generally, the rule of law itself.

## II. The Empirical Evidence Demonstrates that Nonlawyer Programs Work Well.

The district court concluded that New York's UPL law survives intermediate scrutiny as a matter of law, holding that the State need not accept Appellants' allegations that Justice Advocates would give "reliable, truthful, and non-misleading" advice. But a substantial body of empirical evidence—accumulated over decades and across multiple jurisdictions—demonstrates that trained nonlawyer specialists consistently achieve excellent outcomes without causing consumer harm. This evidence is not mere prediction; it is documented fact.[33]

To date, fourteen states and the District of Columbia currently allow nonlawyers to obtain limited authorization[34] "to provide viable alternatives to hiring

[33] Though this brief focuses on the empirical evidence rather than legal doctrine, *amici* note that the district court was mistaken in suggesting that it was *Appellants'* burden—rather than *the state's* burden—to marshal evidence to withstanding intermediate scrutiny. *See, e.g.*, *McCullen v. Coakley*, 573 U.S. 464, 495 (2014) ("To meet the requirement of narrow tailoring, *the government* must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier.") (emphasis added).

[34] *Progress to Date*, FRONTLINE JUST., https://www.frontlinejustice.org/about.

a lawyer for uncomplicated legal needs when the client cannot afford a lawyer."[35] Twenty more are actively developing nonlawyer professional programs or reforms.[36] These lay specialists reach far more people than lawyers can alone, and in many cases the specialists do a better job than *pro bono* attorneys. Yet none of these programs could exist under the sweeping terms of New York's UPL statute.[37]

### A. A Representative Sampling of State Programs Shows that Nonlawyers Not Only Meet the Urgent Access-to-Justice Crisis, They Can Help Resolve It.

The sections below discuss data from a representative sample of state nonlawyer programs—in Alaska, Delaware, and Utah—which have had impressive results. The success of these programs isn't random. It's inherent in their meticulous design, including characteristics shared by Appellants' Justice Advocates program: proper training and oversight; clearly defined areas of focus (such as debt collection or housing court matters); and support from the local communities that these programs serve.

---

[35] Tara Hughes & Joyce Reichard, *How States Are Using Limited Licensed Legal Paraprofessionals to Address the Access to Justice Gap*, AM. BAR ASS'N (Feb. 2, 2026), https://www.americanbar.org/groups/paralegals/blog/how-states-are-using-non-lawyers-to-address-the-access-to-justice-gap/.

[36] *Progress to Date*, *supra* note 34.

[37] *See People v. Alfani*, 125 N.E. 671, 673 (N.Y. 1919) (discussing the breadth of New York's unauthorized-practice-of-law prohibition). For a discussion of *Alfani* and the history of New York's unauthorized-practice-of-law regime, see Bruce A. Green, *Civil Justice at the Crossroads: Should Courts Authorize Nonlawyers to Practice Law?*, 75 STAN. L. REV. ONLINE 104 (June 2023).

**Alaska's Community Justice Worker Program**: In 2022, the Alaska Supreme Court began permitting nonlawyer specialists, called community justice workers (CJWs), to provide limited "legal advice and representation."[38] These CJWs include staff from shelters and food banks, faith leaders, health workers, students, retirees, and other volunteers.[39] CJWs have taken on a variety of matters, including SNAP benefits, debt-collection defense, domestic violence protection orders, and wills, with plans to expand the program into other areas of law.[40] In SNAP cases alone, CJWs have now successfully handled over a thousand cases affecting "roughly 850 households and 2,800 people."[41]

Early research indicates that the program has had a high success rate.[42] CJWs have been "successful in 100% of assessments of SNAP eligibility" and in 73% of cases the client "documented receipt of SNAP benefits" resulting in over $23 million

---

[38] Matthew Burnett, Rebecca L. Sandefur & James Teufel, *Research Brief: Analysis of the Social and Economic Impact of the Alaska Community Justice Worker Program (2021-2025)*, AM. BAR FOUND., at 1, https://www.americanbarfoundation.org/wp-content/uploads/2025/11/ABF-Alaska-Community-Justice-Brief-FIN.pdf. [hereinafter *Alaska Research Brief*]; Matthew Burnett & Rebecca L. Sandefur, *Justice Work as Democracy Work: Reimagining Access to Justice as Democratization*, 76 S.C. L. Rev. 833, 850 (2025).

