# 26-847

# United States Court of Appeals
# for the Second Circuit

UPSOLVE, INC., REV. JOHN UDO–OKON,

*Plaintiffs-Appellants,*

v.

LETITIA JAMES, in her official capacity as
Attorney General of the State of New York,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the Southern District of New York

## BRIEF FOR APPELLEE

BARBARA D. UNDERWOOD
  *Solicitor General*
JUDITH N. VALE
  *Deputy Solicitor General*
KWAME N. AKOSAH
  *Assistant Solicitor General*
    *of Counsel*

LETITIA JAMES
  *Attorney General*
  *State of New York*
Attorney for Appellee
28 Liberty Street
New York, New York 10005
(212) 416-8025

Dated: July 20, 2026

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES.................................................................iii

PRELIMINARY STATEMENT...................................................... 1

ISSUES PRESENTED .................................................................3

STATEMENT OF THE CASE .........................................................4

    A.   New York's Regulation of the Practice of Law ........................ 4

         1.   Attorney licensure requirements ..................................... 4

         2.   Regulations governing attorney conduct.......................... 6

         3.   Prohibition on nonlawyers of practice law........................ 7

    B.   Factual and Procedural Background..................................... 10

         1.   Upsolve's proposal to provide unlicensed legal advice ..... 10

         2.   The prior preliminary injunction appeal ....................... 17

         3.   The decision on appeal.................................................. 20

SUMMARY OF ARGUMENT .................................................... 23

STANDARD OF REVIEW.......................................................... 26

ARGUMENT ............................................................................ 27

POINT I

THE UNAUTHORIZED PRACTICE OF LAW STATUTES ARE CONTENT NEUTRAL AND THUS SUBJECT TO INTERMEDIATE SCRUTINY ................. 27

    A.   Under This Court's Prior, Binding Decision in *Upsolve II*, the Unauthorized-Practice-of-Law Statutes Are Content Neutral. ................................................................27

**Page**

B. The Supreme Court's Decision in *Chiles v. Salazar* Did Not Abrogate the Prior Panel's *Upsolve II* Opinion. ..............30

POINT II

THE DISTRICT COURT PROPERLY DISMISSED PLAINTIFFS' FREE SPEECH CLAIM ......................................................................... 40

    A. The District Court Properly Concluded at the Motion-to-Dismiss Stage That Plaintiffs' Free Speech Claim Fails as a Matter of Law. ................................................................ 40

    B. The District Court Correctly Concluded That the Unauthorized-Practice Statutes Advance the State's Important Interests. ............................................................. 46

    C. The District Court Correctly Concluded That the Unauthorized-Practice Statutes Are Tailored to the State's Interests. ................................................................. 52

POINT III

THE DISTRICT COURT PROPERLY DISMISSED PLAINTIFFS' FREEDOM OF ASSOCIATION CLAIM ....................................................... 58

CONCLUSION ................................................................................... 61

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*360 Virtual Drone Servs. LLC v. Ritter,*
102 F.4th 263 (4th Cir. 2024) ........................................................ 43

*Billups v. City of Charleston,*
961 F.3d 673 (4th Cir. 2020) ..................................................... 44-45

*Brokamp v. James,*
66 F.4th 374 (2d Cir. 2023) ........................ 24, 28, 39-43, 47-48, 52-55

*Chiles v. Salazar,*
146 S. Ct. 1010 (2026) .................................. 1, 23-24, 30-32, 34, 36, 38

*Citizens United v. Schneiderman,*
882 F.3d 374 (2d Cir. 2018) ........................................................ 41-43

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC,*
596 U.S. 61 (2022) ................................................................. 27, 34-35

*Clementine Co. v. Adams,*
74 F.4th 77 (2d Cir. 2023) ............................................................. 41

*Delta Fin. Corp. v. Morrison,*
15 Misc. 3d 308 (Sup. Ct. Nassau County 2007) ................................ 7

*El Gemayel v. Seaman,*
72 N.Y.2d 701 (1988) .......................................... 4, 8, 11, 46-47, 53-54

*Emilee Carpenter, LLC v. James,*
107 F.4th 92 (2d Cir, 2024) ........................................................... 58

*Free Speech Coal., Inc. v. Paxton,*
606 U.S. 461 (2025) ...................................................................... 52

*Goel v. Bunge, Ltd.,*
820 F.3d 554 (2d Cir. 2016) ........................................................... 51

*Goldfarb v. Virginia State Bar,*
421 U.S. 773 (1975) ................................................................ 25, 46-47

iii

**Cases**                                            **Page(s)**

*Hines v. Pardue,*
117 F.4th 769 (5th Cir. 2024) ..................................................... 44-45

*Holder v. Humanitarian Law Project,*
561 U.S. 1 (2010) .................................................................... 38, 58

*In re Arab Bank, PLC Alien Tort Statute Litig.,*
808 F.3d 144 (2d Cir. 2015) ........................................................ 30

*In re South Carolina NAACP Hous. Advoc. Program,*
442 S.C. 189, 897 S.E.2d 691 (2024) ......................................... 57

*Jacoby & Meyers, LLP v. Presiding Justs. of the First, Second,*
*Third & Fourth Dep'ts, App. Div. of the Sup. Ct.,*
852 F.3d 178 (2d Cir. 2017) ................................................... 46, 59

*Jeffery v. City of New York,*
113 F.4th 176 (2d Cir. 2024) .................................................... 41-42

*Lightman v. Flaum,*
97 N.Y.2d 128 (2001) ................................................................... 6

*Mastrovincenzo v. City of New York,*
435 F.3d 78 (2d Cir. 2006) ......................................................... 38

*Matter of Rosenberg,*
202 A.D.3d 1271 (3d Dep't 2022) ............................................... 7

*Matter of Rowe,*
80 N.Y.2d 336 (1992) ............................................................. 8, 53

*McCullen v. Coakley,*
573 U.S. 464 (2014) ................................................................... 45

*NAACP v. Button,*
371 U.S. 415 (1963) ................................................................... 59

*National Inst. of Fam. & Life Advocs. v. Becerra,*
585 U.S. 755 (2018) ................................................................... 36

**Cases**  **Page(s)**

*New York State Ass'n of Career Schs. v. State Educ. Dep't,*
    823 F. Supp. 1096 (S.D.N.Y. 1993) .................................................... 38

*New Yorkers for Religious Liberty, Inc. v. City of New York,*
    125 F.4th 319 (2d Cir.) .................................................... 26

*Ohralik v. Ohio State Bar Ass'n,*
    436 U.S. 447 (1978) .................................................... 5, 46-47

*People v. Alfani,*
    227 N.Y. 334 (1919) .................................................... 4-5, 46, 48, 60

*People v. Divorce Associated & Pub. Ltd.,*
    95 Misc. 2d 340 (Sup. Ct. Queens County 1978) .................................................... 7

*Reed v. Town of Gilbert,*
    576 U.S. 155 (2015) .................................................... 37

*Roberts v. U.S. Jaycees,*
    468 U.S. 609 (1984) .................................................... 58

*Roth v. Jennings,*
    489 F.3d 499 (2d Cir. 2007) .................................................... 26

*Rudolf v. Shayne, Dachs, Stanisci, Corker & Sauer,*
    8 N.Y.3d 438 (2007) .................................................... 6

*Spivak v. Sachs,*
    16 N.Y.2d 163 (1965) .................................................... 7, 48

*TikTok Inc. v. Garland,*
    604 U.S. 56 (2025) .................................................... 52, 56

*United States v. Bein,*
    728 F.2d 107 (2d Cir. 1984) .................................................... 6

*Upsolve, Inc. v. James,*
    604 F. Supp. 3d 97 (S.D.N.Y. 2022) .................................................... 17-18, 59-60

**Cases** **Page(s)**

*Upsolve, Inc. v. James,*
  155 F.4th 133 (2d Cir. 2025) ...................................................... passim

*Upsolve, Inc. v. James,*
  146 S. Ct. 1854 (2026) ...................................................................... 19

*Vidal v. Elster,*
  602 U.S. 286 (2024) ........................................................................... 32

*Wilmington Sav. Fund Soc'y, FSB v. Unknown Heirs at L. of*
  *Danny Higdon,*
  161 A.D.3d 1559 (4th Dep't 2018) ..................................................... 14

**New York Statutes**

Ch. 165, 1898 N.Y. Laws 309 ................................................................ 4

C.P.L.R.
  213-d ................................................................................................ 14
  3025 .................................................................................................. 15
  3101 .................................................................................................... 6
  3215 .................................................................................................. 15
  4503 ................................................................................................ 6-7

Education Law
  tit. VIII ............................................................................................ 37
  § 8402 .............................................................................................. 55

Judiciary Law
  § 460 et seq. ....................................................................................... 5
  § 466 ..................................................................................................... 5
  § 468-a ................................................................................................. 6
  § 476-a ................................................................................................. 8
  § 476-b ................................................................................................. 8
  § 476-c ................................................................................................. 8
  § 478 .......................................................................................... 4, 7, 9
  § 484 ............................................................................................. 4, 7
  § 485 ..................................................................................................... 8

**New York Statutes** **Page(s)**

Judiciary Law (*cont'd*)
 § 485-a ............................................................................................ 8
 § 486 ............................................................................................... 8
 § 750 ............................................................................................... 8
 § 753 ............................................................................................... 8

N.Y.C. Civil Court Act
 § 201 ............................................................................................. 10
 § 202 ............................................................................................. 10
 § 909 ............................................................................................. 15

**New York Regulations**

Mandatory Continuing Legal Educ. Program for Att'ys (22 N.Y.C.R.R.)
 § 1500.12 ........................................................................................ 6
 § 1500.22 ........................................................................................ 6

Rules of Ct. of Appeals for Admission of Att'ys and Counselors at
 Law (22 N.Y.C.R.R.)
 pt. 520............................................................................................. 5
 § 520.12 ........................................................................................... 5
 §§ 520.3-520.9 ............................................................................... 5

Rules of Pro. Conduct (22 N.Y.C.R.R. pt. 1200.0)
 1.1........................................................................................ 6, 12, 48
 1.6-1.18............................................................................................ 6
 3.1..................................................................................................... 7
 3.3..................................................................................................... 7
 3.4..................................................................................................... 7
 4.1..................................................................................................... 7
 5.3.................................................................................................. 8-9

Rules for Att'y Disciplinary Matters (22 N.Y.C.R.R.) pt. 1240 ................ 7

| **Miscellaneous Authorities** | **Page(s)** |

The Civil Legal Advice & Resource Off., *CLARO NYC*
https://staging.claronyc.org/ ................................................................... 9

Nat'l Conf. of Bar Exam'rs & Am. Bar Ass'n, *Comprehensive
Guide to Bar Admission Requirements* (2024),
https://www.americanbar.org/content/dam/aba/administrativ
e/legal_education_and_admissions_to_the_bar/24-comp-
guide.pdf ................................................................................................ 36

Robert Kry, *The "Watchman for Truth": Professional Licensing
and the First Amendment*, 23 Seattle U.L. Rev. 885, 955
(2000) ...................................................................................................... 4

Roy D. Simon, *Simon's New York Rules of Professional Conduct
Annotated* (July 2024 update) (Westlaw) ............................................. 8

St. John's Univ. Sch. of L., *Consumer Justice for the Elderly:
Litigation Clinic*, https://www.stjohns.edu/law/academics/
clinics/consumer-justice-elderly-litigation-clinic ................................. 9

Standing Comm. on Lawyers' Responsibility for Client Prot.,
Am. Bar Ass'n, *1994 Survey and Related Materials on the
Unauthorized Practice of Law / Nonlawyer Practice* (1996) ................. 4

## PRELIMINARY STATEMENT

The plaintiffs—a nonprofit organization and an individual with no legal education—challenge New York's statutes prohibiting the unauthorized practice of law, claiming that plaintiffs have a First Amendment right to practice law without a license. In a prior appeal in this case, the Court held that the statutes impose a content-neutral regulation on plaintiffs' unlicensed law practice, and are thus subject to intermediate scrutiny, because the statutes apply to all individuals practicing law—regardless of the type of law practiced or the message conveyed. *Upsolve, Inc. v. James ("Upsolve II")*, 155 F.4th 133, 143 (2d Cir. 2025), *cert. denied*, 146 S. Ct. 1854 (2026). On remand, the district court (Kaplan, J.) granted the Attorney General's motion to dismiss the complaint, concluding that the unauthorized-practice statutes satisfy intermediate scrutiny.

