# 26-847

## In The United States Court of Appeals
## For The Second Circuit

UPSOLVE, INC. AND REV. JOHN UDO-OKON,
*Plaintiffs-Appellants,*

v.

LETITIA JAMES, IN HER OFFICIAL CAPACITY AS ATTORNEY GENERAL OF THE STATE OF NEW YORK,
*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**REPLY BRIEF OF PLAINTIFFS-APPELLANTS**

Robert J. McNamara
Elizabeth L. Sanz
Paul M. Sherman
INSTITUTE FOR JUSTICE
901 North Glebe Road, Suite 900
Arlington, Virginia 22203
(703) 682-9320
rmcnamara@ij.org; bsanz@ij.org;
psherman@ij.org

*Counsel for Plaintiffs-Appellants*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........ iii

INTRODUCTION ........ 1

ARGUMENT ........ 1

I. *Chiles* abrogated the prior panel opinion's content-neutrality holding. ........ 2

A. *Chiles*'s application of strict scrutiny did not turn solely on viewpoint discrimination. ........ 4

B. *City of Austin* does not make subject-matter discrimination content neutral. ........ 8

C. Traditional professional licensing does not create an exception for this speech. ........ 10

D. *Chiles*'s reliance on *Holder* reinforces the conclusion that New York's rule is content based. ........ 13

E. Applying ordinary First Amendment scrutiny would not dismantle professional licensing. ........ 15

II. Even if intermediate scrutiny applies, the complaint cannot be dismissed on the pleadings. ........ 17

A. Ordinary intermediate scrutiny requires a real fit, not rational-basis deference. ........ 18

B. When more than half the states are implementing or exploring programs allowing nonlawyers to offer legal help, New York must justify why those facts are irrelevant here. ........ 22

C. Other disputed alternatives and disputed facts raised in the State's own response show why fit cannot be resolved on the pleadings here. .................... 25

III. Plaintiffs' free-association claim independently states a claim for relief. .................... 31

CONCLUSION .................... 34

CERTIFICATE OF COMPLIANCE .................... 35

# TABLE OF AUTHORITIES

PAGE(S)

**CASES**

*360 Virtual Drone Services LLC v. Ritter*,
102 F.4th 263 (4th Cir. 2024) .......... 18

*Brokamp v. James*,
66 F.4th 374 (2d Cir. 2023) .......... 9, 14, 19, 22, 30

*Capital Associated Indust. v. Stein* (*CAI*),
922 F.3d 198 (4th Cir. 2019) .......... 33

*Chiles v. Salazar*,
146 S. Ct. 1010 (2026) .......... 1, 3, 4, 5, 9, 10, 11, 12, 13, 28, 29

*Citizens United v. Schneiderman*,
882 F.3d 374 (2d Cir. 2018) .......... 21

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC*,
596 U.S. 61 (2022) .......... 8, 10

*Clementine Co. v. Adams*,
74 F.4th 77 (2d Cir. 2023) .......... 21

*Cohen v. California*,
403 U.S. 15 (1971) .......... 13

*Conant v. Walters*,
309 F.3d 629 (9th Cir. 2002) .......... 15

*Cornelio v. Connecticut*,
32 F.4th 160 (2d Cir. 2022) .......... 21

*Dale v. Barr*,
967 F.3d 133 (2d Cir. 2020) .......... 3

*DoorDash, Inc. v. City of New York*,
No. 25-81, slip op. (2d Cir. Aug. 5, 2026) ............................. 19, 20, 29

*Goldfarb v. Virginia State Bar*,
421 U.S. 773 (1975) ............................................................ 27

*Hines v. Pardue*,
117 F.4th 769 (5th Cir. 2024) ................................................ 18

*In re Zarnel*,
619 F.3d 156 (2d Cir. 2010) .................................................... 3

*Jacoby & Meyers, LLP v. Presiding Justs.*,
852 F.3d 178 (2d Cir. 2017) .................................................. 27

*Jeffery v. City of New York*,
113 F.4th 176 (2d Cir. 2024) ................................................. 21

*McCullen v. Coakley*,
573 U.S. 464 (2014) ....................................................... 19, 29

*NAACP v. Button*,
371 U.S. 415 (1963) ....................................................... 32, 33

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
585 U.S. 755 (2018) ............................................................ 13

*Nutt v. Ritter*,
707 F. Supp. 3d 517 (E.D.N.C. 2023) ...................................... 15

*Ohralik v. Ohio State Bar Ass'n*,
436 U.S. 447 (1978) ............................................................ 27

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015) .............................................................. 4

*Richwine v. Matuszak*,
148 F.4th 942 (7th Cir. 2025) ........................................... 18, 19

*Roberts v. U.S. Jaycees*,
468 U.S. 609 (1984) .......... 31

*Schneider v. Revici*,
817 F.2d 987 (2d Cir. 1987) .......... 29

*Shamrock Hills, LLC v. Iowa*,
No. 25-2991, 2026 WL 2330562 (8th Cir. Aug. 12, 2026) .......... 7, 11, 16

*Upsolve v. James*,
155 F.4th 133 (2d Cir. 2025) .......... 1, 2, 9, 14

*Vidal v. Elster*,
602 U.S. 286 (2024) .......... 6

## INTRODUCTION

The first appeal in this case settled the threshold issue: When New York forbids Upsolve and Reverend John Udo-Okon from giving individualized legal advice, it forbids speech protected by the First Amendment. *Upsolve v. James*, 155 F.4th 133, 142 (2d Cir. 2025) ("*Upsolve II*"). The State does not seriously dispute that holding now. Instead, the question on appeal is whether New York can suppress that protected speech (and forbid nonprofits like Upsolve from associating with others to engage in it) without any meaningful judicial scrutiny. The answer is no, and the district court's ruling to the contrary should be reversed.