[39] *Alaska Research Brief*, *supra* note 38, at 1.

[40] Joy Anderson et al., *Community Justice Workers: Part of the Solution to Alaska's Legal Deserts*, 41 ALASKA L. REV. 9, 19 (2024).

[41] *Alaska Research Brief*, *supra* note 38, at 2.

[42] *Id.* at 2.

dollars in direct food assistance to low-income individuals and families.[43] This improved allocation of government programs had positive knock-on effects as well. "Standard techniques for estimating these impacts suggest that these monies resulted in an additional $14.5 million dollars in benefit to the communities where people received them."[44] Beyond SNAP benefits, CJWs "assisted in the completion of 180 wills"—notably reaching often remote Indigenous communities.[45]

CJWs were able to reach far more people than attorneys were able to reach. "By the end of 2024, CJWs were serving nearly 4 cases for every one case served [by] volunteer attorneys."[46] The program has also proven to be a particularly efficient investment, with an estimated $25 of public benefit value for every $1 invested.[47]

**Delaware Qualified Tenant Advocates**: In March 2022, the Delaware Supreme Court adopted a rule authorizing "legal aid organizations to employ or contract with, train, and supervise Qualified Tenant Advocates" (QTAs).[48] QTAs are

---

[43] *Id.* at 2.

[44] *Id.*

[45] *Id.*

[46] *Id.*

[47] *Id.* at 3.

[48] James Teufel, Matthew Burnett & Rebecca L. Sandefur, *Research Brief: Analysis of the Social and Economic Impact of Delaware Qualified Tenant Advocates (2022-2025)*, AM. BAR FOUND., at 2–4, https://www.americanbarfoundation.org/wp-content/uploads/2026/02/Delaware-Qualified-Tenant.pdf.

nonlawyer professionals trained to represent tenants in eviction proceedings and related housing matters.[49] Prospective QTAs must undergo comprehensive training to equip them to deal with all aspects of a matter, including "client intake and case management, case investigation and development, legal writing, negotiation with opposing parties, and participation in court and administrative proceedings."[50] Since the program's launch, QTAs have worked on "3,755 housing matters" and "preserv[ed] approximately $4.8 million in housing-related financial assistance."[51] And "the vast majority of cases involving QTAs closed through negotiated settlements or court decisions" that produced one or more favorable outcomes for the tenant, including preventing eviction, preserving subsidies, or reducing rent.[52]

What's more, the data show that QTAs help serve a wider and more diverse demographic of clients.[53] And the positive effects of this program have reverberated beyond QTAs' individual clients to the broader community. For instance, "QTA-assisted cases helped Delaware communities avoid an estimated $5.43 million in

[49] *Id.*

[50] *Id.*

[51] *Id.*

[52] *Id.*

[53] "67 percent of clients identified as Black, 80 percent identified as female, 57 percent reported living with a disability, and 9 percent reported experiencing domestic violence." *Id.*

downstream public costs, including expenditures related to emergency shelter, foster care replacements, and disruptions to children's education."[54]

**Utah's Regulatory Sandbox**: In 2020, Utah launched a regulatory sandbox model whereby entities, like churches and other non-profit organizations, may "seek waivers of existing blanket unauthorized-practice-of-law prohibitions in favor of assessing applicants' risk of harming consumers and monitoring the impact of admitted entities' work on consumers."[55] The lower the risk a particular entity poses (based on an assessment of how far the model departs from traditional models of legal-service delivery), the less regulation and oversight to which the entity is subject.[56] Many of the entities that have opted into the regulatory sandbox offer programs like Upsolve's Justice Advocates. For instance, Holy Cross Ministries, a non-profit organization, has partnered with Innovation 4 Justice "to train and deploy lay medical-debt legal advocates to help people negotiate and resolve their medical debt."[57]

---

[54] *Id.*

[55] Rebecca L. Sandefur & Matthew Burnett, *Justice Futures: Access to Justice and the Future of Justice Work*, *in* RETHINKING THE LAWYER'S MONOPOLY: ACCESS TO JUSTICE AND THE FUTURE OF LEGAL SERVICES 36 (David Freeman Engstrom & Nora Freeman Engstrom eds., 2025).