This Court should affirm. First, contrary to plaintiffs' arguments, the Supreme Court in *Chiles v. Salazar*, 146 S. Ct. 1010 (2026), did not abrogate this Court's prior panel decision in *Upsolve II. See* Br. for Pls.-Appellants at 19-30. *Chiles* is inapposite because the Court decided that the Colorado law at issue there banned a licensed professional from expressing viewpoints disfavored by the State, while allowing that profes-

sional to express viewpoints favored by the State. New York's unautho-rized-practice statutes do not discriminate based on viewpoint, as this Court already correctly ruled. And nothing in *Chiles* undermines this Court's ruling in *Upsolve II* that the unauthorized-practice statutes are content neutral because they apply to all legal advice being given to clients about their legal issues, regardless of the topic or message.

Second, the district court correctly concluded that the unauthorized-practice statutes satisfy intermediate scrutiny. Properly relying on established judicial precedent, plaintiffs' complaint, and the documents incorporated therein, the district court correctly determined that the unauthorized-practice statutes advance important governmental inter-ests in maintaining ethical behavior by lawyers and protecting the public from the dangers of legal counsel given by unlicensed persons. And the statutes are narrowly tailored to further these interests because they do not prevent plaintiffs from speaking outside the context of giving legal advice to a client about their specific case—a context in which incompe-tent and unethical legal advice is especially likely to cause harm.

## ISSUES PRESENTED

1. Whether the district court correctly concluded, in accordance with this Court's prior opinion in this case, that New York's unauthorized-practice statutes are content neutral and thus subject to intermediate scrutiny.

2. Whether the district court correctly concluded that plaintiffs' free speech claim must be dismissed because New York's unauthorized-practice statutes satisfy intermediate scrutiny.

3. Whether the district court correctly dismissed plaintiffs' freedom of association claim.

## STATEMENT OF THE CASE

### A. New York's Regulation of the Practice of Law

#### 1. Attorney licensure requirements

The practice of law has been the legitimate subject of government regulation since even before the Founding.[1] In New York, for well over a century, the Legislature has required individuals who want to practice law to obtain and maintain a license. *See* Ch. 165, 1898 N.Y. Laws 309; *see also* N.Y. Judiciary Law §§ 478, 484 (limiting the practice of law in New York to licensed attorneys). The Legislature enacted this requirement "to protect the public in this State from 'the dangers of legal representation and advice given by persons not trained, examined and licensed for such work,'" *El Gemayel v. Seaman*, 72 N.Y.2d 701, 705 (1988) (quoting *Spivak v. Sachs*, 16 N.Y.2d 163, 168 (1965)), including the dangers of "ignorance, inexperience and unscrupulousness," *People v. Alfani*, 227

---

[1] *See* Robert Kry, *The "Watchman for Truth": Professional Licensing and the First Amendment*, 23 Seattle U.L. Rev. 885, 955 (2000) (acknowledging that States "passed professional licensing laws following the American Revolution"); Standing Comm. on Lawyers' Responsibility for Client Prot., Am. Bar Ass'n, *1994 Survey and Related Materials on the Unauthorized Practice of Law / Nonlawyer Practice* xi-xiii (1996) (describing early American attorney regulation).

N.Y. 334, 339 (1919). The licensure requirement ensures that individuals providing legal services have not only the relevant knowledge and ability, but also the honesty and integrity that are essential both to the attorney-client relationship and to the sound administration of justice. *See id.*; *see also Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 460 (1978).

To these ends, New York requires those seeking to practice law to meet a number of qualifications. *See* Judiciary Law § 460 et seq.; Rules of Ct. of Appeals for Admission of Att'ys and Counselors at Law (22 N.Y.C.R.R.) pt. 520. An aspiring lawyer ordinarily must complete an appropriate course of legal study and must pass examinations demonstrating fundamental legal knowledge and ability, facility with New York law, and an understanding of the rules of legal ethics. *See* 22 N.Y.C.R.R. §§ 520.3-520.9. Each applicant must also demonstrate "the good moral character and general fitness requisite for an attorney- and counselor-at-law." *Id.* § 520.12(a).

Upon satisfying these requirements, each new attorney must solemnize his or her admission to the bar by "tak[ing] the constitutional oath of office in open court." Judiciary Law § 466. After admission, each lawyer must maintain his or her license, including by satisfying biennial continu-

5

ing legal education requirements. *See id.* § 468-a; Mandatory Continuing Legal Educ. Program for Att'ys (22 N.Y.C.R.R.) §§ 1500.12(a), 1500.22(a).

### 2. Regulations governing attorney conduct

After being admitted to practice, attorneys in New York are bound by the Rules of Professional Conduct. Among other things, the rules obligate attorneys to provide "competent representation" reflecting the necessary "legal knowledge, skill, thoroughness and preparation." N.Y. Rules of Pro. Conduct (22 N.Y.C.R.R. pt. 1200.0) r. 1.1. Failure to provide competent representation exposes an attorney to malpractice liability. *See Rudolf v. Shayne, Dachs, Stanisci, Corker & Sauer*, 8 N.Y.3d 438, 442 (2007).

Attorneys must also "remain faithful to the fiduciary duties of loyalty and confidentiality owed by attorneys to their clients." *Lightman v. Flaum*, 97 N.Y.2d 128, 135 (2001) (quotation marks omitted); *see* Rules of Pro. Conduct rr. 1.6-1.18. A lawyer's duty of confidentiality is effectuated in part through the attorney-client privilege. *See* N.Y. C.P.L.R. 3101(b), 4503. That privilege does not shield communications with a nonlawyer. *See, e.g.*, *United States v. Bein*, 728 F.2d 107, 112-13 (2d Cir.

6

1984); *Delta Fin. Corp. v. Morrison*, 15 Misc. 3d 308, 316-17 (Sup. Ct. Nassau County 2007); C.P.L.R. 4503.

A lawyer's role as an "officer of the court" also obligates a lawyer to preserve the courts' integrity and resources by refusing to advocate false or frivolous claims and defenses. *See* Rules of Pro. Conduct r. 3.1; *see also id.* rr. 3.3, 3.4, 4.1. In addition to civil and criminal liability, breaches of a lawyer's professional obligations can lead to attorney discipline, including public censure, temporary suspension, and permanent disbarment. *See, e.g.*, *Matter of Rosenberg*, 202 A.D.3d 1271 (3d Dep't 2022). *See generally* Rules for Att'y Disciplinary Matters (22 N.Y.C.R.R.) pt. 1240.

### 3. Prohibition on nonlawyers of practice law

Persons who lack a law license, and who thus are not subject to a lawyer's legal and ethical duties (or the mechanisms for enforcing those duties), are prohibited from practicing law in New York. Judiciary Law §§ 478, 484. This prohibition is not limited to appearing in court or holding oneself out as a lawyer but also includes out-of-court "legal advice and counsel." *Spivak v. Sachs*, 16 N.Y.2d 163, 166 (1965); *People v. Divorce Associated & Pub. Ltd.*, 95 Misc. 2d 340, 343 (Sup. Ct. Queens County 1978) (enjoining unauthorized practice of law that included "giving legal

7

advice by aiding and assisting individual customers in filling out legal forms"). To constitute the "practice of law," advice must be "rendered to particular clients" based on their individual circumstances. *El Gemayel*, 72 N.Y.2d at 706. Conduct or speech on legal subjects untethered to any specific client, such as publishing legal literature or providing general opinions about a legal topic, does not require a law license. *See id.*; *Matter of Rowe*, 80 N.Y.2d 336, 342 (1992).

The practice of law by someone who is not licensed to do so is a misdemeanor. Judiciary Law §§ 485, 486. More serious violations constitute felonies. *Id.* § 485-a (falsely holding oneself out as an attorney and causing loss exceeding $1,000). The New York Attorney General is authorized to investigate and prosecute violations of the unauthorized-practice statutes. *Id.* §§ 476-a(1), 476-b, 476-c; *cf. id.* §§ 750(B), 753(A)(4) (power of courts to punish unauthorized practice).

Nonlawyers may perform a variety of tasks to assist an attorney in rendering legal services, so long as the nonlawyer's work is properly supervised by the attorney. *See* Rules of Pro. Conduct r. 5.3; Roy D. Simon, *Simon's New York Rules of Professional Conduct Annotated* §§ 5.3:1 to 5.3:16 (July 2024 update) (Westlaw); *see also* Simon, *supra*, § 5.5:31

8

(collecting authorities). For example, lawyers routinely rely on nonlaw-yers, such as paralegals, to conduct client interviews, gather facts, under-take research, and draft legal documents. In this way, lawyers can reduce the need for their own direct involvement, while retaining supervisory legal judgment over nonlawyers acting "for the lawyer in rendition of the lawyer's professional services." *See* Rules of Pro. Conduct r. 5.3 cmt. 2 (comment of the N.Y. State Bar Association).

The Legislature has made the policy decision to allow a narrow exception to the unauthorized-practice-of-law statutes (UPL), by autho-rizing certain law students and not-yet-licensed recent law school gradu-ates to provide legal services under certain circumstances. To guard against the risk of incompetent or unethical legal advice, the Legislature has required such nonlawyers to work under the supervision of lawyers acting under a legal services program approved by the New York Supreme Court, Appellate Division. Judiciary Law § 478. Pursuant to this statute, several legal services programs have employed nonlawyers to assist with advising clients on consumer law and debt collection defense.[2]

---

[2] *E.g.*, The Civil Legal Advice & Resource Off., *CLARO NYC* https://staging.claronyc.org/; St. John's Univ. Sch. of L., *Consumer Justice*

(*continued on next page*)

## B.     Factual and Procedural Background

### 1.     Upsolve's proposal to provide unlicensed legal advice

Plaintiff Upsolve, Inc. is a nonprofit that wants to launch a program (the "American Justice Movement") through which nonlawyers would provide unlicensed legal services. (J.A. 33, 41.) Specifically, Upsolve seeks to recruit an unspecified number of nonlawyer "Justice Advocates," including plaintiff Reverend John Udo-Okon, to provide unlicensed legal advice to individuals who have been named as defendants in debt collection cases filed in New York City Civil Court (J.A. 33-34, 54), a tribunal that hears claims worth as much as $50,000, *see* N.Y.C. Civil Court Act §§ 201-202.

Under the proposed program, nonlawyer advocates would advise individuals about how to answer a debt collection complaint filed against them. (J.A. 33.) The nonlawyer advocates would counsel their clients based on an answer form that the New York court system makes publicly available to debt collection defendants. (J.A. 27, 34, 54.) The form contains

_____

*for the Elderly: Litigation Clinic,* https://www.stjohns.edu/law/academics/clinics/consumer-justice-elderly-litigation-clinic.

twenty-four checkboxes pertaining to potential legal defenses and counterclaims that a defendant might raise in answering a debt collection lawsuit filed against them. (*See* J.A. 65.) The parties here agree that the nonlawyer advocates' participation in Upsolve's program would constitute the unauthorized practice of law because Upsolve's nonlawyer advocates would advise individual debtors on how to answer this form based on the debtors' particular circumstances. (*See* J.A. 19, 34, 40-41, 52-62.) *See El Gemayel*, 72 N.Y. 2d at 706.