## ARGUMENT

Appellants' opening brief established three basic propositions. First, the Supreme Court's opinion in *Chiles v. Salazar*, 146 S. Ct. 1010 (2026), confirms the prior panel opinion's conclusion that the legal advice at issue here is protected speech but fatally undermines that opinion's conclusion that a restriction on legal advice (and only legal advice) is content neutral. Second, even if a restriction on legal advice (and only legal advice) is content neutral, it cannot be upheld without any evi-

dence to support it. And third, nonprofits like Upsolve and their volunteers like Reverend John have a free-association right to gather together to engage in protected First Amendment activity like sharing advice. The State's response brief refutes none of these arguments, and the judgment below should therefore be reversed.

## I. *Chiles* abrogated the prior panel opinion's content-neutrality holding.

As the opening brief explained, *Chiles* confirms the prior panel's holding that New York's UPL prohibition, as applied to Upsolve and Reverend Udo-Okon, regulates speech. Opening Br. 21–22. But *Chiles* also fatally undermines the panel's separate conclusion that New York's prohibition on giving individualized advice about law is content neutral. Opening Br. 22–30.

As explained in the opening brief, the panel in *Upsolve II* rested its content-neutrality analysis on three features of New York's UPL laws: (1) they did not favor any particular legal viewpoint; (2) they singled out individualized legal advice based on the speech's "purpose, focus, and circumstance," rather than what the panel considered its content; and (3) they left Plaintiffs free to discuss law in other ways, including by "publishing books and guides." 155 F.4th at 143. *Chiles* re-

jects all three premises. It treats viewpoint discrimination as a distinct—and especially egregious—subset of content discrimination while reaffirming that subject-matter restrictions themselves trigger strict scrutiny. 146 S. Ct. at 1021, 1023–24. It rejects the effort to avoid ordinary First Amendment analysis by redescribing speech according to its professional purpose and setting. *Id.* at 1023–26. And it makes clear that a speaker's ability to say other things does not change the constitutional character of the speech the government has prohibited. *Id.* at 1024. That is more than enough to abrogate a prior decision under this Court's precedent. *See Dale v. Barr*, 967 F.3d 133, 142–43 (2d Cir. 2020) (panel precedent is abrogated when intervening precedent has "broken the link on we premised our decision, or undermined an assumption of that decision" (quotation marks and citation omitted));; *In re Zarnel*, 619 F.3d 156, 168 (2d Cir. 2010) (the intervening decision need not "address the precise issue decided by the panel").

The State offers five reasons why *Upsolve II* should nevertheless survive. It says *Chiles* turned only on viewpoint discrimination; that *City of Austin* permits the "purpose, focus, and circumstance" approach; that *Chiles* preserved traditional professional licensing; that *Holder* has

little to say outside the material-support context; and that Plaintiffs' rule would destabilize professional licensing nationwide. Resp. Br. 30–39. None of these arguments succeeds.

### A. *Chiles*'s application of strict scrutiny did not turn solely on viewpoint discrimination.

The State's principal response is that *Chiles* involved viewpoint discrimination while New York treats debtor-side and creditor-side legal advice alike. Resp. Br. 30–33. That is true but beside the point. It was well established even before *Chiles* that viewpoint-based laws are merely a particularly disfavored subset of content-based laws and that both are subject to strict scrutiny. *See Reed v. Town of Gilbert*, 576 U.S. 155, 168–69 (2015).

The reasoning of *Chiles* confirms this understanding. The Court began by restating the ordinary rule that laws regulating speech by "subject matter" or "communicative content" are presumptively unconstitutional. 146 S. Ct. at 1021. It then held that Colorado's law regulated the content of Ms. Chiles's speech. *Id.* at 1023–24. Only after that did the Court explain that Colorado went "a step further" by prescribing which views she could express. *Id.* at 1024. Viewpoint discrimination thus made Colorado's law worse and harder to defend under the strict

scrutiny that applies to content-based laws; it was not what made the law content based or subjected it to strict scrutiny.

Unable to find support in the *Chiles* majority, the State turns to Justice Kagan's concurrence, where two Justices suggested that "content-based but viewpoint-neutral laws regulating speech in doctors' and counselors' offices" might present a "different and more difficult question." *See* Resp. Br. 31–33; 146 S. Ct. at 1029, 1031 (Kagan, J., concurring). But that concurrence is not the opinion of the Court. *Chiles* was an 8-1 decision. Justice Kagan and Justice Sotomayor joined Justice Gorsuch's opinion for the Court in full, while six other Justices joined the majority without joining the concurrence. More fundamentally, the concurrence does not suggest that a subject-matter restriction is content neutral. At most, it leaves open whether some content-based but viewpoint-neutral professional-speech restrictions might receive less than strict scrutiny. That is a different question from the one answered in *Upsolve II*: whether New York's UPL laws are content based when applied to pure advice on the subject of law.