[56] *Id.*

[57] Rebecca L. Sandefur & Lucy Ricca, *Outside the Box: How States Are Increasing Access to Justice Through Evidence-Based Regulation of the Practice of Law*, 108 JUDICATURE 59, 62 (2024).

Over the life of the program, innovation has increased, underscoring the way UPL restrictions can stifle creative resolutions to the access-to-justice gap.[58] Entities that have opted into the sandbox have offered over 70,000 services on a range of issues, "including medical debt, domestic violence protection orders, and expungement."[59] The Office of Legal Services Innovation received fewer than ten complaints across all services rendered.[60] Both Justice Gorsuch and former Colorado Supreme Court Justice Kourlis have specifically applauded Utah's efforts and "encourage[d] others to follow suit."[61]

### B. Federal Programs Demonstrate the Longstanding Success, Reliability, and Competence of Nonlawyer Advocates.

The federal government also allows representation by nonlawyers in certain administrative proceedings, including hearings.[62] For immigration hearings, over 2,000 federally accredited nonlawyer immigration representatives deal with all sorts of immigration matters faced by their clients, including representation in

[58] *See* LOGAN CORNETT ET AL., AN INTERIM EVALUATION OF UTAH'S LEGAL REGULATORY SANDBOX PART 3: OUTCOMES EVALUATION 13 (IAALS 2025).

[59] Sandefur & Burnett, *supra* note 55, at 37.

[60] *Id*. at 36–37.

[61] Kourlis & Gorsuch, *supra* note 25.

[62] AMY WIDMAN, NONLAWYER ASSISTANCE AND REPRESENTATION: REPORT TO THE ADMINISTRATIVE CONFERENCE OF THE UNITED STATES 20 (2024), https://www.acus.gov/sites/default/files/documents/Nonlawyer%20Assistance%20and%20Representation%20-%20Final%20Report%202024.12.09_0.pdf.

immigration court and before the Board of Immigration Appeals.[63] Most of these services are provided by religious, community, and social services organizations, which are authorized by the U.S. Executive Office for Immigration Review to offer legal advice and representation through non-lawyer staff.[64]

To take another example, the U.S. Department of Veterans' Affairs (VA) "authorizes and encourages nonlawyers to assist veterans" in VA adjudications.[65] In fact, nonlawyers represent the "vast majority" of veterans dealing with all manner of VA adjudications, making the program one of the largest and longest-running in the country.[66]

The VA accredits nonlawyer Veteran Service Organization (VSO) representatives and claims agents.[67] These nonlawyer representatives achieve

---

[63] Rebecca L. Sandefur, Legal Advice from Nonlawyers: Consumer Demand, Provider Quality, and Public Harms, 16 STAN. J. CIV. RTS. & C.L. 283, 290 (2020).

[64] *See Recognized Organizations and Accredited Representatives Roster by State and City*, U.S. DEP'T OF JUST. (Apr. 20, 2026), https://www.justice.gov/eoir/media/1398081/dl?inline.

[65] WIDMAN, *supra* note 62, at 20.

[66] *Id.*

[67] *Id.* at 72. The only difference between the VSO representatives and claims agents is that claims agents are permitted to charge reasonable fees, while VSO representatives may not. *Id.*

significant success. VSO representatives and claims agents have an approximate 35% success rate, which is comparable to their attorney counterparts.[68]

### C. The Consistent Theme: Training and Specialization Produce Quality Outcomes.

In every instance, nonlawyer professionals demonstrated their effectiveness both in handling clients' problems without resorting to costlier and often inaccessible legal services and their usefulness in helping clients identify the legal nature of their problems. Wherever nonlawyer professionals are permitted, the evidence overwhelmingly shows they make a positive impact by providing a broader range of community members the opportunity to seek justice.

Critically, the programs discussed above and Appellants' Justice Advocates share the common marks of sustainable nonlawyer professional programs: comprehensive training and oversight; discrete focus areas; and community-member buy-in and participation.

## III. The Empirical Evidence Shows that New York's UPL Law Is Unconstitutional as Applied to Upsolve's Justice Advocates Program.