Although some of the listed defenses and counterclaims are simple, many are legally or factually complex. (*See* J.A. 40.) For example, the form contains boxes to check if: "service [of the complaint] was not correct as required by law"; "the time has passed to sue on this debt"; "[t]he collateral (property) was not sold at a commercially reasonable price"; the creditor engaged in conduct giving rise to a defense of unjust enrichment; the creditor breached the duty of good faith; the equitable doctrine of laches applies; the defendant's income is exempt from collection; or the defendant has counterclaims against the plaintiff. (*See* J.A. 65.)

Although the nonlawyer advocates must be "approved" by Upsolve (J.A. 52), the criteria (if any) for such approval are unclear. Plaintiffs do

11

not allege they will require their nonlawyer advocates to have any particular level of educational attainment (such as a high school diploma). (J.A. 75.) Plaintiffs do not allege that Upsolve's program would require the nonlawyer advocates to pass any examination regarding either substantive legal knowledge or the rules of ethics. Nor do plaintiffs allege that they will implement any procedure to assess the character and fitness of potential recruits.

Plaintiffs allege that Upsolve will require its nonlawyer advocates to execute a "Justice Advocate's Affidavit" to participate in the program. Through the affidavit, the nonlawyer advocates would agree to provide legal counsel free of charge and only as described in a "Training Guide" prepared by Upsolve. They would also agree to comply with consumer-protection laws and rules 1.6 through 1.9 of the New York Rules of Professional Conduct, which are among the provisions that govern licensed attorneys' obligations concerning confidentiality and conflicts of interest. (J.A. 52-53, 63.) But, Upsolve's materials do not require the nonlawyer advocates to abide by other professional conduct rules applicable to lawyers, such as the obligation to provide competent representation. *See* Rules of Pro. Conduct r. 1.1. Upsolve's materials also fail to acknowledge

that communications with nonlawyers are not shielded by the attorney-client privilege and would therefore be discoverable in litigation. See *supra* at 6-7. Moreover, Upsolve's materials do not establish any conflicts-check procedure, nor do they provide guidance to nonlawyer advocates (or their clients) regarding identifying or addressing conflicts.

Upsolve's Training Guide, which is attached to plaintiffs' complaint, contains a series of questions for the nonlawyer advocates to ask individual clients, and instructions on counseling those clients in the preparation of the answer form based on the information that each client provides. (J.A. 56-61.) The guide acknowledges that some of the scripted questions are "unclear" and instructs that, when in doubt, a nonlawyer advocate should "apply your best judgment . . . to determine whether you think [the client's] description satisfies the requirements for a particular defense." (J.A. 56.) The guide states that the advocate "should err on the side of telling the client to check the box to make sure they don't lose the opportunity to raise that defense" (J.A. 56), but it does not call for the nonlawyer advocate to advise the client regarding potential consequences for making false or unsupported claims in a legal pleading.

13

Although some portions of the Training Guide are straightforward, other aspects appear to be confusing, problematic, or incorrect. For example, the Training Guide misstates the statute of limitations for medical debt as six years (J.A. 58), instead of three years, under C.P.L.R. 213-d (as of April 2020).[3] With respect to computing the period of time for asserting a statute of limitations defense, the guide incorrectly states that such period is measured from the client's last payment (if any) to the present (J.A. 58), but a statute of limitations defense in New York turns on the period between the client's payment default (i.e., missed payment) and the date on which the action was commenced. *See, e.g., Wilmington Sav. Fund Soc'y, FSB v. Unknown Heirs at L. of Danny Higdon*, 161 A.D.3d 1559 (4th Dep't 2018).

The Training Guide contains numerous other contradictory, problematic, or incorrect information. For example:

---

[3] In the district court, plaintiffs incorrectly asserted that this error was due to an "amend[ment] by the legislature." Pl. Mem. in Opp'n to Def.'s Mot. to Dismiss at 7 (Dec. 9, 2025), ECF No. 126. In fact, the statute in question, C.P.L.R. 213-d, became effective in April 2020—nearly two years before plaintiffs brought this lawsuit (and filed their Training Guide in the district court). (*See* J.A. 5.)

14

- The guide initially asserts that the American Justice Movement assists only persons sued in "New York Civil Court" [*sic*], then directs nonlawyer advocates to provide counsel to clients "sued in a county outside of New York City." (J.A. 54, 59.)

- The guide states that nonlawyer advocates may provide legal advice only to a client that "ha[s] been served with a Summons and/or Complaint," but also directs nonlawyer advocates to advise clients that "did not receive the Summons and Complaint." (J.A. 54, 56.)

- The guide advises that it is always "in [the client's] interest to file an answer," "even if that deadline has elapsed" (J.A. 55), disregarding circumstances in which filing an answer may be detrimental to a client who was not properly served or where the period for obtaining a default judgment has passed (*see* C.P.L.R. 3215(a)-(c)).

- The guide emphasizes that a nonlawyer advocate "cannot assist a client" if the client "ha[s] already filed an answer" (J.A. 62 (bold font omitted)), but also directs that an advocate may assist a client with an amended answer (J.A. 54) without providing any guidance on the rules governing amendment of pleadings, which often requires a motion, *see* N.Y.C. Civil Court Act § 909; C.P.L.R. 3025.

Plaintiffs supply little information regarding how Upsolve intends to train or supervise its nonlawyer advocates, or to hold them accountable for malfeasance. For example, the Training Guide anticipates that nonlawyer advocates will attend one "virtual training" (J.A. 52), but plaintiffs do not claim that the training will be led by a lawyer. Similarly, plaintiffs allege that their nonlawyer advocates will be supervised (*e.g.*, J.A. 33) but do not allege that such supervision will be conducted by

15

lawyers. Plaintiffs allege that they have developed "web-based forms" to track interactions between a nonlawyer advocate and a client "to confirm that the service provided was consistent with the terms [the American Justice Movement] requires." (J.A. 37.) But the form linked in the complaint does not collect information regarding the client's circumstances or the nonlawyer advocate's legal advice to the client. (*See* J.A. 37 n.20 (link); Addendum (Add.) 1-2.[4])

Upsolve's materials state that nonlawyer advocates who violate Upsolve's rules may be "terminated" from the program, risk prosecution for the unauthorized practice of law, or face "liability under various other consumer-protection laws." (J.A. 53, 63.) But, Upsolve's clients would be required to sign a broad waiver of liability stating that neither Upsolve nor its nonlawyer advocates "assume any liability regarding the outcome of your case." (J.A. 64.)

---

[4] The complaint alleged that the "web-based forms" were hosted on the American Justice Movement's website. But, as of the filing of this brief, the links provided no longer contain that information nor do they provide any information about the American Justice Movement. (J.A. 37 n.20.) For the Court's convenience, screenshots of relevant web pages published by Upsolve, as those pages appeared on October 5, 2022, are submitted in an addendum to this brief.

16

### 2. The prior preliminary injunction appeal

In January 2022, plaintiffs filed this lawsuit against the Attorney General of the State of New York, seeking declaratory relief and preliminary and permanent injunctions barring the Attorney General from enforcing the State's UPL statutes against plaintiffs. (*See* J.A. 5, 18-47.) Plaintiffs' complaint asserted two causes of action. First, plaintiffs alleged that enforcing New York's UPL statutes against them would violate their First Amendment right to freedom of speech by preventing them from dispensing unlicensed legal counsel to clients. (J.A. 44-45.) Second, plaintiffs alleged that applying New York's UPL statutes against them would violate their First Amendment right of association by preventing them from "ensuring that low-income New Yorkers can access their rights to be heard in court." (J.A. 45-46.)

In May 2022, the United States District Court for the Southern District of New York (Crotty, J.) granted plaintiffs' motion for a preliminary injunction, after determining, inter alia, that plaintiffs' free speech claim was likely to succeed on the merits. *Upsolve, Inc. v. James*, 604 F. Supp. 3d 97, 111-21 (S.D.N.Y. 2022), *vacated and remanded*, 155 F.4th 133 (2d Cir. 2025). The district court found that, as applied to plaintiffs,

17

the "conduct triggering coverage" under the UPL statutes "consists of communicating a message." *Id.* at 114 (quotation marks omitted). Based on this finding, the district court held that the UPL statutes impose a content-based restriction on speech, *id.*, and thus trigger strict scrutiny, *id.* at 117. The district court then found that the UPL statutes likely failed strict scrutiny. *Id.* at 117-20.

The Attorney General appealed and, in September 2025, this Court vacated the preliminary injunction. *Upsolve, Inc. v. James*, 155 F.4th 133, 144 (2d Cir. 2025) ("*Upsolve II*"). Although the Court agreed with the district court that the UPL statutes regulate speech (rather than conduct) as applied to plaintiffs here, the Court held that the statutes are content neutral—not content based. *Id.* at 137, 143. This Court rejected plaintiffs' argument that the UPL statutes are content based because they required "'some evaluation of the speech'" to determine whether a person is violating the statute by communicating legal advice without a license. *Id.* at 142-43 (quoting *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61 (2022)). This Court observed that a restriction on speech is not content based simply because it considers the overall context—the "'particular purpose, focus, and circumstance'"—of the speech being regu-

18

lated. *Id.* at 143 (quoting *Brokamp v. James*, 66 F.4th 374, 393 (2d Cir. 2023). Rather, the test for determining whether a restriction is content based is whether it "'discriminate[s] based on the topic discussed or the idea or message expressed.'" *Id.* (quoting *City of Austin,* 596 U.S. at 73-74)).

Applying that test, the Court concluded that the UPL statutes were content neutral because they do not discriminate against any topics, ideas, or messages that may be expressed in the context of legal practice. *Id.* The Court held that the UPL statutes are subject only to intermediate scrutiny, vacated the preliminary injunction, and remanded the case. *Id.* at 143-44.

Plaintiffs filed a petition for certiorari seeking review of this Court's September 2025 decision. The Supreme Court denied the petition. *Upsolve, Inc. v. James*, 146 S. Ct. 1854 (2026).

### 3. The decision on appeal

Upon remand, the Attorney General moved to dismiss the complaint for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure. (J.A. 88.) The district court (Kaplan, J.)[5] granted New York's motion to dismiss the complaint. (J.A. 78-104.)

With respect to the free speech claim, the district court began by noting that this Court's decision in *Upsolve II* had already determined that the UPL statutes, as applied to plaintiffs here, are content-neutral limitations on speech that are subject to intermediate scrutiny. (J.A. 89.) The court explained that to satisfy intermediate scrutiny, the government needs to show that the challenged restriction: (1) advances an important governmental interest unrelated to the suppression of free speech; and (2) does not burden substantially more speech than necessary to further those interests. (J.A. 90.) Applying this well-settled standard, the court ruled that the Attorney General had established that the UPL statutes satisfy intermediate scrutiny here.

---

[5] In April 2024, the matter was reassigned from Judge Paul A. Crotty to Judge Richard M. Berman who presided over the matter until September 2025. At that time, the case was reassigned to Judge Lewis A. Kaplan, who issued the decision on appeal. (J.A. 13-14.)

First, the district court explained that the UPL statutes further governmental interests long recognized by the Supreme Court to be compelling and substantial. (J.A. 94.) For example, the district court noted that the UPL statutes further "ethical behavior and independence among the members of the legal profession" and "protect the public from ignorance, inexperience and unscrupulousness." (J.A. 94 (quotation marks omitted).) The court further explained that the UPL statutes advance these interests by requiring legal practitioners to meet certain minimum education and examination requirements designed to measure practitioners' competency and demonstrate their moral character and fitness to assist clients who trust them and to serve as an officer of the court. (J.A. 95.) The court observed that enforcing the UPL statutes against plaintiffs plainly advances these important interests because Upsolve's unlicensed advocates would advise clients on "what legal defenses to raise (or not raise)" in a pending litigation and "may provide incompetent advice that prejudice's a client's legal rights" or "advise a client to make statements that mislead the court." (J.A. 95-96.)