*Vidal v. Elster*—the principal case Justice Kagan relied on in her concurrence and a case the State itself invokes, Resp. Br. 32–33—

confirms the distinction. *Vidal* involved the Lanham Act's "names clause," which barred registration of a trademark identifying a living person without that person's consent. The Court first held that the clause was content based because its application turned on what the mark said, even though the rule did not discriminate among viewpoints. 602 U.S. 286, 293–95 (2024). The Court then separately considered whether that content-based restriction should receive strict scrutiny in the historically distinctive trademark context. *Id.* That sequence of analysis matters—it confirms that whatever effect viewpoint neutrality may have on the level of scrutiny in a particular setting, it does not make a subject-matter restriction content neutral.

Again, the opening brief addressed all of this, explaining that the law in *Chiles* was viewpoint-based but that the *Chiles* opinion nonetheless makes clear that content-based but viewpoint-neutral laws still get strict scrutiny. Opening Br. 24–26. It addressed Justice Kagan's concurrence and explained why it cannot be squared with the majority's analysis. *Id.* at 27. The State brief in opposition simply ignores this, quoting the parts of *Chiles* that discuss viewpoint discrimination and ignoring the rest.

And ignoring Supreme Court precedent—beyond being wrong in itself—would lead this Court into a circuit split because other circuits have read *Chiles* just the way Upsolve reads it. In *Shamrock Hills, LLC v. Iowa*, the Eighth Circuit reversed dismissal of a First Amendment challenge to Iowa's viewpoint-neutral licensing scheme for public adjusters. No. 25-2991, 2026 WL 2330562 at *1-2 (8th Cir. Aug. 12, 2026). The scheme required a license before a person could, among other things, advise or assist insureds with first-party property claims. Iowa's enforcement did not turn on which side of an insurance dispute the contractor favored. But it did prevent a roofing contractor from telling customers that it would "assist [them] with the claims process," help them "navigate the insurance red tape," or "walk[] [them] through" insurance reimbursement. *Id.* at *5. Citing *Chiles*, the Eighth Circuit held that those applications "regulated speech as speech" and were subject to "strict scrutiny." *Id.* So too here.

In short, the *Upsolve II* panel's ruling that New York's UPL laws are content neutral as applied here cannot be squared with *Chiles*'s reaffirmation of the Supreme Court's ordinary test for content neutrality. New York's UPL laws single out speech for regulation based on its sub-

ject matter. Under *Chiles*, that is a content-based regulation of speech, even if it is not also viewpoint based.

### B. *City of Austin* does not make subject-matter discrimination content neutral.

The State next invokes *City of Austin v. Reagan National Advertising of Austin, LLC*, 596 U.S. 61 (2022), arguing that Plaintiffs make the "extreme argument" that "*any* consideration of the purpose of speech necessarily renders a regulation content based." Resp. Br. 33–36. That claim misunderstands *City of Austin* and Plaintiffs' argument.

To begin, Plaintiffs do not argue (and *Chiles* does not hold) that "*any* consideration of the purpose of speech necessarily renders a regulation content based." *Contra* Resp. Br. 34. *City of Austin* clearly holds that the government can sometimes consider the purpose of speech without triggering strict scrutiny. 596 U.S. at 74. As *City of Austin* makes clear, restrictions on "solicitation" are not automatically content-based; neither are restrictions on signs soliciting for an off-premises business. *Id.* at 72–74. But, as it also makes clear, nothing about this tradition of regulating solicitation allows the government to regulate speech based on its "function or purpose" as a "proxy" for "an obvious subject-matter distinction[.]" *Id.* at 74.

Nothing in *Chiles* disturbs that rule or the content-neutral regulation of solicitation. Instead, as the opening brief explains, *Chiles* makes clear that the rule in *City of Austin* does not sweep nearly so broadly as the State or the prior panel opinion would have held. Opening Br. 28–29. The prior panel opinion held that the law challenged here is content neutral because it restricts speech whose "purpose . . . [is the] rendering of legal advice and opinions to particular clients." *Upsolve II*, 155 F.4th at 143. But *Chiles* rejected exactly that move, refusing to hold that a restriction was content neutral when it restricted speech "in the context of the professional-patient relationship . . . for the purpose of providing medical care." *Chiles*, 146 S. Ct. at 1041 (Jackson, J., dissenting); *cf. id.* at 1026 (rejecting this argument and holding that "the State's law trains directly on the content of speech"); *see also* Opening Br. 28–29 (explaining all of this).[1] Nothing about the plaintiffs' argument here asks this Court to accept anything novel, let alone "extreme[.]" It asks

[1] In fairness to the prior panel opinion, it believed its content-neutrality analysis was controlled by this Court's earlier decision in *Brokamp v. James*, 66 F.4th 374 (2d Cir. 2023). But *Brokamp*'s capacious understanding of "purpose"-based restrictions on speech doesn't survive *Chiles*, either. Opening Br. 28–30

this Court to accept the rule the Supreme Court articulated just last year—a rule with which the State's brief again declines to engage.

Simply put, *City of Austin* endorses "neutral, location-based lines" restricting certain kinds of commercial solicitations. 596 U.S. at 69. The restriction here is none of those things—it is not neutral (singling out certain topics but not others), it is not location-based (because it restricts these topics everywhere), and it is not focused only at solicitations (because it directly regulates ordinary advice). To the extent this Court's earlier precedents held that this kind of restriction could nonetheless escape strict scrutiny so long as it is couched in the language of "purpose" or "function," *Chiles* squarely commands courts to reject that holding as mere "word game[s]" unworthy of the First Amendment. 146 S. Ct. at 1023. The prior panel's contrary ruling is therefore no longer good law, and the judgment below should be reversed..