### A. The Data Confirm that Upsolve's Program Would Be Safe and Successful.

The district court acknowledged that Appellants' complaint alleges that Justice Advocates would give "reliable, truthful, and non-misleading" advice, but

---

[68] *Id.* at 72 n.255.

concluded that New York's blanket licensure requirement is a reasonable means of protecting consumers—without meaningfully engaging with Appellants' evidence that less restrictive alternatives work. The empirical evidence discussed above does not merely predict that nonlawyer programs will work in the future. It documents that comparable programs are working *right now*—across multiple states, at significant scale, with near-zero consumer harm. When Alaska's community justice workers achieve a 100% client-success rate; when Delaware's QTAs produce successful outcomes in the "vast majority" of their cases; and when Utah's sandbox processes over 70,000 services with fewer than ten complaints—the State's asserted interest in protecting consumers from "ignorance, inexperience and unscrupulousness" cannot justify a blanket prohibition on programs like Appellants' that are modeled on these very successes. That is especially so at the motion-to-dismiss stage, where courts are required to "draw[] all reasonable inferences in the plaintiff's favor."[69]

### B. Many Other States Have Found Less Restrictive Means That Work.

The district court acknowledged that "some states and federal agencies permit non-lawyers to perform certain legal work" but nevertheless concluded that prohibiting the operation of Upsolve's similar program comports with the First

[69] *B.B. by Rosenthal v. Hochul*, 166 F.4th 259, 270 (2d Cir. 2026) (citation and internal quotation marks omitted).

Amendment's narrow-tailoring requirement. Under intermediate scrutiny, the application of the state's UPL law must not burden "substantially more speech than necessary." And while the state is not necessarily required to use the *least* restrictive means, evidence that many other states have determined that less restrictive means can achieve the same ends confirms that the application of New York's UPL law is burdening substantially more speech than necessary. Moreover, the burden to show that such alternatives are infeasible rests squarely on *the state*: Under intermediate scrutiny, "the burden of proving narrow tailoring requires the [government] to *prove* that it actually *tried* other methods to address the problem . . . . In other words, the government is obliged to demonstrate that it actually tried or considered less-speech-restrictive alternatives and that such alternatives were inadequate to serve the government's interest."[70] Here, the state has not carried its burden—and the empirical data confirm that it is unable to do so.

In sum, the fact that many jurisdictions have concluded that consumer protection can be adequately served through less restrictive means—targeted training, supervision, discrete practice areas, and consumer-harm monitoring—is powerful evidence that New York's blanket prohibition burdens substantially more

[70] *Billups v. City of Charleston*, 961 F.3d 673, 687–88 (4th Cir. 2020) (emphasis in original; citations omitted); *see also McCullen*, 573 U.S. at 495.

speech than necessary. New York is an outlier, and its refusal to pursue these proven alternatives is increasingly unjustifiable.

### C. The Program Here Poses Minimal Risk of Consumer Harm.

The district court concluded that "[m]any of the risks that the licensure of attorneys guards against are at or near their apices" in the context of Appellants' proposed program. This conclusion is contradicted by the evidence. Justice Advocates would advise clients on whether it is in their interest to answer the lawsuit, and if so, on how to fill out a state-designed form in response to a debt-collection complaint and where to file it. The advice would be limited to the confines of a 12-page training guide reviewed and approved by third-party experts in consumer law and debt-collection defense. Advocates would serve clients only in New York City Civil Court (though they would not represent them) and only for simple consumer-debt matters.

This is precisely the type of setting in which nonlawyers who are deeply experienced in the ins and outs of these similar routine proceedings have consistently excelled across jurisdictions. Indeed, these experienced nonlawyer practitioners may be *better* positioned to provide helpful and practical guidance than a licensed attorney (e.g., a mergers-and-acquisitions lawyer who rarely appears in court) who is unfamiliar with the particular forum (e.g., housing court or Social Security tribunals) and the specialized rules and practices that govern in that forum. The

empirical evidence is clear: nonlawyer providers can be highly effective where, as here, they are (1) trained and specialized, and (2) the issues at hand do not raise complex questions of substantive law. That is precisely the situation that Appellants' program targets.

## CONCLUSION

The empirical evidence assembled over decades demonstrates that nonlawyer programs, when properly designed with comprehensive training, discrete focus areas, and appropriate oversight, work safely and effectively. They achieve remarkable outcomes for clients; they do so without causing consumer harm; and they make the justice system fairer for everyone. They work well for their purposes, and their success serves as strong evidence that New York's UPL law, as applied to Appellants' Justice Advocates program, fails intermediate scrutiny. Accordingly, this Court should reverse the district court's order granting the motion to dismiss and remand for further proceedings. It is past time for New York to join the critical mass of other jurisdictions that have recognized what the evidence makes plain: well-designed nonlawyer programs expand access to justice without compromising consumer protection.