Second, the district court concluded that the UPL statutes are narrowly tailored because they advance the "state's content-neutral

21

interests without burdening a substantial amount of speech that is unlikely to bring about the evils against which the rules are directed." (J.A. 100.) As the court explained, the UPL statutes prohibit an unlicensed individual only from providing legal advice to clients about their specific legal problems, without limiting any individual's freedom to discuss law-related topics in general and without limiting a licensed individual's freedom to provide legal advice to clients about any topic. (J.A. 100.)

Lastly, the district court dismissed plaintiffs' freedom of association claim, rejecting plaintiffs' view that the right of association under the First Amendment confers a right to provide free legal advice without a license. (J.A. 102.)

Plaintiffs timely appealed. (J.A. 105.)

## SUMMARY OF ARGUMENT

I. In the prior appeal in this case, the Court held that the UPL statutes are content neutral and thus subject to intermediate scrutiny because they do not "'discriminate based on the topic discussed or the idea or message expressed.'" *Upsolve II*, 155 F.4th at 143 (quoting *City of Austin*, 596 U.S. at 73-74). That decision is controlling here.

There is no merit to plaintiffs' contention that the Supreme Court's decision in *Chiles v. Salazar* abrogated this Court's holding in *Upsolve II*. *See* Br. at 20. *Chiles* is inapplicable here because it involved a Colorado law that, in stark contrast to the UPL statutes, banned the plaintiff mental-health counselor from expressing viewpoints about reducing same-sex attraction, while authorizing her to express viewpoints about facilitating same-sex attraction. *See Chiles*, 146 S. Ct. at 1024. The UPL statutes do not engage in any such viewpoint discrimination, as this Court has already ruled. *See Upsolve II,* 155 F.4th at 143.

Plaintiffs err in asking this Court to read into *Chiles* a sweeping principle that a professional licensing statute is content based because it regulates one profession rather than all professions, and thus necessarily regulates, for example, legal advice but not financial advice. *See* Br. at

23

16. *Chiles* says nothing of the sort. To the contrary, the Court in *Chiles* emphasized that Colorado's conversion therapy ban was not comparable to licensing laws that have "traditionally addressed what qualifications an individual must possess before practicing a particular profession." *Chiles*, 146 S. Ct. at 1028. The UPL statutes fit squarely within the long history of States requiring an individual to possess certain qualifications before they may practice law, whatever the legal topic or message.

II. The district court correctly concluded that the UPL statutes satisfy intermediate scrutiny.

A. As an initial matter, there is no merit to plaintiffs' argument that the district court was required to wait for the summary-judgment stage before conducting the intermediate scrutiny analysis. *See* Br. at 30-48. As this Court's precedents make clear, courts may rely on established judicial precedent, the plain language of a challenged statute, and the plaintiffs' complaint and documents incorporated therein to determine whether the challenged statute serves an important governmental interest and is narrowly tailored to that interest. *See, e.g., Brokamp v. James*, 66 F.4th 374, 397-98 (2d Cir. 2023). The district court properly

24

relied on such sources here in concluding that the UPL statutes satisfy intermediate scrutiny.

B. Long established precedent, including from the Supreme Court, establishes that New York's UPL statutes serve the important governmental interest of protecting the public from incompetent and unscrupulous legal practitioners. *See, e.g.*, *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 792 (1975). Enforcing the UPL statutes furthers that interest, particularly when plaintiffs propose to have individuals who are not required to meet any educational, competency, or ethical standards give legal advice to clients about completing an answer. And plaintiffs do not allege that their nonlawyer advocates will be trained or supervised by licensed attorneys.

C. The UPL statutes are narrowly tailored because they do not burden substantially more speech than necessary to achieve the State's interests. The text of the statutes makes plain that plaintiffs would not be prevented, for example, from posting their training materials online or generally discussing the information contained therein. The only thing the statutes prohibit is the provision of legal advice to clients about their

25

legal issues—a circumstance in which incompetent and unethical legal advice is likely to cause harm.

III. The district court correctly concluded that plaintiffs failed to state a freedom of association claim. The UPL statutes do not stop plaintiffs from associating with others to promote access to the courts; they simply prohibit unlicensed legal practice. No court has recognized any associational right to provide unlicensed legal counsel, and this Court should not do so.

## STANDARD OF REVIEW

This Court reviews de novo a district court decision dismissing a complaint under Rule 12(b)(6). *New Yorkers for Religious Liberty, Inc. v. City of New York*, 125 F.4th 319, 327 (2d Cir.), *cert. denied sub nom.*, *Kane v. City of New York*, 146 S. Ct. 993 (2025). "Documents that are attached to the complaint or incorporated in it by reference are deemed part of the pleading and may be considered." *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007).

## ARGUMENT

## POINT I

THE UNAUTHORIZED PRACTICE OF LAW STATUTES ARE CONTENT NEUTRAL AND THUS SUBJECT TO INTERMEDIATE SCRUTINY

**A. Under This Court's Prior, Binding Decision in *Upsolve II*, the Unauthorized-Practice-of-Law Statutes Are Content Neutral.**

In the prior appeal in this case, this Court already concluded that, as applied to plaintiffs, the UPL statutes impose content-neutral restrictions on speech that are subject to intermediate scrutiny. *Upsolve II*, 155 F.4th at 141-44. The Court's prior decision is binding here and disposes of plaintiffs' argument that the UPL statutes' application to them is content based.

In reaching its content-neutrality holding in *Upsolve II*, the Court relied on both settled Supreme Court precedent, such as *City of Austin v. Reagan National Advertising of Austin, LLC*, 596 U.S. 61 (2022), and this Court's decision in *Brokamp*. *See Upsolve II*, 155 F.4th at 142-44. In *Brokamp*, this Court determined that New York's professional licensing rules for mental health counselors are content neutral because they apply generally to the context of mental health counseling without discrimi-

27

nating based on the topic or viewpoint of any regulated speech. *Brokamp*, 66 F.4th at 392-97.

Under these precedents, the Court explained in *Upsolve II*, the test for determining whether a challenged restriction on speech is content based or content neutral fundamentally turns on whether the restriction "'discriminate[s] based on the topic discussed or the idea or message expressed'" in the speech being regulated. 155 F.4th at 143 (quoting *City of Austin*, 596 U.S. at 73-74). The Court emphasized that a restriction on speech does not necessarily discriminate based on content simply because it identifies the overall context in which it applies—without discriminating based on a topic or viewpoint. In other words, a statute that applies "'only to speech having a particular purpose, focus, and circumstance,'" *id.* (quoting *Brokamp*, 66 F.4th at 393), is not necessarily content based so long as the statute does not "'discriminate based on the topic discussed or the idea or message expressed,'" *id.* (quoting *City of Austin*, 596 U.S. at 73-74).

Applying these principles, this Court ruled that the UPL statutes are content neutral because they apply evenhandedly to all people wishing to practice law, without discriminating against certain legal advice or

28

topics. *Id.* at 143. For example, this Court noted that the UPL statutes "apply equally to individuals who provide legal advice only to creditors and to those who advise only debtors." *Id.* (quotation marks omitted). And the statutes "do not prohibit public discussion of an entire legal topic," leaving all individuals, whether they are licensed or not, "free to discuss legal topics or provide generalized advice, including by publishing books and guides, without running afoul of the UPL statutes." *Id.*

Rather than discriminate based on content or viewpoint, this Court emphasized that the UPL statutes apply neutrally based only on the overall context in which speech is made, meaning based on its "'particular purpose, focus, and circumstance.'" *Id.* at 143 (quoting *Brokamp*, 66 F.4th at 393). In other words, application of the UPL statutes depends solely on whether the speech at issue constitutes "'the rendering of legal advice and opinions directed to particular clients.'" *Id.* (quoting *Matter of Rowe*, 80 N.Y.2d at 341-42)). The Court explained that such generic professional licensing rules, that dictate only the qualifications needed to give *any* individualized legal advice to clients, is a content-neutral regulation subject to intermediate scrutiny. *Id.*

29

*Upsolve II* and the *Brokamp* decision on which it is based are controlling here because neither decision has been reversed by this Court en banc or by a decision of the Supreme Court. *See In re Arab Bank, PLC Alien Tort Statute Litig.*, 808 F.3d 144, 154 (2d Cir. 2015). Plaintiffs' argument to the contrary is meritless, for the reasons discussed below.

**B.    The Supreme Court's Decision in *Chiles v. Salazar* Did Not Abrogate the Prior Panel's *Upsolve II* Opinion.**

Contrary to plaintiffs' primary argument on appeal, the Supreme Court's decision in *Chiles v. Salazar*, did not abrogate this Court's decision in *Upsolve II*. *See* Br. at 20-30.

First, *Chiles* is inapplicable here because that decision turned on the Court's determination that the challenged Colorado licensing statute discriminated against certain *viewpoints* expressed by licensees and disfavored by the State—which the UPL statutes at issue here plainly do not do. Specifically, the statute challenged in *Chiles* prohibited state-licensed mental health counselors from engaging in "conversion therapy," which was defined as any practice or treatment that attempts "to change an individual's sexual orientation or gender identity." 146 S. Ct. at 1018 (quotation marks omitted). The statute expressly permitted licensed

counselors to engage in therapies involving, inter alia, "acceptance, support, and understanding for the facilitation" of gender-identity exploration or assistance to clients undergoing a gender transition. *Id.* at 1023 (quotation and alteration marks omitted).

The Supreme Court concluded that the Colorado law not only discriminated based on the content of licensees' speech but also discriminated based on viewpoints about gender identity or sexual orientation. *Id.* at 1024. For example, the law prohibited the plaintiff, a licensed counselor, from speaking to a client about eliminating or reducing their "sexual or romantic attraction or feelings toward individuals of the same sex." *Id.* at 1023. But the law allowed the plaintiff to speak to a client about exploring or facilitating their sexual or romantic attractions towards individuals of the same sex. *See id.* at 1024. Indeed, all nine justices agreed that the law discriminated based on viewpoint. *Id.*; *id.* at 1030 (Kagan, J., concurring); *id.* at 1042 (Jackson, J., dissenting) (noting that law is "*unavoidably* viewpoint based").

Unlike the Colorado law at issue in *Chiles*, New York's UPL statutes do not in any way discriminate based on particular viewpoints. *Upsolve II*, 155 F.4th at 143. As this Court aptly explained, the UPL

31

statutes do not, for example, prohibit licensed attorneys from giving legal advice that supports challenges to debt collection lawsuits while allowing licensed attorneys to give legal advice that supports debt collection lawsuits. *See id.* Nor, for that matter, do the UPL statutes prohibit unlicensed advocates from giving legal advice about one side of any legal topic or debate while allowing them to give legal advice about the other side.

Second, plaintiffs miss the mark in arguing that *Chiles* noted that, as a general rule, speech regulations that discriminate based on content but not viewpoint are subject to strict scrutiny, 146 S. Ct. at 1021. *See* Br. at 24-27. This general rule is nothing new and does not undermine *Upsolve II*. This Court in *Upsolve II* did not, as plaintiffs wrongly contend, focus solely on viewpoint discrimination or hold that the UPL statutes are content neutral merely because they do not discriminate based on viewpoint. *See* Br. at 25. To the contrary, this Court concluded that the UPL statutes are content neutral because they do not discriminate based on *content*, i.e., they do not "'discriminate based on the topic discussed or the idea or message expressed.'" *Upsolve II*, 155 F.4th at 143 (quoting *City of Austin*, 596 U.S. at 73-74); *cf. Vidal v. Elster*, 602 U.S. 286, 293 (2024) (defining viewpoint discrimination as discriminating between views taken

32

by speakers on a particular subject). For example, this Court observed that the UPL statutes apply to everyone, regardless of the type of law they want to practice or the legal topic, idea, or message they seek to discuss. *Upsolve II*, 155 F.4th 143. And the UPL statutes do not "prohibit public discussion of an entire legal topic." *Id.* The Court thus properly concluded that the UPL statutes are content neutral because they are agnostic as to both viewpoint and content.