### C. Traditional professional licensing does not create an exception for this speech.

The State next points to *Chiles*'s observation that licensing laws have traditionally addressed the qualifications needed to practice a profession. Resp. Br. 34, 36–38. But that passage answered Colorado's historical argument that the existence of licensing laws was enough to de-

feat Chiles's First Amendment claim. Opening Br. 28. It did not hold that all applications of licensing laws represent historically supported exceptions to the First Amendment. To the contrary, *Chiles* simultaneously held that professionals retain ordinary First Amendment rights and rejected Colorado's effort to define a broad "First Amendment Free Zone" for professional speech. 146 S. Ct. at 1022, 1026–28. The existence of a licensing regime therefore does not answer the First Amendment question when the particular application regulates speech.

*Shamrock Hills* illustrates the point here, too. Iowa's public-adjuster laws reached both nonexpressive activity and client communications. The Eighth Circuit rejected the facial challenge to the broader licensing scheme but reversed dismissal of the as-applied speech claim, explaining that licensing laws still "must pass muster under the ordinary First Amendment analysis" and cannot serve as "an end run around the First Amendment's prohibition against regulating speech as speech." 2026 WL 2330562 at *3, *5.

The same distinction applies here. New York may regulate courtroom appearances, filings made on another's behalf, client funds, agency authority, and the many other noncommunicative incidents of law

practice. Plaintiffs challenge none of those things. Their claim concerns advice.

Nor does history supply an exception at the level of generality the State proposes. The relevant question is not whether governments historically regulated lawyers; they did. It is whether there is a long-settled tradition of prohibiting nonlawyers from giving out-of-court legal advice to willing listeners. The opening brief explained why there is not. Early restrictions concentrated on admission, courtroom appearances, pleadings, and similar incidents of representation, while nonlawyers continued providing legal and law-related services outside court. Opening Br. 9–12. Broad campaigns against out-of-court nonlawyer advice came much later, especially through organized-bar efforts in the early twentieth century. *Id.*

The State disputes none of this and identifies no contrary tradition of prohibiting nonlawyers from giving out-of-court legal advice. Instead, it asks the Court to defer to its speech restriction based on the history of *in-court* attorney licensing in general—the opposite of the specific historical inquiry *Chiles* demands. 146 S. Ct. at 1026–28 (reject-

ing Colorado's similarly high-level appeal to a history of professional regulation in medicine).

### D. *Chiles*'s reliance on *Holder* reinforces the conclusion that New York's rule is content based.

The State next tries to dismiss *Chiles*'s reliance on the speech/conduct test set forth in *Holder v. Humanitarian Law Project* and to limit *Holder* to the terrorism context. Resp. Br. 38–39. The State suggests that Plaintiffs are calling for "some new content-neutrality analysis." *Id.* at 38. Not so. Plaintiffs are asking this Court to apply the Supreme Court's established content-neutrality analysis, which *Chiles* reaffirmed. Opening Br. 20–24.

That analysis is not new. *Chiles* itself ties it back to *Cohen v. California*, 403 U.S. 15 (1971), in which the Supreme Court applied the First Amendment to a specific application of California's prohibition on disturbing the peace. The Court then "repeated the point in *Holder v. Humanitarian Law Project*." *Chiles*, 146 S. Ct. at 1022. And the Court further confirmed that this analysis applies to so-called "professional speech." *Id.* (citing *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 766–67 (2018)).

The prior panel opinion in this case read *Brokamp* to require a different analysis. *Brokamp* distinguished *Holder* based on its finding that New York's counseling law did not draw distinctions based on content because the law would prohibit a conversation about literally anything so long as it was for a prohibited therapeutic purpose. 66 F.4th at 394–97 & n.19. That meant conversations about "hobbies, sports, favorite movies, or any other subject" were all equally prohibited. *Id.* at 397. But that move was unavailable to the prior panel in this case—after all, one cannot violate a prohibition on giving legal advice by talking only about "sports"—and so it read *Brokamp* as requiring a broader rule allowing content-based "speech-licensing regimes" so long as they were viewpoint neutral. Opening Br. 26 (quoting *Upsolve II*, 155 F.4th at 143 & n.2). That rule does not survive *Chiles*. Not because *Chiles* announces "some new content-neutrality analysis" but because *Chiles* makes clear that the ordinary content-neutrality analysis applies to speech-licensing regimes in general. Opening Br. 26–27. *Holder* held that a law triggered strict scrutiny because it turned on whether advice was specialized rather than general; New York's UPL laws require exactly the same in-

quiry into the level and topic of a speaker's advice. Under the Supreme Court's ordinary test, that is a content-based restriction on speech.