June 2, 2026

Respectfully submitted,

*/s/ Peter Karanjia*

Peter Karanjia
Caitlin Brydges (*not admitted*)
DLA PIPER LLP (US)
500 Eighth Street, N.W.
Washington, DC 20004
(202) 799-4135
peter.karanjia@us.dlapiper.com
caitlin.brydges@us.dlapiper.com

Whitney Cloud
DLA Piper LLP (US)
One Liberty Place
1650 Market Street Suite 5000
Philadelphia, PA 19103-7300
(215) 656-2440
whitney.cloud@us.dlapiper.com

*Counsel for Amici Curiae*
*Professor Rebecca L. Sandefur*
*and Empirical Scholars*

## APPENDIX A:

*Amici Curiae Scholars*[*]

**Richard L. Abel**
Connell Distinguished Professor of Law Emeritus
and Distinguished Research Professor
University of California, Los Angeles

**Benjamin Barton**
Helen and Charles Lockett Distinguished Professor of Law
University of Tennessee Winston College of Law

**Matthew Burnett**
Director of Research and Programs for the Access to
Justice Research, American Bar Foundation
Visiting Scholar for Justice Futures, Arizona State University
Adjunct Professor of Law, Georgetown University Law Center

**Cassie Chambers Armstrong**
Assistant Professor of Law
University of Louisville Brandeis School of Law

**Elizabeth Chambliss**
Henry Harman Edens Professor of Law and
Director, NMRS Center on Professionalism
University of South Carolina Rice School of Law

**Stephen Daniels**
Research Professor Emeritus
American Bar Foundation

[*] All listed scholars join solely in their individual capacities and not as representatives of their affiliated institutions. The views and opinions expressed in this brief are those of the individual *amici* and do not necessarily reflect the position of the institutions with which they are affiliated.

**David Freeman Engstrom**
LSVF Professor of Law
Co-Director, Deborah L. Rhode Center on the Legal Profession
Stanford Law School

**Nuno Garoupa**
George Mason University Antonin Scalia Law School

**Bryant Garth**
Distinguished Professor of Law Emeritus
University of California, Irvine

**D. James Greiner**
Honorable S. William Green Professor of Public Law
Faculty Director, Access to Justice Lab
Harvard Law School

**Gillian K. Hadfield**
Bloomberg Distinguished Professor of AI Alignment
and Governance
Johns Hopkins University

**Renee Knake Jefferson**
Joanne and Larry Doherty Chair in Legal Ethics
and Professor of Law
University of Houston Law Center

**Herbert M. Kritzer**
Marvin J. Sonosky Chair Emeritus of Law and
Public Policy, University of Minnesota Law School
Professor Emeritus of Political Science and Law,
University of Wisconsin-Madison

**Alyx Mark**
Associate Professor, Department of Government
Wesleyan University

**Tanina Rostain**
Agnes Williams Sesquicentennial Professor of
Justice Innovation
Georgetown University Law Center

**Noel Semple**
Associate Professor
University of Windsor Faculty of Law

**Colleen F. Shanahan**
Practice Professor of Law
University of Pennsylvania Carey School of Law

**Michele Statz**
University of Minnesota Medical School
Berkeley Judicial Institute

**Jessica Steinberg**
John Marshall Harlan Dean's Research Professor of Law
George Washington University Law School

**Lauren Sudeall**
David Daniels Distinguished Chair of Law
Vanderbilt Law School

**David Udell**
Executive Director
National Center for Access to Justice at Fordham Law School

**Amy Widman**
Professor of Law
Rutgers Law School

**Kathryne Young**
Professor of Law
The George Washington University Law School

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitations of Fed. R. App. P. 29(a)(4) and 29(b)(4). It contains 5,388 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6). It has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated: June 2, 2026

*/s/ Peter Karanjia*
Peter Karanjia

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the court's CM/ECF system on June 2, 2026. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the court's CM/ECF system.

*/s/ Peter Karanjia*
Peter Karanjia