Third, plaintiffs wrongly argue (Br. at 20) that *Chiles* abrogates this Court's conclusion in both *Upsolve II* and *Brokamp* that a licensing statute can be content neutral when it applies based solely on the overall context—i.e., the "'purpose, focus, and circumstance'" in which speech is given—without discriminating based on the viewpoint or content expressed. *See Upsolve II*, 155 F.4th at 143 (quoting *Brokamp*, 66 F.4th at 393). In plaintiffs' view, *Chiles* essentially dictates that a professional licensing statute is content based because it regulates one profession rather than all professions, and thus necessarily regulates, for example, legal advice but not financial advice. *See* Br. at 16. But *Chiles* says nothing of the sort.

33

*Chiles* did not address, let alone rule on, the type of sweeping theory that plaintiffs espouse here. Indeed, *Chiles* did not address the constitutionality of a statute that requires individuals to obtain a license before they provide any mental health counseling to clients, no matter the topic or viewpoint. And the Court did not remotely suggest in *Chiles* that such a statute would be content based because it would prohibit unlicensed practitioners from giving mental health counseling while allowing them to give financial counseling or interior design counseling. To the contrary, the Court in *Chiles* emphasized that Colorado's conversion therapy ban was not comparable to licensing laws that have "traditionally addressed what qualifications an individual must possess before practicing a particular profession." *Chiles*, 146 S. Ct. at 1028.

Moreover, *Chiles* did not address, much less abrogate, the main Supreme Court precedent that this Court relied on in determining that the UPL statutes are content neutral because they apply based only on the general professional context in which speech is given. Specifically, this Court relied on the Supreme Court's decision in *City of Austin*, which rejected the "extreme" argument, 596 U.S. at 69, that *any* consideration of the purpose of speech necessarily renders a regulation content based,

34

*id.* at 74. *See Upsolve II,* 155 F.4th at 143. *Chiles* did not accept (or address) this type of extreme argument and thus does not undermine *City of Austin* or this Court's reliance on that case in *Upsolve II* to reject plaintiffs' extreme argument that the UPL statutes are content based merely because they apply to unlicensed legal advice but not to unlicensed financial advice.

Contrary to plaintiffs' view, application of the principles set forth in *City of Austin,* and relied on by this Court in *Upsolve II,* would not permit a statute like the conversion therapy ban at issue in *Chiles* to escape strict scrutiny. *See* Br. at 28. According to plaintiffs, applying these principles would allow easy circumvention of strict scrutiny because the government could just characterize a conversion therapy ban as applying only to speech "with the *purpose* of changing a patient's sexual orientation." Br. at 29. But *City of Austin* already precludes such circumvention, and nothing in *Upsolve II* allows it. As the Supreme Court explained in *City of Austin,* a regulation will be content based if it imposes "an obvious subject-matter distinction" through a "function or purpose" proxy. 596 U.S. at 74. The conversion therapy ban in *Chiles* imposed such an obvious

35

subject-matter distinction, *see* 146 S. Ct. at 1018, whereas the UPL statutes at issue here do not. See *supra* at 28-29.

Fourth, nothing in *Chiles* indicates that the Supreme Court intended to radically upend States' traditional authority to impose reasonable, content-neutral licensing requirements upon those who want to practice certain professions. *National Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 770 (2018). Attorney licensing has existed since before the First Amendment was ratified (see *supra* at 4); New York's licensing requirement has existed for more than a century. And today, every State has attorney-licensing requirements.[6]

Accepting plaintiffs' theory here would upend these longstanding attorney-licensing statutes by applying strict scrutiny to any attorney-licensing regime simply because it requires licensure before practicing law through one's speech. Any individual could assert an "as-applied" challenge and demand their own exception to a UPL statute. Or they could simply commence unlicensed law practice with the intention of raising the First Amendment as a defense if they are discovered and

---

[6] Nat'l Conf. of Bar Exam'rs & Am. Bar Ass'n, *Comprehensive Guide to Bar Admission Requirements* 1-2 (2024).

36

prosecuted. In any such case, the State would bear the burden of proving that it has a compelling government interest in preventing each unlicensed practitioner from practicing law, and that prohibiting each plaintiff's law practice is the least restrictive means of attaining that interest. *See Reed v. Town of Gilbert*, 576 U.S. 155, 171 (2015).

Such challenges would not likely be limited to First Amendment claims to provide out-of-court legal advice. Indeed, when lawyers write briefs and participate in oral argument, they are also "communicating their opinion about a particular person's legal problems." Br. at 9. Nor would plaintiffs' conception of the First Amendment necessarily be limited to the UPL statutes, as other licensing regimes protect state residents from unqualified practitioners in professions that require a license to provide "one-on-one spoken . . . advice." *See* Br. at 9. For example, fields including medicine, architecture, accounting, psychology, and social work all require state licensure, despite entailing the communication of ideas, advice, or verbal treatment. *See* N.Y. Education Law tit. VIII. While these and other licensing requirements have long been upheld over constitu-

37

tional challenges,[7] applying strict scrutiny to the attorney-licensing rules would upend that status quo and imperil the State's ability to regulate and oversee many professions that are practiced through speech. *Chiles* did not endorse such a sweeping unraveling of centuries old professional licensing statutes.

Lastly, plaintiffs err in contending that *Chiles* abrogated *Upsolve II* by requiring courts to conduct some new content-neutrality analysis announced in *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010). Br. at 23-24. *Chiles* does not suggest that *Holder* announced any such new analysis. Instead, the Court in *Chiles* simply referred to *Holder's* conclusion that the material-support statute in that case was a content-based restriction on speech as opposed to a restriction on conduct with incidental burdens on expression. *Chiles*, 146 S. Ct. at 1022; *Holder*, 561 U.S. at 27. A citation to the application of a basic principle of law to the specific statute at issue in *Holder* does not entail any sweeping new holding about

---

[7] *See, e.g.*, *Mastrovincenzo v. City of New York*, 435 F.3d 78, 97-102 (2d Cir. 2006) (street vendors' sale of art); *see, e.g., New York State Ass'n of Career Schs. v. State Educ. Dep't*, 823 F. Supp. 1096, 1101-06 (S.D.N.Y. 1993) (educational institutions).

38

whether States may, consistent with the First Amendment, require a license to practice a profession.

To the extent plaintiffs are arguing that the material-support statute in *Holder* is comparable to a licensing scheme like the UPL statutes, this Court has already rejected that argument. In *Brokamp*, the Court explained that the material-support statute in *Holder* regulated content by criminalizing professionals' speech only if it involved "'specialized knowledge'" and was directed towards "groups designated as foreign terrorist organizations.'" 66 F.4th at 394 n.19 (quoting *Holder*, 561 U.S. at 8-9). By contrast, the neutral licensing statutes at issue in *Brokamp* and in this case do not prohibit only narrow topics spoken by licensed professionals.

## POINT II

### THE DISTRICT COURT PROPERLY DISMISSED PLAINTIFFS' FREE SPEECH CLAIM

A challenged restriction will withstand intermediate scrutiny if the government demonstrates that the restriction "(1) advances important governmental interests unrelated to the suppression of free speech and (2) does not burden substantially more speech than necessary to further those interests." *Brokamp*, 66 F.4th at 397 (quotation marks omitted). Here, the district court correctly concluded that the State demonstrated that the UPL statutes satisfy intermediate scrutiny. (*See* J.A. 88-101.)

### A. The District Court Properly Concluded at the Motion-to-Dismiss Stage That Plaintiffs' Free Speech Claim Fails as a Matter of Law.

As an initial matter, the district court properly concluded at the motion-to-dismiss stage that the complaint failed to state a plausible free speech claim as a matter of law. There is no merit to plaintiffs' argument that the court was required to wait for the summary-judgment stage. *See* Br. at 30-48.

Although application of intermediate scrutiny often involves considering evidence submitted at summary judgment, such evidence is

40

not always required. *See Brokamp*, 66 F.4th at 397-98. As this Court's precedents make clear, there are circumstances where courts can—and do—determine at the motion-to-dismiss stage that the government has established that a challenged statute satisfies intermediate scrutiny. *See id.*; *see also Citizens United v. Schneiderman*, 882 F.3d 374, 380-85 (2d Cir. 2018) (upholding law under intermediate scrutiny at the pleading stage); *Clementine Co. v. Adams,* 74 F.4th 77, 88-89 (2d Cir. 2023) (conducting an intermediate scrutiny analysis on the pleadings).

For example, the Court has relied on long-settled judicial precedent in concluding at the motion-to-dismiss stage that a challenged statute plainly furthered the government's important interests. *See Brokamp*, 66 F.4th at 398-99; *see also Clementine Co.*, 74 F.4th at 88; *cf. Jeffery v. City of New York*, 113 F.4th 176, 194-95 (2d Cir. 2024) (compelling interest under strict scrutiny). In *Brokamp*, for instance, this Court concluded that application of New York's professional licensing laws to an out-of-state therapist satisfied intermediate scrutiny because, inter alia, longstanding precedent "recognized the states' strong interest in protecting public health 'against the consequences of ignorance and incapacity, as well as of deception and fraud.'" *Id.* at 398-99 (quoting *Dent v. West Virginia*, 129

41

U.S. 114, 122 (1889)). And in *Jeffery*, the Court applied well-established precedent to conclude that, as a matter of law, the challenged restriction (a temporary curfew instituted during the COVID-19 pandemic) served the government's compelling governmental interest in protecting the community from crime.[8] 113 F.4th at 194.

Moreover, the Court has repeatedly relied on a restriction's plain language, as well as the plaintiffs' complaint and any other materials properly considered on a motion to dismiss, in determining that the challenged restriction was sufficiently tailored. *See Brokamp*, 66 F.4th at 401-03; *see also Citizens United*, 882 F.3d at 379-85 (examining text of challenged regulations). In *Brokamp*, for example, the text of the challenged licensing requirement made clear that it applies only in circumstances in which a practitioner engages in speech for a "therapeutic

---

[8] Plaintiffs misconstrue *Jeffery* in arguing that it stands for the proposition that First Amendment scrutiny may be conducted on the pleadings only if the complaint concedes that the challenged restriction serves an important governmental interest. *See* Br. at 44. The *Jeffery* decision did not rely solely on the plaintiffs' concessions; as explained, it relies on well-established precedent in conducting First Amendment scrutiny. *See Jeffery*, 113 F.4th at 194. In any event, plaintiffs' own complaint here acknowledges the important governmental interests served by the UPL statutes. (J.A. 43-44.) See *infra* at 48-51.

purpose" that is "focused on a disorder or problem of the psyche" given in an "organized setting." *Brokamp*, 66 F.4th at 401; *see id.* at 400-02.[9]

As explained in detail below, the same considerations that have led this Court to affirm dismissals of complaints in cases like *Brokamp*—established precedent, the scope of the UPL statutes, and plaintiffs' own complaint and materials incorporated therein—amply support dismissal of plaintiffs' complaint here. See *infra* at 46-48, 53-55.