### E. Applying ordinary First Amendment scrutiny would not dismantle professional licensing.

Finally, the State argues that a ruling for Plaintiffs would threaten attorney licensing and licensing in medicine, architecture, accounting, psychology, social work, and other professions practiced partly through speech. Resp. Br. 36–38. Of course not. Like the law, those professions involve many activities that are conduct. Lawyers file papers in court and draft legal instruments that bind parties even if no one reads them; doctors perform surgery and prescribe (not merely recommend) controlled substances. Architects and engineers stamp plans for projects that cannot legally be built without their approval. None of that violates the First Amendment—just as preserving that level of regulation does not require courts to allow states to criminalize *talking about* those occupations. *Cf. Conant v. Walters*, 309 F.3d 629, 634–35 (9th Cir. 2002) (holding that prohibition on recommending, rather than prescribing, medical marijuana violated the First Amendment); *Nutt v. Ritter*, 707 F. Supp. 3d 517, 544–45 (E.D.N.C. 2023) (holding that First Amendment prohibited state from requiring an engineering license to merely

testify about engineering topics). The State's parade of horribles would come to pass only if there were no way for courts to distinguish between speech and conduct—and, hard as the State tries to pretend otherwise, there is.

Yet again, the Eighth Circuit in *Shamrock Hills* considered and rejected the same argument. There, the Eighth Circuit agreed that Iowa had a compelling interest in regulating public adjusters but described concerns about "regulatory impotence" as overblown because the requested as-applied relief was narrow and Iowa retained other tools for policing the profession. 2026 WL 2330562 at *5 n.4.

The same is true here. Plaintiffs do not ask the Court to constitutionalize lay law practice. They ask the Court to apply ordinary First Amendment rules to a narrow application of New York's UPL laws: free, individualized advice about a court-created legal form that is designed to be filled out by nonlawyers. Whatever threat the State believes that sort of advice poses to the public can be considered within the strict scrutiny that applies to content-based restrictions on speech. It is not, and cannot be, a reason for this Court not to apply ordinary First Amendment principles.

## II. Even if intermediate scrutiny applies, the complaint cannot be dismissed on the pleadings.

As the opening brief explained, the lower court's ruling implicates a split of authority between courts like the Fourth Circuit, which apply a loosened, evidence-free intermediate-scrutiny test to speech-licensing laws, and courts like this Court, which apply the "ordinary" evidence-based intermediate-scrutiny test across the board. Opening Br. 30–48. The State responds that the district court applied "ordinary" intermediate scrutiny, that courts sometimes resolve First Amendment scrutiny on the pleadings, and that precedent plus the complaint and incorporated materials establish both New York's interests and the fit of full attorney licensure. Resp. Br. 40–57. Those points do not answer the actual problem. Ordinary intermediate scrutiny places an affirmative burden on the government to justify the fit of its speech restriction, and the State's own response shows that fit turns here on disputed facts and disputed alternatives.

Below, plaintiffs first explain why the district court's ruling implicates a real split of authority between circuits that apply intermediate scrutiny as the Supreme Court has described it and circuits that effectively apply rational-basis review to speech-licensing laws. They then

explain why real-world experience makes it more than plausible that New York's prohibition on unlicensed out-of-court legal advice is unconstitutionally excessive. And, finally, they explain why the State's own arguments in support of the judgment below reveal a host of factual disputes that cannot be resolved at a motion to dismiss.

### A. Ordinary intermediate scrutiny requires a real fit, not rational-basis deference.

The State first calls the circuit split discussed in the opening brief irrelevant because *Upsolve II* already said "intermediate scrutiny" applies. Resp. Br. 43–45. But the split matters because it illustrates what that scrutiny entails. In *360 Virtual Drone Services LLC v. Ritter*, the Fourth Circuit used a specially "loosened" form of intermediate scrutiny that did not require the evidence ordinarily demanded for speech restrictions when it treated a surveying law as professional-conduct regulation as applied to a drone photographer. 102 F.4th 263, 276–78 (4th Cir. 2024). By contrast, *Hines v. Pardue* required Texas to justify a rule barring a veterinarian from giving veterinary advice without first physically examining the animal, 117 F.4th 769, 777–85 (5th Cir. 2024), and *Richwine v. Matuszak* required Indiana to justify funeral-director licensing laws as applied to a "death doula" who advised families about

end-of-life choices, 148 F.4th 942, 953–57 (7th Cir. 2025). The disagreement is not over vocabulary, nor is it over whether intermediate scrutiny applies. It is over whether intermediate scrutiny requires the government to actually justify the fit of a restriction on speech.

This Court's own cases point to the ordinary, evidence-sensitive intermediate scrutiny inquiry. *Brokamp v. James* described intermediate scrutiny as requiring an important interest and a restriction that does not burden substantially more speech than necessary. 66 F.4th 374, 397 (2d Cir. 2023). *McCullen v. Coakley* shows what that means. There, Massachusetts defended a 35-foot buffer zone around abortion clinics as necessary to protect access and public safety. The Supreme Court accepted those interests but held the law was insufficiently tailored because the State had not shown why narrower tools—such as enforcing obstruction laws—would fail. 573 U.S. 464, 486, 490–96 (2014). *McCullen* did not require the single least restrictive imaginable law; it required the government to explain why it needed the broader burden it chose.

So did this Court's recent decision in *DoorDash, Inc. v. City of New York*. There, New York City required food-delivery platforms to disclose

customer information to restaurants, and the Court reviewed that compelled commercial speech law under *Central Hudson*. No. 25-81, slip op. at 2–3, 18–24 (2d Cir. Aug. 5, 2026).[2] The Court acknowledged that government receives "considerable leeway" and need not choose the least restrictive means, yet emphasized that this leeway "does not reduce intermediate scrutiny to rational basis review." *Id.* at 19–20. New York City's assertion that its chosen design was "self-evident" and a matter of "common sense" was not enough; the City had to establish why obvious less-burdensome alternatives would not adequately serve its interests. *Id.* at 22–23.