Plaintiffs raise irrelevant arguments in contending that there is a split among the circuits regarding the application of intermediate scrutiny. Br. at 18, 36-37. Plaintiffs argue that the Fourth Circuit applied a "loosened" intermediate scrutiny analysis, rather than rational basis review, to statutes that allegedly regulate professional conduct with only incidental burdens on speech. *See* Br. at 32 (citing *360 Virtual Drone*

---

[9] There is nothing in this Court's decision in *Citizens United*, 882 F.3d 374, to support plaintiffs' contention that First Amendment scrutiny may be conducted on the pleadings only if "the complaint fail[ed] to allege any serious burdens on speech," Br. at 44. To the contrary, in *Citizens United*, this Court held that the plaintiffs' First Amendment claim failed as a matter of law under intermediate scrutiny where the plaintiffs had alleged that the challenged regulations seriously burdened their First Amendment rights through censorship and donor intimidation. 882 F.3d at 380.

*Servs. LLC v. Ritter*, 102 F.4th 263 (4th Cir. 2024).) Plaintiffs then contend, by contrast, that other out-of-circuit decisions apply the usual intermediate scrutiny standard where the challenged statute regulates professional speech rather than conduct. *See* Br. at 33-35 (discussing, e.g., *Hines v. Pardue*, 117 F.4th 769, 778-79 (5th Cir. 2024).) This purported split is irrelevant because there is no dispute here about whether the UPL statutes regulate professional conduct or speech, or about what standard to apply. The Court already decided in *Upsolve II* that the UPL statutes, as applied to plaintiffs here, are content-neutral regulations of professional speech subject to intermediate scrutiny. 155 F.4th at 143. And the district court did not apply any "loosened" intermediate scrutiny. *See* Br. at 31. Rather, in accordance with *Upsolve II* and this Court's other precedents, the district court applied the usual intermediate scrutiny standard. (J.A. 90-91, 94-101.)

In any event, the out-of-circuit cases on which plaintiffs rely (Br. at 33-36) happen to be ones that involved a trial or summary-judgment submissions, but they do not hold that an intermediate scrutiny analysis must be based solely on evidence that is admissible at trial. *See e.g., Billups v. City of Charleston*, 961 F.3d 673, 685 (4th Cir. 2020) (noting

44

that the analysis may be based on "common sense and the holdings of prior cases" (quotation marks omitted)); *Hines v. Pardue*, 117 F.4th 769, 780 (5th Cir. 2024) (applying "history, consensus, and simple common sense" (quotation marks omitted)). Rather, they held that based on the record in that particular case, the government had failed to carry its burden on a particular aspect of the intermediate scrutiny analysis. *See Billups*, 961 F.3d at 688-90; *see also Hines*, 117 F.4th at 784-85.

For similar reasons, plaintiffs are wrong in suggesting that the Supreme Court in *McCullen v. Coakley*, 573 U.S. 464 (2014), held that intermediate scrutiny can never be adjudicated at the motion-to-dismiss stage. *See* Br. at 31-32, 39-40. *McCullen* says nothing of the sort. Instead, the Supreme Court ruled, based on the record there, that the challenged Massachusetts law, which prohibited all expressive activity within a thirty-five foot zone surrounding abortion clinics, was substantially over-broad because methods like banning obstruction of clinic access would have burdened substantially less speech than a total speech ban while achieving the State's interests. *McCullen*, 573 U.S. at 490-91. *McCullen* does not preclude courts from concluding that, under circumstances like those presented here, a challenged statute is sufficiently tailored to satisfy

45

intermediate scrutiny. Indeed, as explained further below, plaintiffs' proposed less restrictive alternative—its own bespoke exception to the UPL statutes—plainly would not serve the State's important interests. See *infra* at 48-51, 55-57.

**B.     The District Court Correctly Concluded That the Unauthorized-Practice Statutes Advance the State's Important Interests.**

Longstanding precedent, including from the Supreme Court, this Court, and New York's highest court, establishes that the UPL statutes plainly further important governmental interests. *See, e.g.*, *Goldfarb*, 421 U.S. at 792; *Jacoby & Meyers, LLP v. Presiding Justs. of the First, Second, Third & Fourth Dep'ts, App. Div. of the Sup. Ct.*, 852 F.3d 178, 191 (2d Cir. 2017); *Alfani*, 227 N.Y. at 339. As courts have long recognized, States have strong interests in regulating the practice of law within their respective jurisdictions, including through the establishment of standards for licensing legal practitioners. *See Ohralik*, 436 U.S. at 460; *see also Jacoby & Meyers, LLP*, 852 F.3d at 191; *El Gemayel*, 72 N.Y.2d at 705.

For example, the UPL statutes serve the State's important interest in "maintaining ethical behavior and independence among the members of the legal profession." *Jacoby & Meyers, LLP*, 852 F.3d at 191. The UPL

46

statutes also serve the State's important interests in "protect[ing] the public from the dangers of legal representation and advice given by persons not trained, examined and licensed for such work." *El Gemayel*, 72 N.Y.2d at 705 (quotation marks omitted). And the State has important interests in regulating the legal profession, including through licensing, because "lawyers are essential to the primary governmental function of administering justice." *Ohralik*, 436 U.S. at 460 (quotation marks omitted). Each of these fundamental interests is "unrelated to the suppression of free speech," *see Brokamp,* 66 F.4th 397 (quotation marks omitted), and plaintiffs do not argue otherwise. Indeed, plaintiffs acknowledge in their complaint that the UPL statutes "are designed to protect consumers from the risk of unreliable or unscrupulous representation and thereby increase public faith in the justice system." (J.A. 43-44.) And plaintiffs cannot seriously dispute that the interests underlying the UPL statutes are important, particularly when the Supreme Court has described these interests as compelling. *See Goldfarb*, 421 U.S. at 792.

Established precedent also makes clear that the UPL statutes further these compelling state interests, as the district court correctly concluded. (J.A. 94-96.) By limiting the practice of law to licensed attor-

47

neys, the State ensures that legal advice is provided by individuals who are educated in the law; who pass examinations designed to measure their competency to practice law; and who demonstrate that they have the moral character and fitness to serve as officers of the court and to serve their clients, who may be vulnerable and likely to rely heavily on legal advice. (J.A. 94-96.) *See Spivak,* 16 N.Y.2d at 168. Requiring lawyers to obtain and maintain their licenses also ensures that New York retains mechanisms to address and deter breaches of its legal ethical and professional standards—including the requirement to provide "competent representation" reflecting the necessary "legal knowledge, skill, thoroughness, and preparation." Rules of Pro. Conduct r. 1.1; *see also*, *Alfani*, 227 N.Y. at 339. "[L]icensure based on specified standards of education, experience, and testing" is a form of regulation long recognized to "directly and materially . . . alleviate concerns about ignorant, incompetent, and/or deceptive" conduct by professionals," *Brokamp*, 66 F.4th at 399.

Indeed, plaintiffs' own complaint and the materials incorporated therein further confirm that the UPL statutes advance the State's important interests. For example, plaintiffs do not allege that Upsolve would require its nonlawyer advocates to possess *any* educational qualifica-

48

tions—such as a high school diploma. (J.A. 75.) Nor do plaintiffs allege that Upsolve would impose any prerequisites in terms of demonstrating legal knowledge, judgment, or character and fitness for nonlawyer advocates to participate in its program.

Plaintiffs thus propose to have individuals provide legal advice to clients—without these individuals demonstrating that they can satisfy any of the educational, legal competency, or ethical standards required to obtain a law license—in a context where the risks from such unlicensed legal advice are substantial. Plaintiffs propose to give individualized legal advice to clients about how to complete an answer to a pending lawsuit, including what legal defenses or counterclaims to raise (or not raise). As the district court correctly explained, the UPL statutes plainly further the State's interests in preventing precisely that type of unlicensed legal advice because "[a] person without proper legal training may provide incompetent advice that prejudices a client's legal rights." (J.A. 96.) "Or a person with questionable moral character may proceed in a representation despite a clear conflict of interest or advise a client to make statements that mislead the court." (J.A. 96.) Ensuring that anyone providing such formal legal advice to clients has been "'trained, examined and

49

licensed' clearly advances the State's interests in avoiding those risks." (J.A. 95 (quoting *El Gemayel*, 72 N.Y.2d at 705).)

Although plaintiffs assert that Upsolve will require its nonlawyer advocates to agree to abide by certain ethical conduct rules (*e.g.*, J.A. 52), plaintiffs' complaint, the materials incorporated therein, and the State's Rules of Professional Conduct make clear that such a private agreement does not replace the safeguards provided under the State's attorney-licensing regime. As an initial matter, plaintiffs' proposed program does not require advocates to abide by important state Rules of Professional Conduct, such as Rule 1.1's requirement to provide competent representation. Moreover, neither Upsolve's clients nor its nonlawyer advocates would be able to rely on the attorney-client privilege to shield confidential communications. See *supra* at 6-7.

More broadly, the nonlawyer advocates would not be subject to the professional sanctions that are used to ensure that lawyers abide by the Rules of Professional Conduct, such as the suspension or revocation of a law license. See *supra* at 7. At most, the nonlawyer might be denied further opportunities to volunteer for Upsolve. Nor would the nonlawyer advocates likely face tort or similar civil liability if they harm clients

50

through incompetent or unethical legal advice because Upsolve requires its clients to sign a broad waiver of liability. (J.A. 55, 64.)

Plaintiffs' Training Guide clearly does not substitute for the UPL statutes in minimizing the risks of unlicensed advocates giving unreliable or harmful legal advice. As discussed (*supra* at 14-15), Upsolve's Training Guide contains numerous contradictory, problematic, or legally incorrect statements. Although the complaint alleges that the training materials were "reviewed" by legal experts who provided declarations (J.A. 35), the referenced declarations contain no analysis about how those materials would reduce the risk of unlicensed advocates giving unreliable or harmful advice.[10] And Upsolve's nonlawyer advocates, incorrectly believing that the Training Guiding makes them experts, may readily and overconfidently misadvise clients to the clients' detriment.

---

[10] *See* Decl. of Tashi Lhewa (Dec. 9, 2021), ECF No. 7-5; Decl. of Pamela Foohey (Dec. 20, 2021), ECF No. 7-6. Because these declarations are incorporated by reference in the complaint (*e.g.,* J.A. 35) this Court may consider them on a motion to dismiss. *See Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016).

51

## C. The District Court Correctly Concluded That the Unauthorized-Practice Statutes Are Tailored to the State's Interests.

The UPL statutes' limited scope, as well as plaintiffs' own allegations and materials incorporated by reference in their complaint, establish that the statutes are sufficiently tailored to the State's interests to satisfy intermediate scrutiny. A content-neutral restriction on speech satisfies intermediate scrutiny if it "does not burden substantially more speech than necessary" to serve the State's interests. *Brokamp*, 66 F.4th at 397 (quotation marks omitted). In conducting the tailoring inquiry, courts must afford the government latitude to "design regulatory solutions to address content-neutral interests." *See TikTok Inc. v. Garland*, 604 U.S. 56, 77 (2025). Consistent with such latitude, a content-neutral restriction does not need to be the least restrictive means to serve the State's interest, *Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 471 (2025); rather, only restrictions that are "*substantially* broader than necessary" will run afoul of the tailoring requirement. *TikTok Inc.*, 604 U.S. at 77 (emphasis added) (quotation marks omitted).

As applied to plaintiffs, the UPL statutes do not restrict substantially more speech than necessary to achieve the State's important

52

interests. The statutes restrict only the provision of legal advice to a specific person about that person's individual legal problems. *E.g.*, *El Gemayel*, 72 N.Y.2d at 706. The statutes do not require a license to speak publicly or publish a book or article about a legal topic untethered to a particular individual's legal problems. *See, e.g.*, *Matter of Rowe*, 80 N.Y.2d at 342. For example, plaintiffs would be free to post their Training Guide online or distribute it publicly as a pamphlet, complete with information about defenses or counterclaims on the fill-in-the-blank answer form. See *supra* at 10-11. Plaintiffs, including Reverend Udo-Okon, are free to speak generally to community members about the potential dangers of debt collection lawsuits, including defaulting in such lawsuits. They are also free to advocate for legislative reform regarding debt collection practices or litigation. The only thing plaintiffs cannot do is give legal advice to a specific person about the person's individual legal issues.