That answers the State's reliance on cases observing that courts may sometimes use history, precedent, or common sense. Resp. Br. 44–45. Plaintiffs do not contend that every proposition under intermediate scrutiny must be proved with trial-admissible evidence. The point is narrower: the government cannot resolve contested questions of efficacy and tailoring by assertion. *DoorDash* makes that distinction especially clear. Whatever latitude intermediate scrutiny gives the government, it

[2] *Central Hudson* is not the governing test here, but *DoorDash*'s fit analysis reflects the same intermediate-scrutiny principle that matters here.

does not permit the court to assume the disputed facts needed to establish fit.

That substantive burden matters at the pleading stage. Where the government bears an affirmative First Amendment burden, judgment "will rarely, if ever, be appropriate at the pleading stage." *Cornelio v. Connecticut*, 32 F.4th 160, 172 (2d Cir. 2022).

To be sure, "rarely" is not "never," and the State musters exactly four cases as examples defying the ordinary rule: *Brokamp*, *Jeffery v. City of New York*, *Citizens United v. Schneiderman*, and *Clementine Co. v. Adams*. Resp. Br. 40–43. But those cases only show why this one does not warrant an exception to this Court's ordinary practice.

In *Jeffery v. City of New York*, the complaint itself revealed the necessity for the restriction, alleging that it was adopted in response to "severe instances of criminal behavior" and "property destruction, vandalism, and looting."113 F.4th 176, 179 (2d Cir. 2024). *Clementine* similarly involved a temporary COVID-19 entry rule against a pleaded public-health backdrop. 74 F.4th 77, 82–89 (2d Cir. 2023). In *Schneiderman* the plaintiffs pleaded themselves out of court by failing to allege any serious burden on speech, 882 F.3d 374, 379–85 (2d Cir. 2018), and in

*Brokamp*, since the plaintiff herself could "easily make [the necessary] showing" for licensure, that minimal burden "itself tailor[ed] the licensing statute to avoid an undue burden on the speech of counselors." 66 F.4th at 402.

Here, the complaint alleges that the government has imposed a substantial burden on speech when that burden is not only unnecessary but "affirmatively counterproductive." JA-20. None of the State's cited cases thus allow it to dodge its evidentiary burden in this case.

### B. When more than half the states are implementing or exploring programs allowing nonlawyers to offer legal help, New York must justify why those facts are irrelevant here.

Because New York cannot dodge its evidentiary burden, it has to explain why myriad less speech-restrictive alternatives are insufficient to accomplish New York's purposes. First and foremost, it has to explain why it need not consider nonlawyer alternatives when that is exactly what most of the other states are currently doing. South Carolina, of course, recently approved a limited legal-advice program much like the one offered by the American Justice Movement. *See* Opening Br. 12–13. But South Carolina is by no means the only state thinking outside the outright-ban box. Fourteen states and the District of Columbia already

"allow nonlawyers to obtain limited authorization to provide viable alternatives to hiring a lawyer for uncomplicated legal needs when the client cannot afford a lawyer." Br. of *Amici Curiae* Professor Rebecca L. Sandefur and 23 Empirical Scholars ("Sandefur Amicus Br.") at 13 (cleaned up). Twenty more states are "actively developing nonlawyer professional programs or reforms" along these lines. *Id*. at 14. And these programs "consistently achieve excellent outcomes without causing consumer harm." *Id*. at 13.

Take Alaska's Community Justice Worker Program. There, nonlawyers in the community—shelter and food bank staff, faith leaders and students and others—are allowed to provide limited legal advice (*and* representation), in the areas of SNAP benefits, domestic violence protection orders, wills, and, yes, debt collection. *Id*. at 15. By 2024, trained laymen volunteers "were serving nearly 4 cases for every one case served [by] volunteer attorneys. *Id*. at 16. By all accounts that program has been extremely successful. *Id*. See, too, Delaware's Qualified Tenant Advocates, which are trained nonlawyer professionals, which in 2022 were allowed by the Delaware Supreme Court to start "represent[ing] tenants in eviction proceedings and related housing matters."

*Id*. at 16–17. Since then, these nonlawyers have worked on 3,755 housing matters, preserved approximately $4.8 million in housing-related financial assistance, helped prevent evictions, and saved Delaware communities an estimated $5.43 million in downstream costs related to emergency shelter, foster care, and children's education. *Id*. at 17–18. And then there's Utah's Regulatory Sandbox, which empowers nonprofit organizations, including churches, to seek waivers of blanket UPL prohibitions so they can help in any number of legal areas. *Id*. at 18. The result? Over 70,000 services provided on a range of issues, including domestic violence protection orders, expungement, and, yes again, debt. *Id*. at 19. The number of complaints? Less than ten. *Id*. Even the federal government allows nonlawyers to offer legal help in certain situations. *Id*. at 19–21.

For the State to prevail here, then, it would need to muster some explanation of why the sort of less restrictive alternatives that work in other states would fail here. It has not. Instead, the State says, and the district court accepted, that New York's flat ban on any kind of nonlawyer advice, under any circumstances, is so clearly justified that dismissal is the only way. Under intermediate scrutiny, New York has the

burden to show why—when, "despite the existence of legal aid and *pro bono* work," "[t]he access-to-justice crisis in the United States has persisted for decades," Sandefur Amicus Br. 4; and when 70 to 90 percent of New Yorkers subject to debt collection actions are losing through default judgments to the tune of $1 billion over just two years, Opening Br. 4—less speech-restrictive alternatives being explored or implemented in more than half the other states are facts categorically irrelevant here.