In these ways, the UPL statutes are narrowly tailored for essentially the same reasons that this Court concluded that the mental-health-counseling-licensing law at issue in *Brokamp* is narrowly tailored. *See Brokamp*, 66 F.4th at 401. As the Court explained, the mental-health-counseling-licensing law applied only to therapeutic counseling in a

53

formal context meant to provide mental health treatment—the context in which licensing served the government's interest in protecting clients from the harm of unlicensed mental health counseling. *See id.* at 401-02. So too here, where the UPL statutes apply only in the context of a formal session meant to provide individualized legal advice—the context in which incompetent and unethical legal advice causes the very harm that the UPL statutes serve to prevent. *See El Gemayel*, 72 N.Y.2d at 705. (*See* J.A. 98.)

Plaintiffs err in arguing that the UPL statutes are more burdensome, as applied to them, compared to the licensing statute's application to the plaintiff in *Brokamp. See* Br. at 46-47. If anything, the licensing statute in *Brokamp* burdened more speech than the UPL statutes' application here because the licensing requirement in *Brokamp* prevented the plaintiff from practicing her profession as a mental health counselor in New York. *See* 66 F.4th at 383-84. By contrast, the UPL statutes, as applied to plaintiffs, prevent them from providing individualized legal advice about a one-page answer form in New York. See *supra* at 10-11.

54

The *Brokamp* licensing statute was also more burdensome because it prevented the plaintiff from practicing her profession notwithstanding her extensive education and experience as demonstrated by her out-of-state licensure. *See Brokamp*, 66 F.4th at 381. By contrast, plaintiffs here seek to rely on unlicensed advocates who are not subject to any educational requirements or other out-of-state legal-licensing requirements, and whose sole sources of instruction are a single virtual training and a Training Guide filled with errors, contradictions, and problematic information (see *supra* at 14-15).[11]

Plaintiffs assert that the State's important interests can be served by less restrictive alternatives such as by adopting "ordinary tort remedies" or by adopting a program like one available in South Carolina that allows nonlawyers to provide legal advice. *See* Br. at 48. As an initial matter, theorizing alternative regulatory approaches that may also serve the State's important interests does not help plaintiffs. As the district court

---

[11] Plaintiffs provide no support for their contention that the licensing requirement in *Brokamp*, unlike the UPL statutes here, do not apply if an unlicensed person discloses "I am not a medical professional." Br. at 47. As the district court correctly noted (J.A. 98) the licensing requirement in *Brokamp* does not contain any such "safe harbor." *Cf.* N.Y. Education Law § 8402.

correctly explained (J.A. 99-100), that argument "ignore[s] the 'latitude' [courts] afford the Government to design regulatory solutions to address content-neutral interests," *TikTok Inc.*, 604 U.S. at 77 (quoting *Turner Broad. Sys., Inc. v. F.C.C.*, 520 U.S. 180, 213 (1997)). Even if the State's "'interest could be adequately served by some less-speech-restrictive alternative,'" that would not be sufficient to invalidate the UPL statutes because those statutes are "'not substantially broader than necessary to achieve the [State's] interest.'" *Id.* at 77 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 800 (1989)).

In any case, in this as-applied challenge, the purported alternatives do not assist plaintiffs. For instance, "ordinary tort remedies" would be ineffective to protect the public from plaintiffs' unlicensed law practice because plaintiffs require their clients to sign broad liability waivers (J.A. 64). And such remedies would not serve the State's important interest in preventing unqualified and unscrupulous nonlawyers from causing injury in the first place.[12] The South Carolina program that plaintiffs' cite (Br.

---

[12] It is not clear that any tort remedy would be available even absent the broad liability waiver. While attorneys are subject to a settled liability standard for professional malpractice (see *supra* at 6), no recognized standard of care governs an unlicensed nonlawyer advocate.

at 48) would not authorize their unlicensed law practice because that program has important safeguards, such as lawyer-led training, testing, and lawyer supervision, that plaintiffs' program lacks. *See In re South Carolina NAACP Hous. Advoc. Program*, 442 S.C. 189, 192-97, 200-02, 897 S.E.2d 691, 692-95, 697-98 (2024). Indeed, New York has adopted a similar program permitting certain nonlawyers to practice law under the supervision of lawyers and the courts (see *supra* at 9), but plaintiffs are not willing to comply with those basic safeguards before advising clients on how to answer a lawsuit. Br. at 42-43.

Because no alternative regulatory regime would allow plaintiffs to operate their program, the question becomes whether Upsolve's unlicensed law practice, as alleged in the complaint, would serve the State's interests. As explained (*supra* at 10-16, 48-51), the complaint and the training materials attached thereto make clear that the answer to that question is "no." Plaintiffs' proposed unlicensed law practice plainly would not serve the State's interests in protecting the public from incompetent and unscrupulous legal advice.

57

## POINT III

### THE DISTRICT COURT PROPERLY DISMISSED PLAINTIFFS' FREEDOM OF ASSOCIATION CLAIM

Plaintiffs failed to state a freedom of association claim, as the district correctly concluded. (*See* J.A. 102-104.) The UPL statutes do not interfere with plaintiffs' right to engage in collective activity "in pursuit of . . . political, social, economic, educational, religious, and cultural ends." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984). For example, the statutes do not penalize plaintiffs' "mere association" with debt collection litigants. *Holder*, 561 U.S. at 39. They do not "impose penalties or withhold benefits from individuals because of their membership" in Upsolve. *Jaycees*, 468 U.S. at 622. Nor do they intrude upon Upsolve's "internal structure or affairs." *Id.* at 623. Rather, the only activity restricted by the UPL statutes is plaintiffs' ability to provide legal advice without a license. Plaintiffs' free association claim thus merely seeks to reiterate their free-speech arguments and thus fails for the same reasons that their free-speech arguments fail. *See Emilee Carpenter, LLC v. James*, 107 F.4th 92, 108 (2d Cir, 2024).

Plaintiffs err in relying on inapposite cases that involved associational rights of *licensed attorneys* or their clients. For example, in

58

*NAACP v. Button*, the Supreme Court recognized a nonprofit organization's associational right to retain attorneys to represent clients bringing legal actions to challenge racial segregation. 371 U.S. 415, 428-29 (1963). And the Court has recognized clients' associational right to seek attorney representation "in the context of union activity." *Jacoby & Meyers, LLP*, 852 F.3d at 185 (collecting cases). None of these cases, or any other, has held that the right of association includes a right to provide unlicensed legal advice. Indeed, plaintiffs do not point to any such case. *See Upsolve, Inc.*, 604 F. Supp. 3d at 111 (noting lack of support for plaintiffs' position).

There is also no merit to plaintiffs' contention that they have an associational right to engage in the unauthorized practice of law because Upsolve is a nonprofit or because their goal is to help people better access the courts. *See* Br. at 50-51. *Button* did not turn on the NAACP's nonprofit status, but rather on the fact that Virginia's law prohibited the NAACP from connecting licensed attorneys with clients to engage in civil rights activity. 371 U.S. at 423-26, 439. Here, by contrast, the UPL statutes do not stop Upsolve from connecting licensed attorneys with clients to defend against debt collection lawsuits. Instead, they serve the State's compel-

59

ling regulatory interests in protecting the public from "ignorance, inexperience and unscrupulousness." *Alfani*, 227 N.Y. at 339.

Indeed, if it were the case that the right of association would attach whenever a nonprofit wants to promote access to the courts—a right shared by every client—then "any non-lawyer, so long as they do not charge a fee, [could] bootstrap a right to practice law" in any civil lawsuit. *Upsolve, Inc.*, 604 F. Supp. 3d at 111. That theory is as extreme as it is unsupported, and this Court should reject it.

## CONCLUSION

Based on the foregoing, this Court should affirm the district court's grant of the State's motion to dismiss.

Dated:   New York, New York
        July 20, 2026

Respectfully submitted,

LETITIA JAMES
  *Attorney General*
  *State of New York*
Attorney for Plaintiff-Appellee


By:   */s/ Kwame N. Akosah*
     KWAME N. AKOSAH
     Assistant Solicitor General

BARBARA D. UNDERWOOD
  *Solicitor General*
JUDITH N. VALE
  *Deputy Solicitor General*
KWAME N. AKOSAH
  *Assistant Solicitor General*
    *of Counsel*

28 Liberty Street
New York, New York 10005
(212) 416-8025

61

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a) of the Federal Rules of Appellate Procedure, Oren L. Zeve, an employee in the Office of the Attorney General of the State of New York, hereby certifies that according to the word count feature of the word processing program used to prepare this brief, the brief contains 11,436 words and complies with the typeface requirements and length limits of Rule 32(a)(5)-(7) and Local Rule 32.1.

_/s/ Oren L. Zeve_

Case 22-1345, Document 62, 10/05/2022, 3394395, Page86 of 95

# Addendum

Case: 26-847, 07/20/2026, DktEntry: 40.1, Page 73 of 81
Case 22-1345, Document 62, 10/05/2022, 3404395, Page87 of 95



**Mission**          **The Lawsuit**          **About**          **Media**

**Donate**          **Join**

# American Justice Movement Tracking Form

Please use the form below to track the legal advice you provide low-income New Yorkers in your community.

You must be a trained Justice Advocate, authorized by the American Justice Movement, to use this form. Use this form every time you provide assistance.

### Your Name

### Your Organization

### Your Physical Address

### Your Email Address

### Your Phone Number

### Name of Client

## Phone Number of Client

<div style="border:1px solid #ccc; height:60px; width:800px;"></div>

## Email Address of Client

<div style="border:1px solid #ccc; height:60px; width:800px;"></div>

## Have you signed the Justice Advocate's Affidavit and are you a member of the American Justice Movement?

Select one... ⌄

## Did you receive a signed copy of the AJM user agreement from your client?

Select one... ⌄

Submit

Case: 26-847, 07/20/2026, DktEntry: 40.1, Page 75 of 81
Case 22-1345, Document 62, 10/05/2022, 3404395, Page89 of 95


**American Justice Movement**

**Mission**  **The Lawsuit**  **About**  **Media**

**Donate**  **Join**

# American Justice Movement Complaint Form

Please use the form below to file a complaint against a Justice Advocate who provided you with assistance under the American Justice Movement. We will investigate and follow up with you. Thank you so much.

Your Name

Your Address

Your Email Address

Your Phone Number

Justice Advocate Name

Justice Advocate Location/Organization

Justice Advocate Address

Case: 26-847, 07/20/2026, DktEntry: 40.1, Page 76 of 81
Case 22-1345, Document 62, 10/05/2022, 3404395, Page90 of 95

Please describe the alleged misconduct with as much detail as possible. Include what happened, where and when, the names and contact information of any witnesses, what was said, etc.

Example Text

Submit

Case: 26-847, 07/20/2026, DktEntry: 40.1, Page 77 of 81
Case 22-1345, Document 62, 10/5/2022, 3404393, Page91 of 95



AJM **American Justice Movement**

Mission    The Lawsuit    About    Media    Donate    Join

## May 24, 2022 Update

As of a court ruling in SDNY on May 24, 2022, trained professionals in NYC who are not lawyers are able to provide vetted, monitored legal advice under the American Justice Movement program to low-income NYC residents facing debt collection lawsuits. If you are a public interest professional in NYC who is not a lawyer and you're interested in helping members of your community respond to debt collection lawsuits, please let us know.