### C. Other disputed alternatives and disputed facts raised in the State's own response show why fit cannot be resolved on the pleadings here.

Even setting aside doctrinal disputes, the State's own brief reveals a multitude of disputed questions about training, safeguards, risk, and other alternatives. It argues that Justice Advocates lack sufficient education, testing, character screening, competence obligations, conflict procedures, privilege, supervision, discipline, and civil liability. Resp. Br. 48–51. It identifies alleged errors and inconsistencies in the Training Guide. *Id.* at 13–16, 51. And it argues that South Carolina's housing-advocate program, New York's law-student rules, tort remedies, and other safeguards would not adequately protect clients without full at-

torney licensure. *Id.* at 55–57. Those arguments are all variations on the same factual proposition: this particular speech is too risky to permit under narrower rules. That is the proposition the State must establish under intermediate scrutiny, not one the Court may assume.

That is especially true at the motion-to-dismiss stage, when Plaintiffs' allegations must be taken as true. And those allegations point the other way. Upsolve trains and supervises Justice Advocates, limits them to a detailed Guide, requires confidentiality and conflict commitments, requires disclosure of their nonlawyer status, forbids compensation, and requires referrals when a client's problem exceeds the program's scope. J.A. 33–37, 51–68. The State may ultimately prove those safeguards insufficient. But its criticisms do not establish that conclusion as a matter of law.

Many of the State's criticisms also identify narrower alternative tools. If New York believes more education, testing, screening, recordkeeping, supervision, conflict procedures, or disclosures are necessary, it can regulate those things directly. The same is true of the Training Guide. Even assuming every alleged error is real, a mistakenly short limitations period can be corrected, a confusing instruction rewritten,

training expanded, and testing added. Those criticisms may support more precise safeguards; they do not establish as a matter of law that every Justice Advocate must complete the entire path to bar admission before giving any individualized advice. The State's observation that a current website link no longer hosts some earlier materials, Resp. Br. 15–16 & n.4, likewise says nothing about whether full attorney licensure is necessary.

The State's cases about the importance of lawyer regulation do not fill that gap. The State cites *Goldfarb v. Virginia State Bar*, an antitrust case involving a minimum-fee schedule for title examinations; *Ohralik v. Ohio State Bar Ass'n*, which involved discipline of a licensed lawyer for in-person solicitation of accident victims; and *Jacoby & Meyers, LLP v. Presiding Justices*, which involved New York's prohibition on nonlawyer investment in law firms. Resp. Br. 46–50; 421 U.S. 773, 775–82 (1975); 436 U.S. 447, 449–54 (1978); 852 F.3d 178, 181–83 (2d Cir. 2017). Those cases support interests Plaintiffs do not contest: competence, ethics, consumer protection, and the administration of justice. They do not establish the separate proposition that a J.D. and full bar license are necessary before a trained volunteer may help a pro se debt-

or understand which box on a court-created answer form fits the debtor's facts.

The State's client-agreement argument fares no better. It characterizes language stating that Upsolve and Justice Advocates do not "assume any liability regarding the outcome of your case" as a "broad waiver of liability." Resp. Br. 16, 51. But of course not. No reasonable person—whether Upsolve or a licensed attorney—can promise a particular outcome in litigation, and the State's insistence on reading this commonsense disclaimer as a nefarious waiver of rights is emblematic of its entire approach to this case. It insists that the Court must read everything about Upsolve's program in the least flattering possible light while simultaneously indulging every presumption in favor of the state's regulations. But that is not how Rule 12 works. It is not how ordinary intermediate scrutiny works. And *even if it were* the State's arguments would still fail because mere risk to listeners does not automatically justify a broad prophylactic restriction on speech. *Chiles* itself contrasts categorical speech bans with traditional malpractice law partly because malpractice requires proof of injury and may leave room for

informed patient choice. 146 S. Ct. at 1028–29 (citing *Schneider v. Revici*, 817 F.2d 987, 995 (2d Cir. 1987)).

Similarly, the State repeatedly invokes the rule that intermediate scrutiny does not require the least restrictive means. Resp. Br. 52, 55–57. True. But less-restrictive alternatives are still relevant under intermediate scrutiny, a fact the State seems to simply pretend away. But *McCullen* required Massachusetts to explain why narrower tools would not work, 573 U.S. at 490–96, and *DoorDash* rejected a broader rule when the City failed to justify its added speech burden over narrower alternatives, slip op. at 19–23. As discussed above, narrower alternatives abound—and, on this record, there is absolutely no explanation for why New York has refused them. Maybe it has a good reason. Maybe not. But, at the pleading stage, it is enough to allege that (1) in New York, there is no path by which non-lawyers can give advice about the law, (2) in many other places ,there is one, and (3) there is no reason for this. The complaint does that much, and that states a claim under intermediate scrutiny. The district court's contrary ruling should be reversed.