## The Mission

Liz Jurado, a working mom in Bayshore, NY, was sued $12,000 by her anesthesiologist for a surprise medical bill she received after a routine epidural in childbirth.

Chris Lepre, a veteran and power plant technician, was unknowingly sold a broken car, financed with a high-interest loan from a subprime auto-lender, and then sued for over $15,000 – even though he gave the car back within three months.

William Evertson, a social worker in Brooklyn, was sued fraudulently by a large third-party debt buyer for a debt that was never his.

Liz, Chris, and William all could not afford legal fees to fight back when they were unjustly sued. And it was against the law for each of them to get free, routine legal advice from a trained social worker, patient advocate, or any other public interest professional who was not a lawyer.

Each of them automatically lost their case without the court considering any of the facts. Liz and William ended up filing bankruptcy. Chris had his wages garnished and borrowed from his 401(k) to make rent.

In America, you're only guaranteed a free lawyer in criminal cases, not the vast majority of civil cases. And there aren't close to enough free lawyers to meet the demand of every single person who needs legal help.

The American Justice Movement, launched in January 2022 by the nonprofit Upsolve, is **working to empower low-income families to get free, safe, and accountable legal advice from trained professionals in their communities who are not lawyers, called Justice Advocates.**

We're fighting for a new civil right: the right to access your rights, regardless of how much money is in your bank account. Justice Advocates include clergy members, social workers, community organizers, patient advocates, and other frontline professionals. Increasing the supply of free, safe help is the only way we can ever achieve equal rights for all.

Right now, we're focused on debt collection lawsuits in NY. Each year, about 4 million Americans are sued for their debt, often for debt that they don't actually owe or for the wrong amounts. Over 90% of people sued for their debt receive no legal advice at all. The downstream consequences can include hunger, homelessness, poverty, and even jail. This problem is urgent in 2022, as experts predict an onslaught of debt collection activity.

But every state in America has policies that make it illegal for low-income people to get free, vetted, and accountable legal advice from trained professionals in their communities who are not lawyers.

This is one of the fundamental civil rights injustices of our time. These policies restrict the supply of help available, perpetuate the imbalance of our justice system towards those who can afford legal fees, and guarantee that we'll never have equal rights under the law.

They're also unconstitutional.



Chris Lepre outside his home in Lynbrook, NY.



Liz Jurado inside her home in Bay Shore, NY.

Case: 26-847, 07/20/2026, DktEntry: 40.1, Page 78 of 81

Case 22-1345, Document 62, 10/05/2022, 3404595, Page92 of 95

## The Lawsuit

On January 25, 2022, Upsolve, the nonprofit launching the American Justice Movement, filed a First Amendment lawsuit against New York in Federal Court (SDNY). We're challenging the constitutionality of New York's laws that make it illegal for low-income people to get free, vetted, and accountable legal advice from trained professionals in their communities who are not lawyers. **See full challenge**. And here are the five amicus briefs filed in our suit from the NAACP, National Center for Access to Justice, Institute for Justice, 25 law professors, and Prof. Becky Sandefur.

Upsolve is joined as a plaintiff by Reverend John Udo-Okon, a pastor in the South Bronx who wants to provide free legal advice on debt collection lawsuits but cannot.

Liz Jurado, Chris Lepre, and William Evertson are all participating in the case, representing the millions of Americans each year whose lives are upended because they cannot afford legal fees.

Upsolve aims to vindicate the constitutional right to provide free, safe, and accountable legal advice – and the right of low-income Americans to receive this advice. We aim to create the volunteer firefighter equivalent in the law.

We're fighting to protect rights the Constitution already guarantees the Americans most in need – like the challengers in Miranda v. Arizona and Gideon v. Wainwright.

Recent filings and transcripts:

New York Attorney General Opposition Brief
(April 15, 2022)

Upsolve Response to New York Attorney General Brief
(May 2, 2022)

SDNY Oral Argument Transcript
(May 12, 2022)

Landmark 33-Page Opinion in SDNY
(May 24, 2022)

"It is vitally important that low-income individuals get the help they need when trying to respond to debt collection actions. Black Americans are more likely to face these actions, and they're more likely to have to do so without being able to call on a lawyer. The rules surrounding the practice of law should make it easier, not harder, to redress this problem by ensuring access to high quality legal help for those who need it." - Janette Wallace, NAACP General Counsel

"Upsolve's lawsuit matters to millions of people nationwide who need basic legal advice and can't get it. The only thing laws like New York's achieve is ensuring that ordinary people who most need help can't get practical advice from people who are willing to give it." - Robert McNamara, Institute for Justice Senior Attorney



Rev. John Udo-Okon outside his church in the South Bronx.

## Join the Movement

Please sign up below to join our movement and stay in touch.

If you're a New York resident and interested in being a Justice Advocate or receiving free legal advice on your debt collection lawsuit, please let us know below. We're unable to conduct trainings or provide access to advice as of now, given NY state laws.

Name

Email Address

Organization

Select one...

Submit

Case: 26-847, 07/20/2026, DktEntry: 40.1, Page 79 of 81
Case 22-1345, Document 62, 10/11/2022, 3404369, Page93 of 95

## About Upsolve

Upsolve is a 501(c)(3) nonprofit, based in NYC, with the mission of helping Americans access their civil legal rights for free and achieve economic mobility, using technology, education, community, and advocacy. Upsolve's first project was an online web application to help families file bankruptcy on their own for free, which has relieved over $400M in debt for families facing medical bills and other financial shocks. Upsolve also provides free financial and legal education that reaches 2 million individuals per year. Upsolve donors include Jack Dorsey, Emergent Ventures at the Mercatus Center, Eric & Wendy Schmidt, Jim Breyer, Chris Sacca, Scott & Cyan Banister, the Robin Hood Foundation, and Y Combinator. In 2020, TIME named Upsolve one of the Best Inventions of the Year. Upsolve launched the American Justice Movement in 2022 to empower low-income families to get free, safe, and accountable legal advice from trained frontline professionals.

## Media Resources

For media inquiries, please contact Natalie Trono at natalie@upsolve.org. **See press kit.**

Sign-up to get updates on news on our work and our case.

Email Address

Outlet

Submit

## Donate

To donate by card, please visit upsolve.org/donate. To donate by check, wire, stock, or other way, please email rohan@upsolve.org.

## Additional Resources

Full Case Papers: Upsolve v. New York (Filed Jan 25, 2022)

TED Talk: An app that empowers people to solve their legal problems (1.4M+ views)

We Need a New Civil Right (CNN Opinion, Joe Kennedy & Rohan Pavuluri)

Unauthorized Practice Of Law' Rules Promote Racial Injustice (Law360, Rohan Pavuluri)

Civil Justice for All (American Academy of Arts & Sciences)

Give People the Law (Democracy Journal, Vivek Maru)

Legal Advice from Nonlawyers (Stanford Journal of Civil Rights & Civil Liberties, Rebecca Sandefur)

How Debt Collectors Are Transforming the Business of State Courts (Pew)

Rubber Stamp Justice US Courts, Debt Buying Corporations, and the Poor (Human Rights Watch)

Case: 26-847, 07/20/2026, DktEntry: 40.1, Page 80 of 81

Case 22-1345, Document 84, 10/05/2022, 3404398, Page80 of 95

 

About Bankruptcy     How to File     How it's Free     Learn ˅          🔍    Login    | Free Filing Tool › |

Careers / Justice Fellow

# Upsolve Justice Fellow (Full-Time)

### In a Nutshell

Upsolve is an award-winning nonprofit that helps low-income families file for both bankruptcy and immigration for free using technology. To date, Upsolve has relieved over $500 million in debt for low-income families trapped in debt from medical bills, predatory loans, and layoffs and has helped hundreds of immigrant families obtain work permits. We combine the scale of tech startups with the quantifiable impact of the most effective nonprofits.

 **Written by Upsolve Team.**
Updated August 18, 2022

### About Upsolve

Upsolve is one of the leading civil rights and technology-focused nonprofits in the United States. Our mission is to help low-income families access the law, so they can achieve economic mobility. Launched nationally in 2019, Upsolve has relieved over $500M in debt for Americans through its free "TurboTax for bankruptcy" app. Upsolve also provides educational content that reaches over 3M Americans every year.

In 2022, Upsolve launched the American Justice Movement project to empower low-income New York residents who have been sued for their debt to get free legal advice from Justice Advocates in their community. To learn more:

- They Need Legal Advice on Debts. Should It Have to Come From Lawyers? (NY Times)
- Kudos to Upsolve for fighting to provide debt-collection advice (NY Daily News)
- American Justice Movement (Project Site)

### About the Fellowship

Upsolve is hiring a full-time Justice Fellow to support our new American Justice Movement project. You will be responsible for finding low-income New York residents who need help and connecting them with trained Justice Advocates. You will also be responsible for providing feedback to our product & engineering team on how to improve the technology that we're building to support the training, matching, and advice-giving process.

You're a good fit if you are passionate about social justice and building a more equitable legal system. Our Fellowship is open to all kinds of individuals from various career backgrounds, whether you are a recent college graduate who is planning to attend law school or a working professional interested in growing your career as a social entrepreneur and advocate for justice.

The initial term for this fellowship is 6 months and you will receive a stipend of $5,000/month. You may have the opportunity to grow into another role at Upsolve, based on your performance.

### Requirements

You should have a commitment to social  justice, be comfortable using technology, be able to start full-time in September 2022, have a strong sense of organization, have a high degree of personal autonomy, and have a bias towards action. We prefer that you live in New York City, but it's not required. This job doesn't require a legal degree.

### How to Apply

Please email your resume and two paragraphs that tell us (1) why you're a good fit, and (2) why you want to lead this work. Please send your email to jonathan@upsolve.org, fernando@upsolve.org, and rohan@upsolve.org. We look forward to hearing from you by 8/26!

↑ Back to top                                                      Share Article [↗]

    

**Upsolve is a 501(c)(3) nonprofit that started in 2016.** Our mission is to help low-income families who cannot afford lawyers file bankruptcy for free, using an online web app. Spun out of Harvard Law School, our team includes lawyers, engineers, and judges. We have world-class funders that include the U.S. government, former Google CEO Eric Schmidt, and leading foundations. It's one of the greatest civil rights injustices of our time that low-income families can't access their basic rights when they can't afford to pay for help. Combining direct services and advocacy, we're fighting this injustice.

To learn more, read why we started Upsolve in 2016, our reviews from past users, and our press coverage from places like the New York Times and Wall Street Journal.

| Upsolve | Need help? | Policies & Privacy | Made in NYC |
|---|---|---|---|
| Team | Learning Center | Terms of Service | f Facebook |
| Press | Browse Articles and Pages | Terms of Use | Twitter |
| Donate | Legal Definitions | Privacy Policy | Youtube |
| Careers | | Editorial Policy | Charity Navigator |
| Policy Platform | | | Guidestar |
| Our Story | | | **Mailing Address** |
| Contact Us | | | Upsolve |
| | | | 205 Hudson St., 7th Floor |
| | | | New York, NY 10013 |

© 2022 Upsolve. Upsolve Inc., EIN 82-1736267, is a registered nonprofit 501(c)(3) organization. Although many of Upsolve's informational articles are drafted or reviewed by attorneys, Upsolve is not a law firm or a substitute for an attorney or law firm. Upsolve provides an online web app that helps you file for bankruptcy for free on your own, if you have a simple case and pass our eligibility criteria. We do not provide any form of legal advice and absolutely no communication between you and Upsolve should be considered legal advice. If you do not qualify for our free web app or you do not want to use it, we provide access to private independent attorneys at your specific direction. Attorneys pay Upsolve for the chance to provide free evaluations to people who ask for them, which helps keep our web app free. By using Upsolve, you do not enter any form of attorney-client relationship with Upsolve. Your access to the website is subject to our Terms of Use.