Finally, the State returns to *Brokamp*, arguing that the counseling rule there was more burdensome because the plaintiff was already a licensed professional. Resp. Br. 53–55. But the comparison favors Plaintiffs. *Brokamp*'s live claim concerned only New York's streamlined endorsement path for an out-of-state licensed counselor; she lacked standing to challenge the base licensing requirement. 66 F.4th at 389. The panel relied on the modesty of that path, which she could "easily" satisfy. *Id.* at 402. New York offers no comparable route here: a Justice Advocate cannot take a targeted class, pass a narrow exam, register, make disclosures, or obtain a limited authorization to advise on the debt-answer form. They can only become (or work for) a fully licensed attorney.

At bottom, the State asks the Court to treat a plausible regulatory concern as enough to sustain the broadest familiar regulatory tool without requiring the State to justify the fit. That is not intermediate scrutiny. New York may ultimately prove that some or all of the safeguards it identifies are necessary. But because the complaint plausibly alleges that substantially less speech-restrictive measures can protect the same interests, dismissal was inappropriate.

## III. Plaintiffs' free-association claim independently states a claim for relief.

The opening brief explained that Plaintiffs' free-association claim provides an independent reason to reverse. Even if New York may generally reserve individualized legal advice to licensed lawyers, that does not answer whether a nonprofit organization and the people it serves may band together to exchange limited information needed to vindicate legal rights. Opening Br. 49–51. The State responds that the UPL laws do not regulate Upsolve's membership or internal structure; that *NAACP v. Button* and related cases involved licensed lawyers; that nonprofit status and access-to-courts goals do not change the analysis; and that Plaintiffs' theory would let any unpaid nonlawyer "bootstrap" a right to practice law. Resp. Br. 58–60. Those arguments define the associational interest too narrowly.

The right of association is not limited to laws regulating membership rolls or internal governance. It protects association "for the purpose of engaging in those activities protected by the First Amendment." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 618 (1984). Here, the collective activity around which the American Justice Movement is organized is speech and petition aimed at helping people vindicate legal rights. The State

cannot answer that claim simply by observing that Upsolve remains free to exist as an organization.

That is the point of *NAACP v. Button*. Virginia invoked its solicitation and unauthorized-practice rules against the NAACP's program for identifying civil-rights plaintiffs and helping them obtain legal representation. 371 U.S. 415, 419–23 (1963). The Supreme Court held that the First Amendment protected the cooperative activity through which the organization and its members sought to vindicate legal rights. *Id.* at 428–39. The State is correct that licensed lawyers participated in that program. Resp. Br. 58–60. But *Button* did not announce a rule that association matters only after every participant already holds the relevant occupational license. It expressly noted the threat Virginia's UPL laws posed not only to "[l]awyers on the [NAACP's] legal staff," but also to "mere NAACP members or sympathizers" who might hesitate to "acquaint persons with what they believe to be their legal rights and advise them to assert their rights by commencing or further prosecuting a suit." 371 U.S. at 434–35 (cleaned up).

The State is also right that nonprofit status was not sufficient by itself in *Button*, but wrong to treat the program's noncommercial char-

acter as irrelevant. *Button* expressly relied on the absence of "pecuniary gain" in assessing the State's asserted conflict concerns. *Id.* at 441–43. And *Capital Associated Industries v. Stein* (*CAI*) confirms why that distinction matters. There, a trade association wanted to employ lawyers and provide legal services to its employer-members, including some services for hourly fees. 922 F.3d 198, 202–03 (4th Cir. 2019). Calling the associational question "admittedly close," the Fourth Circuit distinguished *Button* because *CAI*'s proposal served commercial ends, its members already had access to lawyers and therefore did not need the arrangement to reach the courts, and its corporate structure raised ethical concerns about nonlawyer control and conflicts. *Id.* at 203, 206. Those considerations point the other way here: Upsolve is a nonprofit access-to-justice organization; its program exists because the low-income defendants it serves often cannot obtain counsel; and Justice Advocates do not control litigation, hold client funds, enter appearances, or claim to replace counsel. J.A. 21–37, 52–64.

The State therefore gains little by observing that Upsolve remains free to connect people with licensed attorneys. Resp. Br. 59–60. The complaint alleges that those attorneys often are not practically availa-

ble. J.A. 21–33. At minimum, *Button* and *CAI* make the associational question one that cannot be dismissed by relabeling Plaintiffs' collective First Amendment activity "unlicensed law practice." The complaint plausibly alleges the features those cases treat as constitutionally significant: nonprofit collective activity, protected speech and petition, and meaningful access to courts. Dismissal was therefore error.

## CONCLUSION

The judgment should be reversed and the case remanded for further proceedings.

Dated: August 17, 2026

Respectfully submitted,

*/s/ Robert J. McNamara*
Robert J. McNamara
Elizabeth L. Sanz
Paul M. Sherman
INSTITUTE FOR JUSTICE
901 North Glebe Road, Suite 900
Arlington, Virginia 22203
(703) 682-9320
rmcnamara@ij.org; bsanz@ij.org;
psherman@ij.org

*Counsel for Plaintiffs-Appellants*

**CERTIFICATE OF COMPLIANCE**

This reply brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) and Local Rule 32.1(a)(4)(B) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), it contains 6,503 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)–(6) because it was prepared using Word for Microsoft 365 in Century Schoolbook 14-point font, a proportionally spaced typeface.

Dated: August 17, 2026

*/s/ Robert J. McNamara*
Robert J. McNamara
*Counsel for Plaintiffs- Appellants*